**IN THE NITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| In re: | : | Case No.: 25-12226 |
| CTL-AEROSPACE, INC., | : | Chapter 11 |
| Debtor-In-Possession. | : | Judge Beth A. Buchanan |

---

**DECLARATION OF SCOTT CRISLIP**
**IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

---

I, Scott Crislip, pursuant to 28 U.S.C. § 1746 hereby declare under penalty of perjury that the following is true and correct:

1.      I am the President and Chief Operations Officer of CTL-Aerospace, Inc., the debtor and debtor-in-possession in this case (the "Debtor"). I submit this declaration to provide the Court with an overview of the Debtor, the events that have led to the filing of this case, the Debtor's objectives in the case, and to support the first day relief requested by the Debtor. This Declaration is being filed on the same date that a petition for relief under Chapter 11 is filed by the Debtor (the "Petition Date").

2.      The Debtor is headquartered in Cincinnati, Ohio and operates out of a campus of four leased buildings where all hard assets of the Debtor are located. All operations are located in Butler County and the Debtor employs over 290 workers from this region. The Debtor has two main lines of work; to wit: (1) tier-2 OEM build-to-print manufacturing for items used in engines and aircraft bodies in the aerospace and defense industries, from which the Debtor earns 80 – 90% of its total revenue, and (2) repair and maintenance services, which accounts for the other 10 – 20% of total revenue. The Debtor holds numerous certifications and accreditations, including AS-9100D and ISO 9001, International Traffic in Arms and Export Administration Regulations

1

compliant and accreditation from National Aerospace and Defense Contractors Accreditation Program for AC7118-Composites, AC7122/1, AC7122/2, and AC7122-P – Non-Metallic Testing. The Debtor's tier-2 OEM customers consist of large-cap customers and international customers. In 2024, the Debtor manufactured products for 17 customers with 70% of its sales to its two largest customers.

3.      The Debtor was founded in Cincinnati, Ohio in 1948 and was originally named "Cincinnati Testing Labs." The Debtor was acquired by James Irwin and given its current name in 1983. In 2019, following the passing of James Irwin, John Irwin took over as CEO. John Irwin holds a degree in Business Administration and grew up working in the business, holding multiple positions within the Debtor's operations prior to becoming the CEO in 2019. I was hired by the Debtor in 2021, initially as Vice President of Sales and then in 2023, my role expanded to COO and President. I have over 40 years of experience in military (retired from the USAF as a Colonel) and commercial aerospace engineering, including with GE Engine Services as leader of Military Services and with Rolls Royce as president of the Helicopter Engines Division. The Debtor's Chief Financial Officer is Ben McNary, who joined the Debtor as Director of Finance in August of 2024 and was promoted to CFO in October of 2024. Ben still holds an active CPA license and was an audit manager at Deloitte & Touche before gaining 20 years of experience in Controller and Director of Finance roles within the manufacturing industry.

4.      The current ownership of the Debtor consists of 5 class A voting shares held by the Sue Irwin Trust FBO John C. Irwin, which is controlled by John Irwin (the Debtor's CEO), and 395 class B non-voting shares, which are owned between ten family trusts established by Sue Irwin and James C. Irwin for the benefit of John C. Irwin, Kimberly Ann Berry, James T. Irwin, David M. Irwin, and Karen B. Luce.

## EVENTS LEADING TO BANKRUPTCY FILING

5.     The largest bulk of the Debtor's business (80-90%) is from its manufacturing division, which operates as a build-to-print shop.  As a build-to-print shop, the Debtor is obligated to use the materials and supplier for materials as directed by the Debtor's customer.  The expenses associated with the material costs, labor, tooling, etc. are built into the Debtor's quotes and the Debtor targets a 20-25% margin on new projects (which estimated margin does not account for indirect manufacturing expenses).  The Debtors' sales have been and continue to be strong.  In 2022, the Debor had $54 Million in sales, which increased in 2023 to $71 Million (for net income/profit of $983,000).  For 2024, the Debtors' sales stayed relatively flat ($70 Million), but the net income for 2024 was negative (a loss of $2.1 Million) due to manufacturing challenges in two separate materials lines.  The Debtor had two separate sole source suppliers provide raw materials that did not adhere to the specifications for the materials, which resulted in down time, low first-pass yield rates, high scrap rates, and, as such, increased expenses to supply product to their customers.  In essence, the adage of "garbage in, garbage out" hurt the company's bottom line and created chaos at an unprecedented level that the Debtor struggled to manage.  The raw material quality challenges have been resolved, but the economic impact of those struggles pushed the Debtor into a difficult situation with its primary lender, Wells Fargo.

6.     The Debtor's primary lender is Wells Fargo.  Wells Fargo has two loans with the Debtor – a term loan and an operating line on which the Debtor draws for operations in accordance with limitations of its borrowing base.  Aside from some factoring arrangements (further discussed below), all funds received by the Debtor are deposited into an account at Wells Fargo.  Upon receipt, the funds are swept and applied to the operating line and funds are made available to the Debtor for operations based upon line availability with reference to its borrowing base.  Due to the

financial distress brought on by the raw material quality challenges, the Debtor began working with Focus Management Group ("Focus") – a turnaround consultant recommended by Wells Fargo on June 1, 2025. Thereafter a forbearance agreement was executed with Wells Fargo, which required the Debtor to obtain certain financing with requirements acceptable by Wells Fargo by August 19, 2025. Since the Debtor has been in financial distress, the Debtor has not had sufficient access to cash to continue its operations in a profitable manner. The Debtor has resorted to receiving pre-payments / deposits from certain customers (customers that have an understanding of the Debtor's economic condition, but rely upon the Debtor's production of products) to try to meet its needs. Although the Debtor diligently worked with Focus and also sought out financing in addition to the efforts directed by Focus, the Debtor was not successful in obtaining the replacement financing it sought (or additional capital infusion, or a competitive buy out of the business) and, as such, the Debtor defaulted on the forbearance agreement by lapse of time.

7. Throughout the term of its default with Wells Fargo, Wells Fargo has further restricted the percentage distributions available and/or the identification of eligible values for advancement under its loan. Further, a customer deposit received on September 4, 2025 in excess of $2 Million was expected to be made available to the Debtor for use in purchasing materials and in funding payroll (discussed further below), after the deposit was received, Wells Fargo swept the funds and applied those funds to its debt and did not make a meaningful amount of funds available for the Debtor to use in its operations. The Debtor was instructed to prepare a new forecast, projecting a 40% work force decrease starting on September 10, 2025. I believe taking action to cut that much of the work force would (1) impair the viability of the company as a going concern

to entice potential investors, lenders, or buyers, (2) create substantial WARN Act liability[1] for the company, which would further dilute the value of the business and its ability to pay its general unsecured creditors, and (3) trigger remaining employees to begin seeking out alternative employment.

8.      Despite the current financial difficulties of the Debtor, the business has a strong customer base and supplies products that are difficult (if not currently impossible) for its customers to move to an alternative supplier.  According to research prepared by Focus, the Debtor's industry anticipates a 3.1% compound annual growth rate over the next five years, which is due, in part, to high levels of open order backlogs identified by customers of the Debtor.  As such, we expect the Debtor will have continued and increasing orders from customers as they work to fulfill their current backlogs.  The forecast for 2025 estimates $66 Million in sales for the year.  While the limitations on the Debtors operations caused by limitations on access to funds (to buy materials and pay employees) have hampered the Debtors' operations, the bankruptcy case has been filed to preserve value and operations, to ensure the Debtor is able to more meaningfully supply product to its customers, and to save the jobs of its workforce.

9.      In advance of its bankruptcy case filing, there was a layoff of 14 employees, which was a targeted reduction to the workforce, to reduce redundancies and reduce overhead.  Further layoffs are not anticipated at this time.

### EMPLOYEE WAGE AND BENEFITS MOTION

10.      The Debtor seeks entry of an order authorizing, but not directing, the Debtor to: (a) pay prepetition wages, salaries, reimbursable Employee (as defined below) expenses, and other

---

[1] WARN Act liability may be in an amount of back pay and benefits for each affected employee for each day of the violation up to a maximum of 60 days, plus $500 for each day the Deb tor fails to provide proper notice to the local government, and reasonable attorney's fees and court costs for workers who successfully sue the employer.

compensation in the ordinary course of business on a post-petition basis and in a manner consistent with pre-petition policies and (b) employee benefits in the form of continuing to fund self-insured health insurance for employees who have "opted in" to such coverage.

11.     Debtor employs approximately 293 individuals (collectively, the "Employees"). As of the Petition Date, certain prepetition salary, wage and benefits obligations (the "Salary and Wage Obligations") will have accrued and remain unpaid (the "Unpaid Salary/Wages") given the Debtor's historical payroll cycle.

12.     The Debtor has historically used Paycor, Inc. as its payroll service provider and intends to continue to do so.  The Debtor has a bi-weekly payroll cycle for hourly employees for which it pays one week behind and a bi-monthly payroll cycle for salary employees, which pays for income earned through the date of distribution.  The post-bankruptcy payroll distributions that will have pay relating to the pre-petition periods include:

    a.  For the bi-weekly payroll cycle/hourly employees: the payroll cycle to be funded on September 10, 2025 for distribution on September 12, 2025 will all relate to pre-petition periods and the next payroll cycle to be funded September 24, 2025 and to be distributed on September 26, 2025, which will include any work performed over the weekend prior to the filing of this bankruptcy case.

    b.  For the bi-monthly payroll cycle/salary employees: the payroll cycle to be funded on September 12, 2025 for distribution on September 15, 2025 will relate partially to pre-petition periods and partially to post-petition periods.

The total wages to be funded on September 10th and September 12th is approximately $760,000. No single employee (salary or hourly) has accrued $17,150 in wages as of the Petition Date.  The most highly compensated employee is owed $12,832.21 to be paid in the next payroll cycle.  That

6

most highly compensated employee is on a salary basis and, as such, that pay covers from September 1, 2025 through September 15, 2025, so that only about half (or less than $6,500) of the $12,832.21 accrued pre-petition (and the other half accrued post-petition), which is far below the $17,150 threshold for priority wage claims.

13.     Pursuant to the motion relating to wages, the Debtor seeks authority to continue to pay salary and wage obligations in the ordinary course of business on a post-petition basis, including reimbursement of expenses and funding of all employee benefits, subject to a total limit for all pre-petition portion of wages, reimbursement and employee benefits at or below the maximum for priority wage payments (of $17,150).

14.     As to employee benefits, the Debtor is self-insured for healthcare coverage, which self-insured program is administered by Anthem.  Historically, the Debtor has approximately $60,000 deducted once per week to fund claims and once per year a true up is performed, which has historically been close to break-even.

15.     The Employees are critical to the success of the Debtor's operation and to facilitate any potential post-petition reorganization or sale of operations at the highest possible values. Failure to satisfy the Debtor's obligations with respect to their Employees in the ordinary course of business during this Chapter 11 case will jeopardize Employee loyalty and trust, possibly causing Employees to seek alternative employment and disrupting the Debtor's operations.

16.     In addition, the Employees rely on their compensation, benefits, and reimbursement of expenses to pay their personal living expenses and the effect could be financially devastating if the Debtor does not pay them in the ordinary course of business.  Based on the foregoing, I believe that the relief requested in the Employee Wages and Benefits Motion is in the best interests of the Debtor, its estate and all parties in interest and should be approved.

**UTILITIES MOTION**

17.    The Debtor seeks entry of an interim and final order; (a) determining that the Utility Providers (as defined below) have been provided with adequate assurance of payment within the meaning of Section 366 of the Bankruptcy Code; (b) approving the Proposed Adequate Assurance (as defined below); (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Proposed Adequate Assurance; and (d) determining the Debtor is not required to provide additional adequate assurance.

18.    The Debtor in connection with its operation of its business, incurs utility expenses for gas, electricity, telephone/cellphones, internet/connectivity, trash/waste disposal, recycling, water and sewer services (the "Utility Services") in the ordinary course of business from utility providers for its locations (the "Utility Providers"). The Utility Providers that deliver Utility Services to the Debtor and the estimated average monthly expenses relating to each are as follows:

| Utility Provider Name | Average Monthly Utility Usage |
|---|---|
| Duke Energy | $56,835 |
| Direct Energy | $51,929 |
| Constellation Newenergy | $3,108 |
| NRG Business Marketing | $2,950 |
| Greater Cincinnati Water Works | $1,500 |
| Butler County Water and Sewer | $302 |
| **TOTAL** | **$116,624.00** |

19.    The Debtor's last payments to Duke Energy and Direct Energy were paid on July 14, 2025. The Debtor intends to pay post-petition obligations owed to the Utility Providers in the ordinary course of business. The Debtor expects that cash from operations will be sufficient to pay post-petition obligations related to the Utility Services. Upon request by any Utility Provider,

the Debtor proposes to make a deposit (the "Adequate Assurance Deposit"). The amount of the Adequate Assurance Deposit would equal the estimated aggregate amount for one-half of the average monthly amount of Utility Services for any requesting Utility Providers.

20.    The Adequate Assurance Deposit will be held by Utility Providers during the pendency of the Chapter 11 case. The Debtor submits that the Adequate Assurance Deposit, in conjunction with the Debtor's ability to pay for future Utility Services in the ordinary course of business (together, the "Proposed Adequate Assurance") constitutes sufficient adequate assurance.

21.    If, however, a Utility Provider believes additional adequate assurance is required, the Debtor proposes that such Utility Provider may request additional adequate assurance in accordance with the procedure set forth in the Utility Motion. Uninterrupted Utility Services are essential to the Debtor's ongoing operation, and any disruption in Utility Services would harm the Debtor's operations, revenues and cash flows, to the detriment of the Debtor's reorganization effort and, ultimately, of recoveries to creditors.

22.    Based on the foregoing, I believe that the relief requested in the Utilities Motion is in the best interests of the Debtor, its estate, and all parties in interest and should be approved.

## CASH COLLATERAL MOTION

23.    The Debtor seeks the entry of an order authorizing the Debtor to use its cash collateral.  It is imperative that the Debtor obtains authority to use cash collateral to continue funding its necessary business expenses and to fund the costs associated with the administration of the case, including the funding of payroll, employee benefits, utilities, and material purchase expenses.

24.    To accomplish this goal, however, the Debtor will require the use of cash collateral, which appears to be subject only to the liens of Wells Fargo and no other liens.  The Debtor does

have a factoring relationship with MUFG Bank, Ltd. ("MUFG") whereby MUFG will purchase certain receivables owed by General Electric Company, to which Wells Fargo consented. Any receivables purchased by MUFG are immediately taken off of the Debtor's books as an outstanding account receivable and, upon information and belief, the relationship with MUFG is a true purchase of receivables (rather than a secured loan). As such, any receivables previously sold to MUFG are excluded from the Debtor's books, not available to the Debtor and not subject to any collateralized position of Wells Fargo. While other creditors have filed UCC financing statements, a search of the Ohio Secretary of State filings demonstrates that all other liens have been terminated or, in the alternative, relate only to specific equipment (financed through leases).

25.     In addition to having lien rights as to the cash collateral of the Debtor, Wells Fargo also has a security interest in the Debtor's goods, equipment, inventory, general intangibles and other assets. Attached hereto as Exhibit A is a true and accurate copy of the Security Agreement whereby the Debtor pledged collateral to Wells Fargo, which secures all loans made by Wells Fargo to the Debtor and, essentially takes a lien position as to all assets of the Debtor (subject to very few exclusions, identified as "Excluded Property" defined on page 2 of Exhibit "A"). Wells Fargo perfected its security interest by filing a UCC Financing Statement in the form attached hereto as Exhibit "B."

26.     As referenced, above, Wells Fargo made advances on loans through a term loan position and a revolving loan position. Wells Fargo is owed approximately **$15,136,810**, made up of approximately $3.7 Million on the term loan position and $11.3 Million on the revolving loan position.

27.     The value of the collateral by which Wells Fargo's loans are secured is summarized as follows:

| Asset Description | Estimated Value |
|---|---|
| Collectible Accounts Receivable (exclusive of $1,233,700 in potentially uncollectible accounts) | $5,786,700 |
| Equipment | $4,427,000 - $5,131,000 [2] |
| Inventory (including finished goods, raw materials, WIP, and aged inventory) | $7,076,000 - $14,050,000[3] |
| **Total Value** | **$17,289,700 - $24,967,700** |

As such, even at a forced liquidation value, Wells Fargo is over-secured and the risk to Wells Fargo from the Debtor's use of the cash collateral is limited. Further, the purpose of the bankruptcy case is to permit the Debtor to maximize the value of its assets and not to pursue a forced liquidation sale. As such, I believe the higher end of the values to be attainable through the bankruptcy case.

28.    Now that the Debtor's issues with raw material issues have been resolved, the Debtor anticipates its contracts will result in profits (as operations have historically resulted in profits). In the event of a sale through the bankruptcy case, the Debtor intends to pursue sale of the Debtor's entire operations as a going concern, which will result in much more than an orderly liquidation value. Also, through operations, the Debtor will generate more accounts receivable.

29.    The Debtor commenced this case with the goal of pursuing a restructuring of its secured and unsecured debt or, in the alternative, to continue operations to maximize the profitability of the Debtor and move through an organized process to sell the business as a going concern in such a manner that provides maximum return to its creditor constituents while limiting job loss for employees.

---

[2] The values provided are derived from an appraisal of the Debtors' equipment with an effective date of June 26, 2025, with the low end of the value being the Forced Liquidation Value and the high end of the value being the Orderly Liquidation Value.

[3] The values provided are derived from an appraisal of the Debtors' inventory with an effective date of May 31, 2025 with each number providing for a Net Orderly Liquidation Value and the low end of the range being the value of the inventory classes without conversion (i.e. "as-is") and the higher end of the value range being the value of the inventory classes with conversion (i.e. with the inventory in process and raw materials being completed into finished goods). I believe the value of the inventory has remained relatively stable since the effective date of May 31, 2025.

30.     To accomplish this goal, however, the Debtor will require the use of cash collateral, which is vital for the Debtor to be able to fund payroll, which must be funded starting on September 10, 2025, and to fund other operations, including post-petition material acquisition, utilities, etc. The Debtor has prepared a budget for the interim use of cash collateral, a true copy of which is attached to the motion regarding use of cash collateral.  I believe that the proposed budget, which is proposed to act as a limit to the use of cash collateral, provides for reasonable expenditure of funds to maintain value in the operations of the Debtor.

31.     I believe that the relief requested in the Cash Collateral Motion is in the best interests of the Debtor, its estate and all parties in interest and should be approved.  The budget attached to the motion seeking authority to use cash collateral identifies payment of only the necessary expenses to protect the Debtor's business operations and the value of its assets for the benefit of all creditors.

32.     Without the use of the cash collateral, the Debtor would be required to terminate all business operations immediately, which would, in turn, result in the loss of employee's jobs and value of ongoing operations.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Scott Crislip*

_____
Scott Crislip

SECURITY AGREEMENT

by and among

WELLS FARGO BANK, NATIONAL ASSOCIATION
as Secured Party

and

CTL-AEROSPACE, INC.,
CTL-AEROSPACE NEVADA, INC.,

as Grantors

EXHIBIT A

## Table of Contents

<b>Page</b>

ARTICLE 1. Definitions and Construction ................................................................. 1

    Section 1.1.    Definitions ................................................................................. 1
    Section 1.2.    Construction ............................................................................. 4
    Section 1.3.    Schedules ................................................................................. 5
    Section 1.4.    Relation to Other Loan Documents ......................................... 5

ARTICLE 2. Grant of Security and Secured Obligations. ............................................ 5

    Section 2.1.    Grant of Security Interest ........................................................ 5
    Section 2.2.    Grantors Remain Liable .......................................................... 6

ARTICLE 3. Representations and Warranties. ............................................................. 6

    Section 3.1.    Chief Executive Office; Name; Jurisdiction of Organization, Etc ............................... 6
    Section 3.2.    Commercial Tort Claims .......................................................... 6
    Section 3.3.    Deposit Accounts; Securities Accounts ..................................... 6
    Section 3.4.    Real Property ........................................................................... 6
    Section 3.5.    Intellectual Property. ............................................................... 6
    Section 3.6.    Valid and Perfected Security Interest ....................................... 7
    Section 3.7.    Pledged Interests. ..................................................................... 7
    Section 3.8.    Locations of Inventory and Equipment .................................... 8
    Section 3.9.    No Conflicts; Consents ............................................................ 8

ARTICLE 4. Covenants. ............................................................................................ 8

    Section 4.1.    Possession of Collateral .......................................................... 8
    Section 4.2.    Chattel Paper .......................................................................... 9
    Section 4.3.    Control Agreements ................................................................. 9
    Section 4.4.    Letter-of-Credit Rights ............................................................ 9
    Section 4.5.    Commercial Tort Claims .......................................................... 9
    Section 4.6.    Intellectual Property. ............................................................... 9
    Section 4.7.    Investment Property ................................................................. 10
    Section 4.8.    Real Property; Fixtures ............................................................ 10
    Section 4.9.    Name, Etc. ............................................................................... 11
    Section 4.10.    Account Verification .............................................................. 11
    Section 4.11.    Insurance ............................................................................... 11
    Section 4.12.    Locations of Inventory and Equipment .................................. 11

ARTICLE 5. Further Assurances. ............................................................................... 12

    Section 5.1.    General ..................................................................................... 12
    Section 5.2.    Authorization to File Financing Statements, Etc. ................... 12
    Section 5.3.    Secured Party May Perform; Secured Party's Duties ............... 12

ARTICLE 6. Remedies. ............................................................................................. 12

    Section 6.1.    General ..................................................................................... 12
    Section 6.2.    License for Intellectual Property .............................................. 13
    Section 6.3.    Deposit Accounts and Securities Accounts .............................. 13
    Section 6.4.    Investment Property ................................................................. 13
    Section 6.5.    Deficiency ............................................................................... 13
    Section 6.6.    Possession; Receiver ............................................................... 14

Section 6.7.    Secured Party's Right to Perform Contracts, Exercise Rights, Etc ............................. 14
Section 6.8.    Secured Party Appointed Attorney-in-Fact. ................................................. 14
Section 6.9.    Voting and Other Rights in Respect of Pledged Interests. ............................. 15
Section 6.10.   Disposition of Pledged Interests by Secured Party ...................................... 15
Section 6.11.   Collection of Accounts, General Intangibles and Negotiable Collateral ..................... 15
Section 6.12.   Remedies Cumulative ................................................................. 15
Section 6.13.   Marshaling ........................................................................... 16
Section 6.14.   Expenses ............................................................................. 16

ARTICLE 7. Continuing Security Interest:  Assignments under Credit Agreements. ............................ 16

Section 7.1.    Continuing Security Interest; No Waiver ............................................... 16
Section 7.2.    Reinstatement ........................................................................ 16

ARTICLE 8. CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER, ETC. ................................. 17

Section 8.1.    GOVERNING LAW .................................................................... 17
Section 8.2.    FORUM NON CONVENIENS ........................................................ 17
Section 8.3.    WAIVER OF JURY TRIAL ............................................................ 17
Section 8.4.    SUBMISSION TO JURISDICTION .................................................... 17
Section 8.5.    WAIVER OF CLAIMS ................................................................. 18

ARTICLE 9. Miscellaneous ................................................................................ 18

Section 9.1.    Survival .............................................................................. 18
Section 9.2.    Merger, Amendments; Etc ............................................................. 18
Section 9.3.    Addresses for Notices ................................................................. 18
Section 9.4.    Counterparts .......................................................................... 18
Section 9.5.    Effectiveness; Severability; Section Headings .......................................... 18

## Schedules

Schedule 1          Chief Executive Office, Jurisdiction of Organization, Etc.
Schedule 2          Commercial Tort Claims
Schedule 3          Deposit Accounts; Securities Accounts
Schedule 4          Real Property
Schedule 5          Copyrights, Patents, Trademarks and Intellectual Property Licenses
Schedule 6          Pledged Interests
Schedule 7          Locations of Inventory and Equipment

## SECURITY AGREEMENT

This **SECURITY AGREEMENT** (this "Agreement") is entered into as of May 4, 2023, by and among CTL-AEROSPACE, INC., an Ohio corporation ("CTLA", and together with any entity that may hereafter become party to either Credit Agreement as a Borrower, individually, a "Borrower" and collectively, "Borrowers"), CTL-AEROSPACE NEVADA, INC., a Nevada corporation ("CTLN", and together with any entity that may hereafter become party to either Credit Agreement as a Guarantor, individually, a "Guarantor" and collectively, "Guarantors," and together with Borrowers, individually, a "Grantor" and collectively, "Grantors") and Wells Fargo Bank, National Association ("Secured Party").

W I T N E S S E T H:

WHEREAS, Secured Party has agreed to make certain financial accommodations available to Borrowers from time to time pursuant to the terms and conditions of the Credit Agreement, dated of even date herewith, by and among Secured Party and Grantors (the "Domestic Credit Agreement") and pursuant to the terms and conditions of the EXIM Guaranteed Credit Agreement, dated of even date herewith, by and among Secured Party and Grantors (the "EXIM Credit agreement," and together with the Domestic Credit Agreement, collectively the "Credit Agreements"); and

WHEREAS, in order to induce Secured Party to enter into the Loan Documents, and to provide financial accommodations to Borrowers as set forth in the Loan Documents, each Grantor has agreed to (a) guaranty the Obligations of Borrowers (or in the case of a Borrower, the Obligations of the other Borrowers), and (b) grant to Secured Party a continuing security interest in and to the Collateral in order to secure the prompt and complete payment, observance and performance of the Secured Obligations; and

WHEREAS, as a result of its relationship with the other Grantors, each Grantor will receive substantial benefits from the financial accommodations provided by Secured Party to Borrowers.

NOW, THEREFORE, for and in consideration of the recitals made above and other good and valuable consideration, the receipt, sufficiency and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1.
## DEFINITIONS AND CONSTRUCTION

**Section 1.1.    Definitions**.  As used in this Agreement, the following terms shall have the following definitions:

"Agreement" means this Security Agreement.

"Borrower" and "Borrowers" have the respective meanings set forth in the preamble to this Agreement.

"Collateral" has the meaning set forth in Section 2.1ARTICLE 2.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), and any successor statute.

"Copyright Security Agreement" means each Copyright Security Agreement between any Grantor and Secured Party.

"Copyrights" means any and all rights in any works of authorship, including (a) copyrights and moral rights, (b) copyright registrations and recordings thereof and all applications in connection therewith

including those listed on Schedule 5, (c) income, license fees, royalties, damages, and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past, present, or future infringements thereof, (d) the right to sue for past, present, and future infringements thereof, and (e) all of each Grantor's rights corresponding thereto throughout the world.

"Credit Agreements" has the meaning set forth in the recitals to this Agreement.

"Excluded Accounts" means deposit accounts that are specifically and exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of any Grantor's employees.

"Excluded Property" means:

(a) any rights or interest in any contract, lease, permit, license, or license agreement covering real or personal property of any Grantor if under the terms of such contract, lease, permit, license, or license agreement, or applicable law with respect thereto, the grant of a security interest therein is prohibited as a matter of law or under the terms of such contract, lease, permit, license, or license agreement and such prohibition or restriction has not been waived or the consent of the other party to such contract, lease, permit, license, or license agreement has not been obtained, provided, that, (i) the foregoing exclusions of this clause (a) shall in no way be construed (A) to apply to the extent that any such prohibition or restriction is ineffective under Section 9-406, 9-407, 9-408, or 9-409 of the UCC or other applicable law, or (B) to apply to the extent that any consent or waiver has been obtained that would permit Secured Party's security interest to attach notwithstanding the prohibition or restriction on the pledge of such contract, lease, permit, license, or license agreement and (ii) the exclusions in this clause (a) shall in no way be construed to limit, impair, or otherwise affect the continuing security interests of Secured Party upon any rights or interests of any Grantor in or to (1) monies due or to become due under or in connection with any described contract, lease, permit, license, license agreement, or Equity Interests (including any accounts or Equity Interests), or (2) any proceeds from the sale, license, lease, or other dispositions of any such contract, lease, permit, license, license agreement, or Equity Interests;

(b) any United States intent-to-use trademark applications to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark applications under applicable Federal law; provided, that, upon submission and acceptance by the United States Patent and Trademark Office of an amendment to allege use pursuant to 15 U.S.C. Section 1060(a), such intent-to-use trademark application shall cease to be Excluded Property and shall be considered Collateral;

(c) motor vehicles or other equipment subject to a certificate of title statute;

(d) Excluded Accounts; and

(e) any leasehold interests in Real Property.

"Grantor" and "Grantors" have the respective meanings set forth in the preamble to this Agreement.

"Guarantor" means each Grantor, and in the case of any Grantor that is a Borrower, such Borrower with respect to the Obligations of the other Borrowers guaranteed by such Borrower.

"Intellectual Property" means any and all Patents, Copyrights, Trademarks, trade names, trade secrets, know-how, inventions (whether or not patentable), algorithms, software programs (including source code and object code), processes, product designs, industrial designs, blueprints, drawings, data,

2

customer lists, URLs and domain names, specifications, documentations, reports, catalogs, literature, advertising matter, and any other forms of technology or proprietary information of any kind, including all rights therein and all applications for registration or registrations thereof.

"Intellectual Property Licenses" means, with respect to any Person (as used in this definition, the "Specified Party"), (a) any licenses or other similar rights provided to the Specified Party in or with respect to Intellectual Property owned or controlled by any other Person, and (b) any licenses or other similar rights provided to any other Person in or with respect to Intellectual Property owned or controlled by the Specified Party, in each case, including (i) any software license agreements (other than license agreements for commercially available off-the-shelf software that is generally available to the public which have been licensed to a Grantor pursuant to end-user licenses), (ii) the license agreements listed on Schedule 5, and (iii) the right to use any of the licenses or other similar rights described in this definition in connection with the enforcement of Secured Party's rights under the Loan Documents.

"Investment Property" means (a) any and all investment property (as that term is defined in the UCC), and (b) any and all of Pledged Interests and rights under Pledged Operating Agreements (regardless of whether classified as investment property under the UCC).

"Negotiable Collateral" means letters of credit, letter-of-credit rights, instruments, promissory notes, drafts and documents.

"Obligations" means collectively the Obligations defined in the Domestic Credit Agreement and the EXIM Credit Agreement.

"Patent Security Agreement" means each Patent Security Agreement between any Grantor and Secured Party.

"Patents" means patents and patent applications, including (a) the patents and patent applications listed on Schedule 5, (b) all continuations, divisionals, continuations-in-part, re-examinations, reissues, and renewals thereof and improvements thereon, (c) all income, royalties, damages and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past, present, or future infringements thereof, (d) the right to sue for past, present, and future infringements thereof, and (e) all of each Grantor's rights corresponding thereto throughout the world.

"Pledged Company" means each Person listed on Schedule 6, together with each other Person, all or a portion of whose Equity Interests are acquired or otherwise owned by a Grantor after the Closing Date.

"Pledged Interests" means all of each Grantor's right, title and interest in and to all of the Equity Interests now owned or hereafter acquired by such Grantor, regardless of class or designation, including in each Pledged Company, and all substitutions therefor and replacements thereof, all proceeds thereof and all rights relating thereto, also including any certificates representing the Equity Interests, the right to receive any certificates representing any of the Equity Interests, all warrants, options, share appreciation rights and other rights, contractual or otherwise, in respect thereof and the right to receive all dividends, distributions of income, profits, surplus, or other compensation by way of income or liquidating distributions, in cash or in kind, and all cash, instruments, and other property from time to time received, receivable, or otherwise distributed in respect of or in addition to, in substitution of, on account of, or in exchange for any or all of the foregoing.

"Pledged Interests Addendum" means a Pledged Interests Addendum substantially in the form of Exhibit A.

3

"Pledged Operating Agreements" means the limited liability company operating agreements of each Pledged Company that is a limited liability company and the partnership agreements of each Pledged Company that is a partnership.

"Secured Obligations"  means each and all of the following:  (a) the Obligations (including any Bank Product Obligations) now or hereafter existing, whether for principal, interest (including any interest that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), fees, Lender Expenses (including any fees or expenses that accrue after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding), or otherwise, and (b) any and all expenses (including reasonable counsel fees and expenses) incurred by Secured Party in enforcing any rights under any Loan Document.  Without limiting the generality of the foregoing, Secured Obligations shall include all amounts that constitute part of the Secured Obligations and would be owed by any Grantor to Secured Party but for the fact that they are unenforceable or not allowable, including due to the existence of a bankruptcy, reorganization, other Insolvency Proceeding or similar proceeding involving any Grantor or any other Person; provided that, notwithstanding anything to the contrary contained herein, the Secured Obligations shall exclude any Excluded Swap Obligation.

"Secured Party" means Wells Fargo Bank, National Association, individually, and whether as Lender, the issuer or confirming bank with respect to any Letter of Credit, provider of Bank Products or otherwise and in its capacity as agent for any affiliate of Wells Fargo Bank, National Association that is at any time owed any Bank Product Obligations, which affiliates shall be deemed hereby to have appointed Wells Fargo Bank, National Association as agent for purposes of the security interests granted hereunder.

"Threshold Amount" means $100,000.

"Trademark Security Agreement" means each Trademark Security Agreement between any Grantor and Secured Party.

"Trademarks" means any and all trademarks, trade names, registered trademarks, trademark applications, service marks, registered service marks and service mark applications, including (a) the trade names, registered trademarks, trademark applications, registered service marks and service mark applications listed on Schedule 5, (b) all renewals thereof, (c) all income, royalties, damages and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past or future infringements or dilutions thereof, (d) the right to sue for past, present and future infringements and dilutions thereof, (e) the goodwill of each Grantor's business symbolized by the foregoing or connected therewith, and (f) all of each Grantor's rights corresponding thereto throughout the world.

"UCC" means the Illinois Uniform Commercial Code, as in effect from time to time; provided, that, in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection, priority, or remedies with respect to Secured Party's Lien on any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of Illinois, the term "UCC" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority, or remedies.

Section 1.2.    Construction.  Capitalized terms used but not otherwise defined herein (including in the preamble and recitals hereof) that are defined in the Credit Agreements shall have the collective meanings given to them in the Credit Agreements.  Unless otherwise defined herein or in the Credit Agreements, capitalized terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC.  The rules of interpretation specified in the Domestic Credit Agreement (including

Sections 1.2, 1.3, 1.4, 1.5 and 1.6 thereof) shall be applicable to this Agreement. All references in this Agreement to Sections are references to Sections of this Agreement unless otherwise specified. Each reference herein to any right granted to, benefit conferred upon or power exercisable by the "Secured Party" shall be a reference to Secured Party, for the benefit of itself, as Lender, the issuer or confirming bank with respect to any Letter of Credit, provider of Bank Products and each affiliate of Secured Party that is owed any Bank Product Obligations. For purposes of this Agreement, except as may otherwise be specifically provided for herein, any reference to any document or Collateral being delivered "promptly" or action taken "promptly" shall mean as soon as possible, but in any event within five Business Days after the applicable event or request.

Section 1.3.    **Schedules**. Secured Party and each Grantor agree that the schedules hereto and all descriptions of Collateral contained in such schedules and all amendments and supplements thereto are and shall at all times remain a part of this Agreement.

Section 1.4.    **Relation to Other Loan Documents**. In the event of any conflict between any provision in this Agreement and a provision in a Credit Agreement, such provision of such Credit Agreement, as applicable, shall control. The provisions of the Copyright Security Agreements, Trademark Security Agreements, or the Patent Security Agreements are supplemental to the provisions of this Agreement, and nothing contained in the Copyright Security Agreements, Trademark Security Agreements, or the Patent Security Agreements shall limit any of the rights or remedies of Secured Party hereunder. In the event of any conflict between any provision in this Agreement and a provision in any Copyright Security Agreement, Trademark Security Agreement, or the Patent Security Agreement, such provision of this Agreement shall control.

## ARTICLE 2.
## GRANT OF SECURITY AND SECURED OBLIGATIONS.

Section 2.1.    **Grant of Security Interest**. Each Grantor hereby unconditionally grants, assigns as collateral, and pledges to Secured Party to secure the Secured Obligations a continuing security interest in all of such Grantor's right, title, and interest in and to the following, whether now owned or hereafter acquired or arising and wherever located (the "Collateral"):

(a) all accounts;

(b) all goods, including equipment, inventory and fixtures;

(c) all chattel paper;

(d) all commercial tort claims;

(e) all deposit accounts and securities accounts;

(f) all general intangibles, including payment intangibles, Intellectual Property, and Intellectual Property Licenses;

(g) all Investment Property;

(h) all Negotiable Collateral;

(i) all supporting obligations;

(j) all books and records;

5

(k) all of money or other assets of such Grantor that now or hereafter come into the possession, custody, or control of Secured Party (or its designee); and

(l) all proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance or commercial tort claims.

**Section 2.2.    Grantors Remain Liable**.  Notwithstanding anything to the contrary contained herein, (a) each Grantor shall remain liable under the contracts and agreements included in the Collateral, including the Pledged Operating Agreements, to perform all of the duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by Secured Party of any of the rights hereunder shall not release any Grantor from any of its duties or obligations under such contracts and agreements included in the Collateral, and (c) Secured Party shall not have any obligation or liability under such contracts and agreements included in the Collateral by reason of this Agreement, nor shall Secured Party be obligated to perform any of the obligations or duties of any Grantor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.  Until an Event of Default exists, except as otherwise provided in any Loan Document, Grantors shall have the right to possession and enjoyment of the Collateral for the purpose of conducting their respective businesses in the ordinary course, subject to and upon the terms of the Loan Documents.  Without limiting the generality of the foregoing, the record and beneficial ownership of the Pledged Interests, including all voting, consensual, dividend, and distribution rights, shall remain in the applicable Grantor until (i) an Event of Default exists and (ii) Secured Party has notified any Grantor of Secured Party's election to exercise such rights with respect to the Pledged Interests.

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES.

Each Grantor represents and warrants to Secured Party the following:

**Section 3.1.    Chief Executive Office; Name; Jurisdiction of Organization, Etc**.  The name (within the meaning of Section 9-503 of the UCC) and jurisdiction of organization of each Grantor is set forth on Schedule 1, the chief executive office of each Grantor is located at the address indicated on Schedule 1 and each Grantor's tax identification numbers and organizational identification numbers, if any, are identified on Schedule 1, subject in each case to modification in accordance with Section 4.9.

**Section 3.2.    Commercial Tort Claims**.  As of the Closing Date, no Grantor holds any commercial tort claims that exceed $100,000, individually or in the aggregate, except as set forth on Schedule 2.

**Section 3.3.    Deposit Accounts; Securities Accounts**.  Set forth on Schedule 3 is a list of all of the deposit accounts and securities accounts of each Grantor, including, with respect to each bank or securities intermediary (a) the name and address of such Person, (b) the account numbers of the deposit accounts or securities accounts maintained with such Person and (c) the purpose or nature of the deposit account or securities account, subject in each case to the modification of Schedule 3 based on information provided to Secured Party in accordance with Section 5.9 of the Domestic Credit Agreement in the case of deposit accounts or Schedule 5.1 of the Domestic Credit Agreement in the case of securities accounts.

**Section 3.4.    Real Property**.  Schedule 4 sets forth all Real Property owned by any Grantor as of the Closing Date.

**Section 3.5.    Intellectual Property.**

(a)  Set forth on Schedule 5 is a complete and correct list as of the Closing Date of:  (i) all registered Copyrights owned by any Grantor, all applications for registration of Copyrights owned by any Grantor, and all other Copyrights owned by any Grantor and material to the conduct of the business of any Grantor, (ii) all Intellectual Property Licenses to which any Grantor is a party, (iii) all Patents owned by any Grantor and all applications for Patents owned by any Grantor, and (iv) all registered Trademarks owned by any Grantor, all applications for registration of Trademarks owned by any Grantor, and all other Trademarks owned by any Grantor and material to the conduct of the business of any Grantor.

(b)  Each Grantor owns exclusively or holds licenses in all Intellectual Property that are necessary in or material to the conduct of its business.

(c)  To each Grantor's knowledge, in each case except where such  infringement or misappropriation either individually or in the aggregate could not reasonably be expected to have a Material Adverse Effect, (i) no Person has infringed or misappropriated or is currently infringing or misappropriating any Intellectual Property rights owned by such Grantor (ii) such Grantor has never infringed or misappropriated and is not currently infringing or misappropriating any Intellectual Property rights of any Person, (iii) no product manufactured, used, distributed, licensed, or sold by or service provided by such Grantor has ever infringed or misappropriated or is currently infringing or misappropriating any Intellectual Property rights of any Person, and (iv) there are no infringement or misappropriation claims or proceedings pending, or to any Grantor's knowledge, threatened in writing against any Grantor, and no Grantor has received any written notice or other communication of any actual or alleged infringement or misappropriation of any Intellectual Property rights of any Person.

(d)  To each Grantor's knowledge, all registered Copyrights, registered Trademarks, and issued Patents that are owned by such Grantor and necessary in or material to the conduct of its business are valid, subsisting and enforceable and in compliance with all legal requirements, filings, and payments and other actions that are required to maintain such Intellectual Property in full force and effect.

Section 3.6.     **Valid and Perfected Security Interest**. This Agreement creates legal and valid security interests in all of the Collateral in favor of Secured Party, and such security interests constitute perfected and continuing Liens on the Collateral, securing the Secured Obligations, enforceable against each Grantor and having priority over all other Liens on the Collateral, subject only to Permitted Liens which are non-consensual Permitted Liens, permitted purchase money Liens, or the interests of lessors under Capital Leases, subject only to the filing of appropriate financing statements in the jurisdictions listed on Schedule 11 and in the case of registered Copyrights upon the filing of any Copyright Security Agreement with the United States Copyright Office, in the case of registered Patents, the filing of any Patent Security Agreement and in the case of registered Trademarks, any Trademark Security Agreement with the United States Patent and Trademark Office, except for Liens (a) in respect of motor vehicles that are subject to a certificate of title, (b) letter-of-credit rights (other than supporting obligations), (c) commercial tort claims (other than those that, by the terms of any Loan Document, are required to be perfected), and (d) any deposit accounts and securities accounts not subject to a Control Agreement as permitted by any Loan Document.   All action by any Grantor necessary to protect and perfect such security interest on each item of Collateral has been taken, except as expressly set forth above.

Section 3.7.     **Pledged Interests.**

(a)  Each Grantor is and will at all times be the sole holder of record and the legal and beneficial owner of the Pledged Interests indicated on Schedule 6 as being owned by such Grantor and, when acquired by such Grantor, any Pledged Interests acquired after the Closing Date.  All of the Pledged Interests are, and shall be, duly authorized, validly issued, fully paid and nonassessable and constitute (or will constitute) the percentage of the issued and outstanding Equity Interests of each Pledged Company of such Grantor identified on Schedule 6 as supplemented or modified by any Pledged Interests Addendum to this

Agreement.  Each Grantor has the right and requisite authority to pledge, the Investment Property pledged by such Grantor to Secured Party as provided herein.

(b)  Each Grantor has delivered to and deposited with Secured Party all certificates representing the Pledged Interests owned by such Grantor to Secured Party to the extent such Pledged Interests are represented by certificates, and undated powers (or other documents of transfer acceptable to Secured Party) endorsed in blank with respect to such certificates.  None of the Pledged Interests owned or held by such Grantor has been issued or transferred in violation of any securities registration, securities disclosure, or similar laws of any jurisdiction to which such issuance or transfer may be subject.

(c)  The Pledged Interests issued pursuant to any Pledged Operating Agreement (i) are not dealt in or traded on securities exchanges or in securities markets, (ii) do not constitute investment company securities, and (iii) are not held by such Grantor in a securities account.  In addition, none of the Pledged Operating Agreements, or any other agreements governing any of the Pledged Interests issued under any Pledged Operating Agreement, provide that such Pledged Interests are securities governed by Article 8 of the Uniform Commercial Code as in effect in any relevant jurisdiction.

**Section 3.8.    Locations of Inventory and Equipment**.  As of the Closing Date, all inventory and equipment of each Grantor is located only at, or in-transit between, the locations listed on Schedule 7 to this Agreement and is not stored with any bailee, warehouseman or other third party except as set forth in such schedule.

**Section 3.9.    No Conflicts; Consents**.  No consent, approval, authorization, or other order or other action by, and no notice to or filing with, any Governmental Authority or any other Person is required (i) for the grant of a security interest by such Grantor in and to the Collateral pursuant to this Agreement or for the execution, delivery, or performance of this Agreement by such Grantor, or (ii) for the exercise by Secured Party of the voting or other rights provided for in this Agreement with respect to the Investment Property or the remedies in respect of the Collateral pursuant to this Agreement, except as may be required in connection with such disposition of Investment Property by laws affecting the offering and sale of securities generally and except for consents, approvals, authorizations, or other orders or actions that have been obtained or given (as applicable) and that are still in force.  No Intellectual Property License of any Grantor that is necessary in or material to the conduct of such Grantor's business requires any consent of any other Person that has not been obtained in order for such Grantor to grant the security interest granted hereunder in such Grantor's right, title or interest in or to such Intellectual Property License.

**ARTICLE 4.**
**COVENANTS.**

Each Grantor covenants and agrees with Secured Party that:

**Section 4.1.    Possession of Collateral**.  In the event that any Collateral is evidenced by or consists of Negotiable Collateral, Investment Property, or chattel paper having an aggregate value or face amount of $100,000 or more for all such Negotiable Collateral, Investment Property, or chattel paper, Grantors shall promptly after the acquisition thereof, notify Secured Party thereof, and if and to the extent that possession thereof for purposes of the perfection or priority of the security interest of Secured Party is necessary or desirable, the applicable Grantor shall execute such other documents and instruments as shall be requested by Secured Party or, if applicable, endorse and deliver physical possession of such Negotiable Collateral, Investment Property, or chattel paper to Secured Party, together with such undated powers (or other relevant document of transfer acceptable to Secured Party) endorsed in blank promptly  after the request of Secured Party  and shall do such other acts or things deemed necessary or desirable by Secured Party to protect the security interest of Secured Party therein.

**Section 4.2.      Chattel Paper**.  Each Grantor shall take all steps reasonably necessary to grant Secured Party control of all electronic chattel paper in accordance with the UCC and all "transferable records" as that term is defined in Section 16 of the Uniform Electronic Transaction Act and Section 201 of the Federal Electronic Signatures in Global and National Commerce Act as in effect in any relevant jurisdiction, to the extent that the aggregate value or face amount of such electronic chattel paper equals or exceeds the Threshold Amount promptly after the request of Secured Party.  If any Grantor retains possession of any chattel paper or instruments (to the extent permitted hereunder), promptly upon the request of Secured Party, such chattel paper and instruments shall be marked with the following legend: "This writing and the obligations evidenced or secured hereby are subject to the security interest of Wells Fargo Bank, National Association".

**Section 4.3.      Control Agreements**. Each Grantor shall obtain an authenticated Control Agreement from each depository bank maintaining a deposit account for such Grantor to the extent required under the Credit Agreements and from each issuer of uncertificated securities, securities intermediary or commodities intermediary issuing or holding any financial assets or commodities to or for any Grantor or maintaining a securities account for such Grantor, except as Secured Party may otherwise expressly agree in writing.

**Section 4.4.      Letter-of-Credit Rights**.  If a Grantor is or becomes the beneficiary of letters of credit having a face amount or value in the amount of the Threshold Amount or more in the aggregate, then such Grantor shall promptly after becoming a beneficiary, notify Secured Party thereof and, promptly after the request of Secured Party, deliver a tri-party agreement executed and delivered by such Grantor, the issuer or confirming bank with respect to letter-of-credit rights and Secured Party, assigning such letter-of-credit rights to Secured Party and directing all payments thereunder to Secured Party's account, all in form and substance reasonably satisfactory to Secured Party.

**Section 4.5.      Commercial Tort Claims**.  If a Grantor obtains commercial tort claims having a value, or involving an asserted claim, in the amount of the Threshold Amount or more in the aggregate for all commercial tort claims, then such Grantor shall promptly after obtaining such commercial tort claim, notify Secured Party upon incurring or otherwise obtaining such commercial tort claims and, promptly after the request of Secured Party, amend Schedule 2 to describe such commercial tort claims in a manner that reasonably identifies such commercial tort claims and which is otherwise reasonably satisfactory to Secured Party, and hereby authorizes the filing of additional financing statements or amendments to existing financing statements describing such commercial tort claims, and agrees to take such other actions deemed necessary or desirable by Secured Party to give Secured Party a first priority, perfected security interest in any such commercial tort claim.

**Section 4.6.      Intellectual Property.**

(a)  Each Grantor shall execute and deliver to Secured Party one or more Copyright Security Agreements, Trademark Security Agreements, or Patent Security Agreements with respect to the Patents, Trademarks, Copyrights, and the General Intangibles of such Grantor relating thereto or represented thereby promptly after the request of Secured Party, including with respect to any such Intellectual Property acquired after the Closing Date.

(b)  Each Grantor shall, except as otherwise expressly permitted under the Credit Agreements, (i) take all reasonable and necessary action to preserve and maintain all of such Grantor's Intellectual Property and Intellectual Property Licenses that are necessary in or material to such Grantor's business, including (A) the payment of all maintenance fees and filing of applications for renewal, affidavits of use, and affidavits of noncontestability, and (B) the diligent enforcement and defense thereof (including suing for infringement, misappropriation, or dilution against conflicting Intellectual Property rights of any

9

Person) and (ii) not abandon any Intellectual Property or Intellectual Property License that is necessary in or material to such Grantor's business.

(c)  Secured Party shall have no duties with respect to any Intellectual Property or Intellectual Property Licenses of any Grantor and Secured Party shall not be under any obligation to take any steps necessary to preserve rights in Intellectual Property or Intellectual Property Licenses against any other Person, but Secured Party may do so at its option at any time an Event of Default exists, and all expenses incurred in connection therewith (including reasonable fees and expenses of attorneys and other professionals) shall be Lender Expenses.

(d)  No Grantor shall enter into any Intellectual Property License material to the conduct of the business to receive any license or rights in any Intellectual Property of any other Person unless such Grantor has used commercially reasonable efforts to permit the assignment of or grant of a security interest in such Intellectual Property License (and all rights of Grantor thereunder) to Secured Party (and any transferees of Secured Party).

Section 4.7.    **Investment Property.**

(a)  If any Grantor shall acquire, obtain, receive or become entitled to receive any Pledged Interests after the Closing Date, it shall promptly after acquiring or obtaining such Collateral deliver to Secured Party a duly executed Pledged Interests Addendum identifying such Pledged Interests.

(b)  For so long as any Grantor shall have the right to vote the Pledged Interests owned by it, such Grantor shall not, without the prior written consent of Secured Party, vote or take any consensual action with respect to such Pledged Interests which would materially adversely affect the rights of Secured Party or the value of the Pledged Interests. Each Grantor agrees that it will cooperate with Secured Party in obtaining all necessary approvals and making all necessary filings under Federal, State, local, or foreign law to effect the perfection of the security interest of Secured Party in the Investment Property or to effect any sale or transfer thereof.

(c)  The Pledged Interests issued pursuant to any Pledged Operating Agreement, (i) are not and shall not be dealt in or traded on securities exchanges or in securities markets, (ii) do not and will not constitute investment company securities, and (iii) are not and will not be held by such Grantor in a securities account.  None of the Pledged Operating Agreements, or any other agreements governing any of the Pledged Interests issued under any Pledged Operating Agreement, provide or shall provide that such Pledged Interests are securities governed by Article 8 of the Uniform Commercial Code as in effect in any relevant jurisdiction.

Section 4.8.    **Real Property; Fixtures**.  Upon the acquisition of any fee interest in Real Property by a Grantor having a fair market value in excess of $1,000,000, such Grantor will promptly after the acquisition of such Real Property notify Secured Party of the acquisition of it and will grant to Secured Party a first priority mortgage on each fee interest in Real Property now or hereafter owned by such Grantor and shall deliver such other documentation and opinions, in form and substance satisfactory to Secured Party, in connection with the grant of such mortgage as Secured Party shall request in its Permitted Discretion, including title insurance policies, financing statements, fixture filings and environmental audits and such Grantor shall pay all recording costs, intangible taxes and other fees and costs (including reasonable attorney's fees and expenses) incurred in connection therewith.  Notwithstanding anything to the contrary contained herein, Secured Party shall not accept a Lien on Real Property from any Grantor unless Secured Party has completed its flood insurance due diligence, has received copies of all flood insurance documentation and has confirmed that flood insurance compliance has been completed as required by applicable laws or as otherwise satisfactory to such Secured Party.

10

**Section 4.9.     Name, Etc.**  Each Grantor shall provide Secured Party not less than 10 days' prior written notice of any change in (a) its corporate name, (b) the location of its chief executive office or its principal place of business, (c) its identity or type of organization or corporate structure, (d) its Federal taxpayer identification number or organizational identification number or (e) its jurisdiction of organization (in each case, including by merging with or into any other entity, reorganizing, dissolving, liquidating, reincorporating or incorporating in any other jurisdiction), provided, that, (i) each Grantor shall take all action reasonably satisfactory to Secured Party to maintain the perfection and priority of the security interest of Secured Party, (ii) such Grantor promptly provides Secured Party with certified Governing Documents reflecting any of the changes described in the preceding sentence and (iii) in no event shall any Grantor enter into any merger or similar transaction that would result in the organization of such Grantor in, or shall any Grantor reorganize or otherwise become incorporated or organized under the laws of, any jurisdiction outside of the United States.

**Section 4.10.     Account Verification**.  Each Grantor shall permit Secured Party, in Secured Party's name or in the name of a nominee of Secured Party, to verify the validity, amount or any other matter relating to any account or payment intangible, by mail, telephone, facsimile transmission or otherwise and, promptly upon the request of Secured Party, each Grantor shall send requests for verification of accounts and payment intangibles or send notices of assignment of accounts and payment intangibles to account debtors and other obligors.

**Section 4.11.     Insurance**.  Each Grantor will, at its expense, maintain insurance with respect to all of its assets covering liabilities, losses or damages and in amounts as are customarily insured against by other Persons engaged in same or similar businesses and similarly situated with financially sound and reputable insurance companies acceptable to Secured Party and in any event, in amount, adequacy, and scope reasonably satisfactory to Secured Party (it being agreed that the amount, adequacy, and scope of the policies of insurance of Grantors in effect as of the Closing Date are acceptable to Secured Party).  All property insurance policies are to be made payable to Secured Party, as its interests may appear, in case of loss, pursuant to a standard lender's loss payable endorsement with a standard non-contributory "lender" or "secured party" clause and are to contain such other provisions as Secured Party may reasonably require.  All certificates of property and general liability insurance are to be delivered to Secured Party, with the lender's loss payable and additional insured endorsements in favor of Secured Party and shall provide for not less than 30 days (10 days in the case of non-payment) prior written notice to Secured Party of the exercise of any right of cancellation.  If any Grantor fails to maintain such insurance, Secured Party may arrange for such insurance, but at the expense of Grantors and without any responsibility for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims.  At any time an Event of Default exists, Secured Party shall have the sole right to file claims under any property and general liability insurance policies in respect of the Collateral, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies. If at any time the area in which any Real Property that is subject to a Lien is located in a "flood hazard area" as designated by the appropriate Governmental Authority, the Grantor that is the owner of it shall obtain flood insurance in such amount and on terms that are satisfactory to Secured Party and otherwise comply with the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 and all related laws, rules and regulations, including any amendment or successor provisions.

**Section 4.12.     Locations of Inventory and Equipment; Collateral Access Agreements**.  Each Grantor will keep its inventory and equipment only at the locations listed in Schedule 7 to this Agreement, other than documents of title, inventory or equipment in transit to or between such locations, equipment temporarily at third party locations for repair or maintenance, motor vehicles, vessels or aircraft; provided, that, a Grantor may have inventory or equipment at a new location upon not less than 10 days' prior written notice to Secured Party of its intention so to do, clearly describing such new location and providing such

11

other information and documents to Secured Party requested by Secured Party in its Permitted Discretion and so long as such location is within the United States. Each Grantor will use its commercially reasonable efforts to obtain Collateral Access Agreements for (a) each of the locations identified on Schedule 7 to this Agreement that are not owned and operated by a Grantor, and (b) for such new locations, in each case under clause (a) or (b), except as Secured Party may otherwise agree in writing, and each Grantor shall, prior to any change described in the preceding sentence, take all actions requested by Secured Party in its Permitted Discretion to maintain the validity, perfection and priority of the security interest of Secured Party in the Collateral.

**ARTICLE 5.**
**FURTHER ASSURANCES.**

**Section 5.1.  General.**  Each Grantor agrees that from time to time, at its own expense, such Grantor will promptly execute and deliver all further instruments and documents, and take all further action, that Secured Party may reasonably request, in order to create, perfect or protect the security interest of Secured Party granted (or purported to be granted) in any Loan Document or to enable Secured Party to exercise and enforce its rights and remedies with respect to any of the Collateral.

**Section 5.2.  Authorization to File Financing Statements, Etc.**  Each Grantor authorizes Secured Party at any time and from time to time to file, transmit, or communicate, as applicable, financing or continuation statements, or amendments thereto, (a) describing the Collateral as "all personal property of debtor" or "all assets of debtor" or words of similar effect, (b) describing the Collateral as being of equal or lesser scope or with greater detail, or (c) that contain any information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance.  Each Grantor (i) will promptly execute and deliver to Secured Party such other instruments or notices, as Secured Party may reasonably request, in order to perfect and preserve the security interest granted or purported to be granted hereby, (ii) ratifies any and all financing statements or amendments previously filed by Secured Party in any jurisdiction and (iii) acknowledges that it is not authorized to file any financing statement or amendment or termination statement with respect to any financing statement filed in connection with any Loan Document without the prior written consent of Secured Party, subject to such Grantor's rights under Section 9-509(d)(2) of the UCC.

**Section 5.3.  Secured Party May Perform; Secured Party's Duties**.  If any Grantor fails to perform any agreement contained herein, Secured Party may itself perform, or cause performance of, such agreement, and the reasonable expenses of Secured Party incurred in connection therewith shall constitute Secured Obligations and be payable, jointly and severally, by Grantors.  The powers conferred on Secured Party hereunder are solely to protect Secured Party's interest in the Collateral, and shall not impose any duty upon Secured Party to exercise any such powers.  Except for the safe custody of any Collateral in its actual possession and the accounting for moneys actually received by it hereunder, Secured Party shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.  Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its actual possession if such Collateral is accorded treatment substantially equal to that which Secured Party accords its own property.

**ARTICLE 6.**
**REMEDIES.**

**Section 6.1.  General**.  At any time an Event of Default exists, Secured Party may exercise all of the rights and remedies of a secured party under the UCC or any other applicable law in respect of the Collateral upon a default, in addition to other rights and remedies provided for in the Loan Documents or otherwise available to it.  Without limiting the generality of the foregoing, each Grantor expressly agrees that, in any such event, without demand of performance or other demand, advertisement or notice of any

kind (except a notice specified below of time and place of public or private sale) to or upon any Grantor or any other Person (all and each of which demands, advertisements and notices are hereby expressly waived to the maximum extent permitted by the UCC or any other applicable law), Secured Party may take immediate possession of all or any portion of the Collateral and (a) require each Grantor to, and each Grantor hereby agrees that it will at its own expense and upon the request of Secured Party promptly, assemble all or part of the Collateral as directed by Secured Party and make it available to Secured Party at one or more locations where such Grantor regularly maintains inventory, and (b) without notice except as specified below, sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of Secured Party's offices or elsewhere, for cash, on credit, and upon such other terms as Secured Party may deem commercially reasonable. Each Grantor agrees that, to the extent notification of sale shall be required by law, at least 10 days notification by mail to such Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification and specifically such notification shall constitute a reasonable "authenticated notification of disposition" within the meaning of Section 9-611 of the UCC. Secured Party shall not be obligated to make any sale of Collateral regardless of notification of sale having been given. Secured Party may adjourn any public sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. Each Grantor agrees that (i) the internet shall constitute a "place" for purposes of Section 9-610(b) of the UCC and (ii) to the extent notification of sale shall be required by law, notification by mail of the URL where a sale will occur and the time when a sale will commence at least 10 days prior to the sale shall constitute a reasonable notification for purposes of Section 9-611(b) of the UCC. Each Grantor agrees that any sale of Collateral to a licensor pursuant to the terms of a license agreement between such licensor and a Grantor is sufficient to constitute a commercially reasonable sale (including as to method, terms, manner, and time) within the meaning of Section 9-610 of the UCC.

Section 6.2.    **License for Intellectual Property**.  Secured Party is hereby granted a license or other right to use, without liability for royalties or any other charges, each Grantor's Intellectual Property, whether owned by any Grantor or with respect to which any Grantor has rights under any license, sublicense, or other agreement (including any Intellectual Property License) in preparing for sale, advertising for sale, selling or otherwise dealing with any Collateral, and each Grantor's rights under all licenses and all franchise agreements shall inure to the benefit of Secured Party for such purposes.

Section 6.3.    **Deposit Accounts and Securities Accounts**.  Secured Party may, in addition to other rights and remedies provided for in the Loan Documents or otherwise available to it under applicable law and without the requirement of notice to or upon any Grantor or any other Person (which notice is hereby expressly waived to the maximum extent permitted by the UCC or any other applicable law), (a) with respect to any Grantor's deposit accounts, instruct the bank maintaining such deposit account for such Grantor to pay the balance of such deposit account to or for the benefit of Secured Party, and (b) with respect to any Grantor's securities accounts, instruct the securities intermediary maintaining such securities account for such Grantor to (i) transfer any cash in such securities account to or for the benefit of Secured Party, or (ii) liquidate any financial assets in such securities account that are customarily sold on a recognized market and transfer the cash proceeds thereof to or for the benefit of Secured Party.

Section 6.4.    **Investment Property**.  At any time an Event of Default exists, promptly upon the request of Secured Party, all sums of money and property paid or distributed in respect of any Investment Property that are received by any Grantor shall be held by such Grantor in trust for the benefit of Secured Party segregated from such Grantor's other property, and such Grantor shall promptly deliver it to Secured Party in the form received.

Section 6.5.    **Deficiency**.  Any cash held by Secured Party as Collateral and all cash proceeds received by Secured Party in respect of any sale of, collection from, or other realization upon, all or any part of the Collateral shall be applied against the Secured Obligations in the order set forth in the Credit

Agreements.  In the event the proceeds of Collateral are insufficient to satisfy all of the Secured Obligations in full, each Grantor shall remain jointly and severally liable for any such deficiency.

**Section 6.6.     Possession; Receiver**.  Each Grantor hereby acknowledges that the Secured Obligations arise out of a commercial transaction, and agrees that, if an Event of Default exists, Secured Party shall have the right (a) to an immediate writ of possession without notice of a hearing and (b) to the appointment of a receiver, *ex parte* without notice, for a Grantor or all or any portion of the Collateral (to which appointment each Grantor consents) without the necessity of posting a bond or other form of security (which each Grantor waives).

**Section 6.7.     Secured Party's Right to Perform Contracts, Exercise Rights, Etc**.  At any time an Event of Default exists, Secured Party (or its designee) (a) may proceed to perform any and all of the obligations of any Grantor contained in any contract, lease, or other agreement and exercise any and all rights of any Grantor therein contained as fully as such Grantor itself could, (b) shall have the right to use any Grantor's rights under Intellectual Property Licenses in connection with the enforcement of Secured Party's rights hereunder, including the right to prepare for sale and sell any and all inventory and equipment now or hereafter owned by any Grantor and now or hereafter covered by such licenses, and (c) shall have the right to request that any Equity Interests that are pledged hereunder be registered in the name of Secured Party or any of its nominees.

**Section 6.8.     Secured Party Appointed Attorney-in-Fact.**

(a) Each Grantor hereby irrevocably appoints Secured Party its attorney-in-fact, with full authority in the place and stead of such Grantor and in the name of such Grantor or otherwise, at such time as an Event of Default exists, to take any action and to execute any instrument which Secured Party may, in its Permitted Discretion, deem necessary or advisable to accomplish the purposes of this Agreement, including:

(i)    to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in connection with the accounts or any other Collateral of such Grantor;

(ii)    to receive and open all mail addressed to such Grantor and to notify postal authorities to change the address for the delivery of mail to such Grantor to such address as Secured Party may specify for such purpose;

(iii)    to receive, indorse, and collect any drafts or other instruments, documents, Negotiable Collateral or chattel paper;

(iv)    to file any claims or take any action or institute any proceedings which Secured Party may deem necessary or desirable for the collection of any of the Collateral of such Grantor or otherwise to enforce the rights of Secured Party with respect to any of the Collateral;

(v)    to repair, alter, or supply goods, if any, necessary to fulfill in whole or in part the purchase order of any Person obligated to such Grantor in respect of any account of such Grantor;

(vi)    to use any Intellectual Property or Intellectual Property Licenses of such Grantor, in preparing for sale, advertising for sale, or selling inventory or other Collateral and to collect any amounts due under accounts, contracts or Negotiable Collateral of such Grantor; and

(vii)    to bring suit in its own name to enforce the Intellectual Property and Intellectual Property Licenses (at its election, but without any obligation to do so).

14

(b) If Secured Party shall commence any such suit, each Grantor shall, at the request of Secured Party, take any and all lawful acts and execute and deliver any and all documents reasonably required by Secured Party in aid of such enforcement. To the extent permitted by law, each Grantor hereby ratifies all that such attorney-in-fact shall lawfully do or cause to be done by virtue hereof. This power of attorney is coupled with an interest and shall be irrevocable.

Section 6.9.    **Voting and Other Rights in Respect of Pledged Interests.** At any time an Event of Default exists, (a) Secured Party may, at its option, and with two Business Days prior notice to any Grantor, and in addition to all rights and remedies available to Secured Party under any other agreement, at law, in equity, or otherwise, exercise all voting rights, or any other ownership or consensual rights (including any dividend or distribution rights) in respect of the Pledged Interests owned by such Grantor, but under no circumstances is Secured Party obligated by the terms of this Agreement to exercise such rights, and (b) if Secured Party elects to exercise its right to vote any of such Pledged Interests, each Grantor hereby appoints Secured Party such Grantor's true and lawful attorney-in-fact and IRREVOCABLE PROXY to vote such Pledged Interests in any manner Secured Party deems advisable for or against all matters submitted or which may be submitted to a vote of shareholders, partners or members, as the case may be. The power-of-attorney and proxy granted hereby is coupled with an interest and shall be irrevocable.

Section 6.10.    **Disposition of Pledged Interests by Secured Party**. None of the Pledged Interests existing as of the date of this Agreement are, and none of the Pledged Interests hereafter acquired on the date of acquisition thereof will be, registered or qualified under the various Federal or State securities laws of the United States and disposition thereof at any time an Event of Default exists may be restricted to one or more private (instead of public) sales in view of the lack of such registration. Each Grantor understands that in connection with such disposition, Secured Party may approach only a restricted number of potential purchasers and further understands that a sale under such circumstances may yield a lower price for the Pledged Interests than if the Pledged Interests were registered and qualified pursuant to Federal and State securities laws and sold on the open market. Each Grantor agrees that: (a) if Secured Party shall sell or cause the Pledged Interests or any portion thereof to be sold at a private sale, Secured Party shall have the right to rely upon the advice and opinion of any nationally recognized brokerage or investment firm (but shall not be obligated to seek such advice and the failure to do so shall not be considered in determining the commercial reasonableness of such action) as to the best manner in which to offer the Pledged Interest or any portion thereof for sale and as to the best price reasonably obtainable at the private sale thereof; and (b) such reliance shall be conclusive evidence that Secured Party has handled the disposition in a commercially reasonable manner.

Section 6.11.    **Collection of Accounts, General Intangibles and Negotiable Collateral**. At any time an Event of Default exists, Secured Party or Secured Party's designee may (a) notify account debtors of any Grantor that the accounts, general intangibles, chattel paper or Negotiable Collateral of such Grantor have been assigned to Secured Party, or that Secured Party has a security interest therein, and (b) collect the accounts, general intangibles and Negotiable Collateral of any Grantor directly, and any collection costs and expenses shall constitute part of the Secured Obligations.

Section 6.12.    **Remedies Cumulative**. Each right, power, and remedy of Secured Party as provided for in the Loan Documents or any agreement relating to Bank Products now or hereafter existing at law or in equity or by statute or otherwise shall be cumulative and concurrent and shall be in addition to every other right, power, or remedy provided for in the Loan Documents and the agreements relating to Bank Product now or hereafter existing at law or in equity or by statute or otherwise, and the exercise or beginning of the exercise by Secured Party, of any one or more of such rights, powers, or remedies shall not preclude the simultaneous or later exercise by Secured Party of any or all such other rights, powers, or remedies.

15

**Section 6.13.    Marshaling**.  Secured Party shall not be required to marshal any present or future collateral security (including the Collateral) for, or other assurances of payment of, the Secured Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights and remedies hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights and remedies, however existing or arising. To the extent that it lawfully may, each Grantor hereby agrees that it will not invoke any law relating to the marshaling of collateral which might cause delay in or impede the enforcement of Secured Party's rights and remedies under any Loan Document, and, to the extent that it lawfully may, each Grantor hereby irrevocably waives the benefits of all such laws.

**Section 6.14.    Expenses**.  Grantors shall, upon demand, pay to Secured Party (or Secured Party, may charge to the Loan Account) all the Lender Expenses which Secured Party may incur in connection with (a) the administration of this Agreement, (b) the custody, preservation, use or operation of, or, at any time an Event of Default exists, the sale of, collection from, or other realization upon, any of the Collateral, (c) the exercise or enforcement of any of the rights of Secured Party under any Loan Document or applicable law or (d) the failure by any Grantor to perform or observe any of the provisions of any Loan Document.

**ARTICLE 7.**
**CONTINUING SECURITY INTEREST:  ASSIGNMENTS UNDER CREDIT AGREEMENTS.**

**Section 7.1.    Continuing Security Interest; No Waiver**.  This Agreement shall create a continuing security interest in the Collateral and shall (a) remain in full force and effect until payment in full of the Secured Obligations , (b) be binding upon each Grantor, and its successors and assigns, and (c) inure to the benefit of, and be enforceable by, Secured Party, and its successors, transferees and assigns. Without limiting the generality of the foregoing clause (c), Secured Party may, in accordance with the provisions of the Credit Agreements, assign or otherwise transfer all or any portion of its rights and obligations under the Credit Agreements to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to Secured Party herein or otherwise.  After the payment in full of all Obligations, and the receipt by Secured Party of a general release of all claims against Secured Party and its Affiliates by each Grantor relating to the Credit Facility, Secured Party will, at the expense of each Grantor, execute and deliver any termination statements and lien releases (and, if applicable, in recordable form) as are reasonably necessary to release, as of record, notices of the Liens of Secured Party previously filed by Secured Party.  No transfer or renewal, extension, assignment, or termination of any Loan Document, or any other instrument or document executed and delivered by any Grantor to Secured Party nor any additional loans made by Secured Party to a Grantor, nor the taking of further security, nor the retaking or re-delivery of the Collateral to any Grantor by Secured Party, nor any other act of Secured Party shall release any Grantor from any obligation, except a release or discharge executed in writing by Secured Party in accordance with the provisions of the Credit Agreements.  Secured Party shall not by any act, delay, omission or otherwise, be deemed to have waived any of its rights or remedies hereunder, unless such waiver is in writing and signed by Secured Party and then only to the extent therein set forth.  A waiver by Secured Party of any right or remedy on any occasion shall not be construed as a bar to the exercise of any such right or remedy which Secured Party would otherwise have had on any other occasion.

**Section 7.2.    Reinstatement**.  Each Grantor agrees that, if any payment made by any Grantor or other Person and applied to the Secured Obligations is at any time annulled, avoided, set, aside, rescinded, invalidated, declared to be fraudulent or preferential or otherwise required to be refunded or repaid, or the proceeds of any Collateral are required to be returned by Secured Party under any bankruptcy law, Federal or State law, common law or equitable cause, then, to the extent of such payment or repayment, any Lien or other Collateral securing any Secured Obligations shall be and remain in full force and effect, as fully as if such payment had never been made.  If, prior to any of the foregoing, (a) any Lien or other Collateral securing any Secured Obligations shall have been released or terminated  or (b) any provision of this

16

Agreement or the Guaranty hereunder shall have been terminated, cancelled or surrendered, such Lien, other Collateral or provision shall be reinstated in full force and effect and such prior release, termination, cancellation or surrender shall not diminish, release, discharge, impair or otherwise affect the obligations of any such Grantor in respect of any Lien or other Collateral securing such obligation or the amount of such payment.

## ARTICLE 8.
### CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER, ETC.

**Section 8.1.    GOVERNING LAW**.  THE VALIDITY OF THIS AGREEMENT, THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF, THE RIGHTS OF THE PARTIES HERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR RELATED HERETO, AND ANY CLAIMS, CONTROVERSIES OR DISPUTES ARISING HEREUNDER OR RELATED HERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF OHIO

**Section 8.2.    FORUM NON CONVENIENS**.  THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN THE COUNTY OF COOK, STATE OF ILLINOIS;  <u>PROVIDED</u>,  THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT SECURED PARTY'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE SECURED PARTY ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND.  EACH GRANTOR AND SECURED PARTY WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION.

**Section 8.3.    WAIVER OF JURY TRIAL**.  TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH GRANTOR AND SECURED PARTY HEREBY WAIVE THEIR RESPECTIVE RIGHTS, IF ANY, TO A JURY TRIAL OF ANY CLAIM, CONTROVERSY, DISPUTE OR CAUSE OF ACTION DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS (EACH A "CLAIM").  EACH GRANTOR AND SECURED PARTY REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**Section 8.4.    SUBMISSION TO JURISDICTION**.  EACH GRANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN THE COUNTY OF COOK AND THE STATE OF ILLINOIS, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT SHALL AFFECT ANY RIGHT THAT SECURED PARTY MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AGAINST ANY GRANTOR OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

**Section 8.5.      WAIVER OF CLAIMS**.  NO CLAIM MAY BE MADE BY ANY GRANTOR AGAINST THE SECURED PARTY OR ANY AFFILIATE, DIRECTOR, OFFICER, EMPLOYEE, COUNSEL, REPRESENTATIVE, AGENT, OR ATTORNEY-IN-FACT OF ANY OF THEM FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL, OR PUNITIVE DAMAGES IN RESPECT OF ANY CLAIM FOR BREACH OF CONTRACT OR ANY OTHER THEORY OF LIABILITY ARISING OUT OF OR RELATED TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, OR ANY ACT, OMISSION, OR EVENT OCCURRING IN CONNECTION HEREWITH, AND EACH GRANTOR HEREBY WAIVES, RELEASES, AND AGREES NOT TO SUE UPON ANY CLAIM FOR SUCH DAMAGES, WHETHER OR NOT ACCRUED AND WHETHER OR NOT KNOWN OR SUSPECTED TO EXIST IN ITS FAVOR.

**ARTICLE 9.**
**MISCELLANEOUS.**

**Section 9.1.      Survival**.  All representations and warranties made by a Grantor in this Agreement and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by Secured Party and shall survive the execution and delivery of this Agreement and the making of any loans or other extension of credit, regardless of any investigation made by Secured Party or on its behalf and notwithstanding that Secured Party may have had notice or knowledge of any Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect until payment in full of the Secured Obligations.

**Section 9.2.      Merger, Amendments; Etc**.  THIS AGREEMENT, TOGETHER WITH THE OTHER LOAN DOCUMENTS, REPRESENTS THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN AGREEMENTS AMONG THE PARTIES.  No waiver of any provision of this Agreement, and no consent to any departure by any Grantor from the terms hereof, shall in any event be effective unless the same shall be in writing and signed by Secured Party, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  No amendment of any provision of this Agreement shall be effective unless the same shall be in writing and signed by Secured Party and each Grantor to which such amendment applies.  This Agreement is a Loan Document.

**Section 9.3.      Addresses for Notices**.  All notices and other communications provided for hereunder shall be given in the form and manner and delivered to Secured Party at its address specified in the Credit Agreements, and to any Grantor at its addresses specified in the Credit Agreements or, as to any party, at such other address as shall be designated by such party in a written notice to the other parties.

**Section 9.4.      Counterparts**.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same agreement.  Delivery of an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

**Section 9.5.      Effectiveness; Severability; Section Headings**.  This Agreement shall be binding and deemed effective when executed by any Grantor as to such Grantor (whether or any executed by any other Grantor) whose signature is provided for on the signature pages hereof and Secured Party.  Headings and numbers have been set forth herein for convenience only.  Unless the contrary is compelled by the

context, everything contained in each Section applies equally to this entire Agreement. Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof in that jurisdiction or affecting the validity or enforceability of such provision in any other jurisdiction. Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

[The remainder of this page intentionally left blank.]

IN WITNESS WHEREOF, the undersigned parties hereto have caused this Agreement to be executed and delivered as of the day and year first above written.

**GRANTORS:**

CTL-AEROSPACE, INC.

By: _____

Name:  John C. Irwin
Title:  President, Secretary & Treasurer

CTL-AEROSPACE NEVADA, INC.

By: _____

Name:  John C. Irwin
Title:  President, Secretary & Treasurer

**SECURED PARTY:**                          **WELLS FARGO BANK, NATIONAL
                                             ASSOCIATION**, a national banking association


By: _____
Name:  Catherine Devlin
Title:  Authorized Signatory

## EXHIBIT A

## PLEDGED INTERESTS ADDENDUM

This PLEDGED INTERESTS ADDENDUM, dated as of _____ __, 20___ (this "Pledged Interests Addendum"), is delivered pursuant to Section 4.7 of the Security Agreement referred to below.

The undersigned hereby agrees that this Pledged Interests Addendum may be attached to the Security Agreement, dated as of **[_____ __]**, 20**[__]**, (as amended, restated, supplemented, or otherwise modified from time to time, the "Security Agreement"), made by the undersigned, together with the other Grantors named therein, to WELLS FARGO BANK, NATIONAL ASSOCIATION, a national banking association, as Secured Party. Initially capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Security Agreement or, if not defined therein, collectively ascribed to such term in the Credit Agreements, and this Pledged Interests Addendum shall be subject to the rules of construction set forth in Section 1.2 of the Security Agreement, which rules of construction are incorporated herein by this reference, mutatis mutandis. The undersigned hereby agrees that the additional interests listed on Schedule I shall be and become part of the Pledged Interests pledged by the undersigned to Secured Party in the Security Agreement and any pledged company set forth on Schedule I shall be and become a "Pledged Company" under the Security Agreement, each with the same force and effect as if originally named therein.

This Pledged interests Addendum is a Loan Document. Delivery of an executed counterpart of this Pledged Interests Addendum by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Pledged Interests Addendum. If the undersigned delivers an executed counterpart of this Pledged Interests Addendum by telefacsimile or other electronic method of transmission, the undersigned shall also deliver an original executed counterpart of this Pledged Interests Addendum but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Pledged Interests Addendum.

The undersigned hereby certifies that the representations and warranties set forth in Section 3 of the Security Agreement of the undersigned are true and correct as to the Pledged Interests listed herein on and as of the date hereof.

THIS PLEDGED INTERESTS ADDENDUM SHALL BE SUBJECT TO THE PROVISIONS REGARDING CHOICE OF LAW AND VENUE, JURY TRIAL WAIVER, AND JUDICIAL REFERENCE SET FORTH IN SECTION 8 OF THE SECURITY AGREEMENT, AND SUCH PROVISIONS ARE INCORPORATED HEREIN BY THIS REFERENCE, MUTATIS MUTANDIS.

[The remainder of this page intentionally left blank.]

IN WITNESS WHEREOF, the undersigned has caused this Pledged Interests Addendum to be executed and delivered as of the day and year first above written.

[_____]


By:  _____
Name:  _____
Title:  _____

[signature page for Pledged Interests Addendum]

SCHEDULE I
TO
PLEDGED INTERESTS ADDENDUM


PLEDGED INTERESTS

| Name of Grantor | Name of Pledged Company | Number of Shares/Units | Class of Interests | Percentage of Class Owned | Certificate Nos. |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

Schedule 1
to Security Agreement

Chief Executive Office, Jurisdiction of Organization, Etc.

| Loan Party's Legal Name | Chief Executive Office | Federal Employer Identification No. | Organizational Identification No. | Jurisdiction of Organization |
|---|---|---|---|---|
| CTL-Aerospace, Inc. | 5616 Spellmire Drive, Cincinnati, OH 45246 | ███ | 618728 | Ohio |
| CTL-Aerospace Nevada, Inc. | 5616 Spellmire Drive, Cincinnati, OH 45246 | ███ | E0070342008-6 | Nevada |

Schedule 2
Commercial Tort Claims

None.

Schedule 3
Deposit Accounts; Securities Accounts

| Owner | Type of Account/Purpose | Name and Address of Bank or Intermediary | Account Numbers |
|---|---|---|---|
| CTL-Aerospace, Inc. | Flexible Spending | Huntington National Bank 17 S High St., Columbus, OH 43215 | ███ |
| CTL-Aerospace, Inc. | Concentration | Huntington National Bank 17 S High St., Columbus, OH 43215 | ███ |
| CTL-Aerospace, Inc. | Operating | Huntington National Bank 17 S High St., Columbus, OH 43215 | ███ |

Schedules

| CTL-Aerospace, Inc. | Collection | Huntington National Bank 17 S High St., Columbus, OH 43215 | ███████ |
| CTL-Aerospace, Inc. | Nevada | Huntington National Bank 17 S High St., Columbus, OH 43215 | ███████ |
| CTL-Aerospace Nevada, Inc. | Operating | Huntington National Bank 17 S High St., Columbus, OH 43215 | ██████ |

Schedule 4
Real Property

None.

Schedule 5
Copyrights, Patents, Trademarks and Intellectual Property Licenses

| Owner | Description | Registration Number | Date Filed | Granting Jurisdiction |
|---|---|---|---|---|
| CTL-Aerospace Inc. | Resin Transfer Molding Process | Patent No. 9,951,641<br><br>Application No. 15/209,886 | Date of Patent: 4/24/18<br><br>Date of Application: 7/14/16 | United States of America |
| CTL-Aerospace Nevada, Inc. | N/A | | | |

Schedule 6
Pledged Interests

None.

Schedule 7
Locations of Inventory and Equipment

22621618 v1

Set forth below are the addresses of all places of business and where assets are located of each Loan Party and the other information related thereto set out below, other than locations operated by third parties.

| Loan Party | Address of Place of Business/Location of Assets | Owned/Leased | Name and Address of Lessor (if leased) | Types of Assets at Location |
|---|---|---|---|---|
| CTL-Aerospace, Inc. | 5616 Spellmire Drive Cincinnati, OH 45246 | Leased | Prudential Realty Co. 3700 S. Water St. Suite 100 Pittsburgh, PA 15203 | Inventory, Tooling |
| CTL-Aerospace, Inc. | 9979 International Blvd Cincinnati, OH 45246 | Leased | Exeter Property Group 101 West Elm St Suite 600 Conshohocken, PA 19428 | Inventory |
| CTL-Aerospace, Inc. | 10002 International Blvd Cincinnati, OH 45246 | Leased | Dugan Financing c/o Duke Realty Services 4555 Lake Forest Drive Suite 400 Cincinnati, OH 45242 | Office |
| CTL-Aerospace Nevada, Inc. | N/A | | | |

Set forth below is a list of all third parties, including bailees, consignees, public warehouses and freight forwarders in possession of any assets that may constitute collateral under the proposed credit facility (including bills of lading and other documents of title, inventory, and equipment).

| Loan Party | Address of Location of Assets | Name and Address of Third Party | Types of Assets at Location |
|---|---|---|---|
| CTL-Aerospace, Inc. | 4951 Gateway Blvd Springfield, OH 45502 | Woodruff Cold Storage 4951 Gateway Blvd Springfield, OH 45502 | Freezer Inventory |
| CTL-Aerospace, Inc. | 1210 Chase Avenue Cincinnati, Ohio 45223 | Harris Distributing Company 4211 Crawford St Cincinnati, OH 45223 | Tool Storage |
| CTL-Aerospace, Inc. | 4692 Brate Drive Suite 200 West Chester, Ohio 45011 | Acuren 4692 Brate Drive Suite 200 West Chester, Ohio 45011 | Inventory |

22621618 v1

| | | | |
|---|---|---|---|
| CTL-Aerospace, Inc. | 11766 NC Highway 210 Rocky Point, NC 28457 | Cincinnati Thermal Spray 11766 NC Highway 210 Rocky Point, NC 28457 | Inventory |
| CTL-Aerospace, Inc. | 492 Prospect Avenue West Springfield, MA 01089 | Fountain Plating 492 Prospect Avenue West Springfield, MA 01089 | Inventory |
| CTL-Aerospace Nevada, Inc. | N/A | | |

4874-2386-0825, v. 2

**Frank LaRose**
*Ohio Secretary of State*

| FS Number: | OH00271735721 |
|---|---|
| Date Filed: | 30 March 2023 10:48:22 |

# UCC FINANCING STATEMENT

**FOR FILING OFFICE USE ONLY**

| | |
|---|---|
| **NAME OF CONTACT AT FILER:** | Kim Laughrey |
| **PHONE NUMBER:** | 614-914-4400 |
| **EMAIL CONTACT AT FILER:** | kimberly.laughrey@wolterskluwer.com |
| **SEND ACKNOWLEDGEMENT TO:** | Katie VanWinkle |
| | 4400 Easton Commons Way Suite 125 |
| | COLUMBUS |
| | OHIO |
| | 43219 |
| | United States |

## DEBTOR INFORMATION

| | |
|---|---|
| **ORGANIZATION'S NAME:** | CTL-Aerospace, Inc. |
| **MAILING ADDRESS:** | 5616 Spellmire Drive |

**CITY:** Cincinnati   **STATE:** OHIO   **POSTAL CODE:** 45246   **COUNTRY:** United States

## SECURED PARTY INFORMATION

| | |
|---|---|
| **ORGANIZATION'S NAME:** | Wells Fargo Bank, National Association |
| **MAILING ADDRESS:** | 90 S. 7th Street, 16th Floor, MAC N9305-160 |

**CITY:** Minneapolis   **STATE:** MINNESOTA   **POSTAL CODE:** 55402   **COUNTRY:** United States

## COLLATERAL INFORMATION

**This financing statement covers the following collateral:**

Original Document

## FILING TYPE

Transmitting Utility: No

Public Finance: No

EXHIBIT B

Manufactured Home: No

Agriculture Lien: No

Non-Ucc Filling: No

## ALTERNATIVE DESIGNATION

Lessee/Lessor: No

Consignee/Consignor: No

Seller/Buyer: No

Bailee/Bailor: No

Licensee/Licensor: No

## MISCELLANEOUS:

File with: Ohio - Secretary of State

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)

B. E-MAIL CONTACT AT FILER (optional)

C. SEND ACKNOWLEDGMENT TO:   (Name and Address)

**Benesch, Friedlander, Coplan & Aronoff**
**200 Public Square**
**Suite 2300**
**Cleveland, OH 44114-2378**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME:  Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **CTL-Aerospace, Inc.** | | | |

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **5616 Spellmire Drive** | **Cincinnati** | **OH** | **45246** | **USA** |

2. DEBTOR'S NAME:  Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):  Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **Wells Fargo Bank, National Association** | | | |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **90 S. 7th Street, 16th Floor, MAC N9305-160** | **Minneapolis** | **MN** | **55402** | **USA** |

4. COLLATERAL:  This financing statement covers the following collateral:
**All personal property and assets of Debtor, whether now existing or hereafter acquired, and all products and proceeds thereof.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)   ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:   ☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility
6b. Check only if applicable and check only one box:   ☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):   ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**File with: Ohio - Secretary of State**

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)          International Association of Commercial Administrators (IACA)