# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| In re: | : | Case No.: 25-12226 |
| CTL-AEROSPACE, INC., | : | Chapter 11 |
| Debtor-In-Possession. | : | Judge Beth A. Buchanan |

## DECLARATION OF SCOTT CRISLIP
## IN SUPPORT OF DEBTOR-IN-POSSESSION FINANCING

I, Scott Crislip, pursuant to 28 U.S.C. § 1746 hereby declare under penalty of perjury that the following is true and correct:

1. I am the President and Chief Operations Officer of CTL-Aerospace, Inc., the debtor and debtor-in-possession in this case (the "Debtor"). I previously submitted declarations in this case that include an overview of the Debtor, the events that have led to the filing of this case, the Debtor's objectives in the case (filed on September 8, 2025 [Doc. 9] in support of the Chapter 11 Petition and First Day Motions and filed on September 15, 2025 [Doc. 47] in support of a previously filed critical vendor motion), which included background information as to the Debtor's operations, events leading to the filing of the case, and the Debtor's relationships with its vendors, the details of which are incorporated herein by reference. This declaration is submitted to provide details of the operations of the Debtor post-petition and in support of the Debtor-In-Possession Financing requested by the Debtor in the *Emergency Motion of Debtor, CTL-Aerospace, Inc. for Interim and Final Orders: (A) Authorizing Debtor to Obtain Post-Petition Financing; (b) Authorizing the Debtor to Use Cash Collateral, (C) Granting Adequate Protection to the Prepetition Secured Party, (D) Modifying the Automatic Stay, (E) Scheduling a Final Hearing and (F) Granting Related Relief* filed contemporaneously herewith (the "Second DIP Financing

1

Motion"). The Debtor filed a petition for relief under Chapter 11 on September 8, 2025 (the "Petition Date").

2. The Debtor's primary lender pre-petition and until October 20, 2025 was Wells Fargo Bank, National Association ("Wells Fargo").

## THE POST-PETITION FUNDING AND OPERATIONS

3. Prior to the Petition Date, the Debtor's access to cash had been restricted to the point that the Debtor was unable to ensure the ability to fund the Debtor's payroll and operating expenses. As such, the Debtor had arranged for a loan from General Electric Company (d/b/a GE Aerospace ("GE")) that was intended to cover the Debtor's first post-petition payroll and provide operating capital needed for the Debtor's ongoing operations. The management of the Debtor did not realize that post-petition financing required approval by the Bankruptcy Court and the Debtor's proposed counsel did not realize that the funds to come in (reflected in a short-term budget) were to be characterized as a loan (rather than ordinary course customer deposits or payments. GE was unwilling to continue to make the previously negotiated loan on a post-petition basis without receiving a priming lien position. Wells Fargo was unwilling to consent to GE being provided a priming lien and the issue was not discovered in time to permit the Debtor to prepare for a contested hearing on the matter. As such, the Debtor received a loan from Wells Fargo subject to certain conditions as approved by this Court, to permit the Debtor to fund its first post-petition payroll. The financing approved in the *Final Order Under 11 U.S.C. §§ 105(a), 361, 362, and 363, Federal Bankruptcy Rules 2002, 4001 and 9014, and Local Rule 4001-2; (I) Authorizing Debtor to Obtain Post-Petition Financing; (II) Authorizing Debtor to Use Cash Collateral; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling and Approving the Form and Method of Notice of Final Hearing; and (VI) Granting Related Relief [Doc. 5 and 18]* entered in

2

the Bankruptcy Case on September 30, 2025 [Doc. 72] (the "Original DIP Order" and the post-petition financing approved therein is hereinafter referred to as the "Original DIP Loan"). The Original DIP Order was entered in this case, which provided for the Debtor to have access to draw up to $725,000 through two draws – one per week in the weeks ending September 12, 2025 and September 19, 2025. Due to concerns over the ability to repay the Original DIP Loan, the Debtor only borrowed $200,000. The maturity date for repayment of the Original DIP Loan was extended by agreement of Wells Fargo and was ultimately repaid by the Debtor on October 3, 2025.

4.     The Debtor and Wells Fargo attempted to negotiate terms for financing from Wells Fargo of a more fulsome budget, but were never able to reach agreement. The Debtor was able to prepare a budget that provided for payment of necessary obligations and continued operations through use of cash collateral only. The negotiations with Wells Fargo ultimately resulted in a short-term agreement between the Debtor and Wells Fargo, which was incorporated into the Debtor's filing of the *Emergency Motion of Debtor CTL-Aerospace, Inc. For: (A) Order Amending Order Authorizing Debtor to Obtain Post-Petition Financing and Use Cash Collateral; and (B) Granting Related Relief [Doc. 72]* on October 17, 2025 [Doc. 105] (the "Motion to Amend Original DIP Order"). The Motion to Amend Original DIP Order was set for hearing on October 21, 2025. While the Motion to Amend Original DIP Order was pending, on October 20, 2025, the Debtor was advised that Wells Fargo had sold its debt position. As such, the Debtor negotiated further revisions to the Original DIP Order, which was submitted and described to the Court on October 21, 2025 and the *Order Under 11 U.S.C. §§105(a), 361, 362, and 363, Federal Bankruptcy Rules 2002, 4001 and 9014, and Local Rule 4001-2; (I) Amending Existing Financing Order [Doc. 72] and (II) Granting Related Relief [Doc. 105]* was entered in this case on October 22, 2025 [Doc. 120] (the "Amended DIP Order"). The Amended DIP Order included identification of the

3

buyer of Wells Fargo's position as DKOF VI Trading Subsidiary LP ("DK"). The Amended DIP Order included a consent to use of cash collateral through October 31, 2025 and set a deadline for entry of an order as to sale procedures.

5. Aside from borrowing $200,000 from Wells Fargo pursuant to the Original DIP Loan, the Debtor has been operating post-petition on use of cash collateral only. The operations of the Debtor have been greatly benefitted by its relationship with GE, which has made accommodations to improve the Debtor's cash flow, including reducing its payment terms so that GE initiates payment to the Debtor within 7 days of invoice (received by the Debtor within 9 days of invoice). GE and other customers have also assisted the Debtor in acquiring materials from vendors, particularly vendors with which the Debtor does not have a contractual relationship and to which the Debtor owes pre-petition debts.

6. Even with that accommodation from GE, however, the Debtor's operations have been largely truncated due, in part, to the Debtor's inability to purchase from vendors on credit terms and exacerbated by the pre-petition sweep of the prepayment from Kawasaki Heavy Industries, Ltd. ("KHI"). The sweep of the prepayment from KHI has resulted in KHI withholding payment on invoices (as a method of KHI preserving its rights of setoff/recoupment). Without collections from KHI, the Debtor has only been able to support the KHI programs on a limited basis. Given that KHI is one of the Debtor's largest customers, I believe that retaining good relations with KHI is vital to the Debtor's ability to either maximize its value in a sale of the business as a going concern or otherwise to support post-confirmation operations for any reorganize the Debtor's financial affairs. In order to be able to continue to supply to KHI and support that product line, the Debtor will need access to more than cash collateral – an investment that I believe will benefit the operations of the Debtor and help the Debtor to retain employees.

7. The operations of the Debtor for its other customers have been similarly limited. The Debtor has been able, with use of cash collateral only, to maintain its work force, to marginally supply products to its customers and to avoid causing significant harm to its customers by avoiding operational failure. The Debtor has not had sufficient access to capital to allow it to fund any of the critical vendor amounts the Court has authorized and, as such, has had limited use of materials from critical vendors and has been working with assistance of the Debtor's customers to obtain materials by paying in advance for limited material deliveries or by providing discounts to customers that are able to source the materials used for their product lines. As such, the efforts of the Debtor's management have been extensive to maintain operations that are at a considerably reduced capacity.

8. As such, the Debtor has been in extensive negotiations with DK to provide additional financing in the form of new Debtor-In-Possession Financing ("Second DIP Loan") with DK as the lender. The Debtor and DK have negotiated the terms of the Second DIP Loan, which terms are identified in the Second DIP Financing Motion and in the exhibits thereto, including the proposed interim order attached to the Second DIP Financing Motion as Exhibit 1, the term sheet for the Second DIP Loan, attached to the proposed interim order as Exhibit A (the "DIP Term Sheet"). The Debtor, with assistance of its financial advisors and through negotiations with DK have prepared a budget, a summary of which is attached as Annex A to the DIP Term Sheet (the "Budget"). The borrowing that is needed to comply with the DIP Term Sheet and identified in the Budget is intended to allow the Debtor to (1) ramp back up its production, (2) more meaningfully work with the Debtor's vendors, including allowing the Debtor to more meaningfully pursue return to payment terms with critical vendors, confirm in-stock quantities and lead times for out of stock materials, (3) to allow for the Debtor to fully support its customer's programs (including the KHI

program), and (4) cover the administrative expenses of the bankruptcy case through the next several months, alleviating the concerns raised by the unsecured creditors' committee in response to the sale procedures motion previously filed by the Debtor.

9. The Debtor's advisors have opened two separate data rooms – one for potential lenders and one for potential buyers. I have executed approximately 20 non-disclosure agreements on behalf of the Debtor with third-parties identified as potential lenders for the Debtor. Once those third-parties learned that the debt had been sold by Wells Fargo to DK, however, the level of interest from potential lenders reduced dramatically. We received a few indications of interest from potential lenders. The indications of interest received to date have either (1) required a priming lien, or (2) did not supply sufficient liquidity for the Debtor's operations.

## SECOND DIP FINANCING MOTION

23. The Debtor seeks the entry of an order authorizing the Debtor to borrow funds from DK and for the continued use of cash collateral on the terms outlined in the Second DIP Financing Motion and the exhibits thereto. While the Amended DIP Order provided for the Debtor to have ongoing use of the cash collateral through October 31, 2025 (and further conditioned the use of cash collateral on obtaining a sale procedures order by a date certain) the ongoing use of cash collateral and extension of the deadline for entry of the sale procedures order has been granted by DK. DK extended those deadlines to permit the ongoing discussions and approval of the Second DIP Loan, however, the approval for ongoing use of cash collateral is contingent upon further extension by DK. DK is the only creditor with any rights in the Debtor's accounts receivable and the Debtor believes that the adequate protection offered in the Second DIP Financing Motion and the exhibits thereto for the Debtor's ongoing use of cash collateral are appropriate.

24. It is imperative that the Debtor obtains authority to use cash collateral to continue funding its necessary business expenses and to fund the costs associated with the administration of the case, including the funding of payroll, employee benefits, utilities, and material purchase expenses. Operating exclusively on cash collateral, however, will preserve the value of the business as a going concern, but the value of the Debtor's operations and the ability of the Debtor to fund the expenses of administering the case depend upon obtaining additional financing. The financing being offered by DK will permit the Debtor to improve its operations and preserve or repair its relationships with its customers, which I believe will improve the value of the Debtor.

25. I believe that the relief requested is in the best interests of the Debtor, its estate and all parties in interest and should be approved. The budget attached as Exhibit A identifies payment of only the necessary expenses to protect the Debtor's business operations and the value of its assets for the benefit of all creditors.

26. Without the use of the cash collateral, the Debtor would be required to terminate all business operations immediately, which would, in turn, result in the loss of employee's jobs and value of ongoing operations. Without the ability to borrow from DK, the Debtor's business will only be marginally operational and the Debtor runs the risk of further harm to its relationships with its customers and suppliers. The borrowing from DK will also permit the Debtor to support the expenses of the administration of the bankruptcy case – without he risks of future financing or sale process.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Scott Crislip*

_____
Scott Crislip

4907-0578-7510, v. 2