# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| In re: | : | Case No.: 25-12226 |
| CTL-AEROSPACE, INC., | : | Chapter 11 |
| Debtor-In-Possession. | : | Judge Beth A. Buchanan |

**DECLARATION OF GEOFFREY FRANKEL
IN SUPPORT OF EMERGENCY MOTION OF DEBTOR, CTL-AEROSPACE, INC. FOR INTERIM AND FINAL ORDERS: (A) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING; (B) AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL, (C) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTY, (D) MODIFYING THE AUTOMATIC STAY,
(E) SCHEDULING A FINAL HEARING AND (F) GRANTING RELATED RELIEF**
_____

I, Geoffrey Frankel, pursuant to 28 U.S.C. § 1746 hereby declare under penalty of perjury that the following is true and correct:

1. I am Managing Director and Head of Special Situations Investment Banking at Capstone Partners, LLC ("Capstone"), an investment banking and financial advisory firm headquartered at 10 Post Office Square, Suite 800N, Boston, MA 02109. I reside in Pepper Pike, Ohio. The Debtor has retained Capstone, and its affiliate CRS Capstone Partners, LLC, to provide investment banking and financial advisory services, respectively, in the above-captioned chapter 11 reorganization case (the "Chapter 11 Case").

2. I submit this Declaration in support of the debtor-in-possession financing (the "DIP Facility") requested by the Debtor in the *Emergency Motion of Debtor, CTL-Aerospace, Inc. for Interim and Final Orders: (A) Authorizing Debtor to Obtain Post-Petition Financing; (b) Authorizing the Debtor to Use Cash Collateral, (C) Granting Adequate Protection to the Prepetition Secured Party, (D) Modifying the Automatic Stay, (E) Scheduling a Final Hearing and (F) Granting Related Relief* (the "Second DIP Financing Motion").

3. In particular, I submit this declaration in support of my belief that (a) the Debtor is currently unable to borrow funds on a senior secured, junior secured, or unsecured basis, or solely secured by the Debtor's unencumbered assets, in amounts sufficient to fund the Chapter 11 Case consistent with the Debtor's budget; (b) the proposed DIP Facility is the product of arm's-length negotiations and a competitive marketing process and is the best and only currently available option for DIP financing for the Debtor under the circumstances; and (c) the terms of the DIP Facility are fair and reasonable under the circumstances.

4. Unless otherwise indicated, the statements in this declaration are based upon my experience in the Chapter 11 Case, including with respect to procuring and negotiating DIP financing, documents related to the DIP Facility, Capstone's analyses regarding the proposed DIP Facility, discussions with the Debtor's management and other advisors, discussions with prospective sources of DIP financing, and my opinions based on my experience and knowledge.

5. I am over the age of eighteen and authorized to submit this declaration on behalf of Capstone. I am not being specifically compensated for this testimony other than through monthly and transaction fee payments received by Capstone as the Debtor's investment banker. If called upon to testify, I could and would testify as to the facts set forth herein.

**QUALIFICATIONS AND BACKGROUND**

6. Capstone is a nationally recognized restructuring, turnaround management, and investment banking firm whose professionals have extensive experience providing strategic and financial advisory services to companies and their investors, including restructuring, mergers and acquisitions, and capital-raising.

7. At Capstone, I specialize in advising public and private companies and creditor groups in complex financial restructurings and in raising capital for, selling or acquiring financially challenged businesses. I lead Capstone's special situation investment banking practice.

8. I have more than thirty-five years of restructuring experience as an investment banker, private equity investor, and bankruptcy lawyer. My experience includes serving as the Chief Executive Officer and Senior Managing Director of Hilco Corporate Finance, a restructuring focused investment banking affiliate of Hilco Global; Managing Director and co-head of Special Situation Investment Banking at Duff & Phelps/Kroll; Managing Director and Practice Leader of Huron Transaction Advisory, the investment banking affiliate of Huron Consulting Group; among other firms. I have advised companies, creditors, and investors in over 125 distressed and bankruptcy transactions over the course of my career as an investment banker.

9. I have previously submitted declarations and/or affidavits or have had testimony proffered in several chapter 11 bankruptcy cases, including Sherwin Alumina, RG Steel, Standard Steel, LLC, AcuSport Corporation, AL Tech Specialty Steel Corporation, Gulf States Steel, Inc., Cold Metal Products, Inc., Genesis Worldwide, and Vista Eyecare, among others.

10. I have a juris doctor degree from The George Washington University School of Law and a bachelor's degree in international relations from the University of Pennsylvania. I hold FINRA Series 24 General Securities Principal, Series 7 and 79 General Securities Representative, and Series 63 State Law Representative licenses.

11. I am a member of the Capstone team that is assisting the Debtor in the Chapter 11 Case, and I led Capstone's efforts to secure and negotiate DIP financing for the Debtor. I participated directly in discussions, diligence, and negotiations with potential sources of DIP financing. In doing so, I also worked closely with the Debtor's management and legal counsel.

## BACKGROUND

12. As of the Petition Date, the Debtor's primary senior secured lender was Wells Fargo Bank, NA ("Wells Fargo"). Pursuant to the Cout's initial financing order in the Chapter 11 Case,[1] Wells Fargo provided the Debtor a small post-petition loan (specifically to fund the Debtor's payroll expenses), and the Debtor was authorized to use Wells Fargo's cash collateral.

13. In Exhibit C to the final financing order (as was required in the initial financing order) Wells Fargo insisted that the Debtor commit to a sale process with a "drop dead" date of December 22, 2025 and requested that the Debtor to provide a budget and postpetition funding request consistent with this timeline. With Capstone's assistance, the Debtor prepared such a budget and funding request, but Wells Fargo informed the Debtor that it would not provide post-petition funding after all and that it would only consent to the Debtor's use of cash collateral through October 31, 2025.

14. On October 20, 2025, Wells Fargo informed the Debtor that it sold its senior debt position to DKOF VI Trading Subsidiary LP ("DK"), an affiliate of Davidson Kempner.

**THE PROPOSED DIP FACILITY REPRESENTS THE BEST AND ONLY
AVAILABLE POSTPETITION FINANCING
ALTERNATIVE FOR THE DEBTOR UNDER THE CIRCUMSTANCES**

15. Following Capstone's retention by the Debtor,[2] and considering Wells Fargo's refusal to consider providing post-petition financing consistent with the Debtor's budget, Capstone moved expeditiously to seek the best financing proposals available in the market. Specifically,

---

[1] Final Order Under 11 U.S.C. §§ 105(a), 361, 362, and 363, Federal Bankruptcy Rules 2002, 4001 and 9014, and Local Rule 4001-2; (I) Authorizing Debtor to Obtain Post-Petition Financing; (II) Authorizing Debtor to Use Cash Collateral; (III) Granting Adequate Protection; (IV) Modifying the Automatic Stay; (V) Scheduling and Approving the Form and Method of Notice of Final Hearing; and (VI) Granting Related Relief [Doc. 5 and 18] entered in the Bankruptcy Case on September 30, 2025 [Doc. 72].

[2] On October 17, 2025, the Court entered an Order, the *Agreed Order Authorizing Debtor to Employ Capstone Capital Markets LLC to Supply Investment Banker Services and CRS Capstone Partners LLC to Supply Financial Advisory Services Effective as of the Date of the Application [Doc. 51]* [Doc. 107] approving the Debtor's retention of Capstone.

Capstone contacted approximately 45 parties who we believed to be the most likely candidates to provide DIP financing to the Debtor, due to some combination of: (a) prior lending to middle-market aerospace companies, (b) prior DIP lending to companies in chapter 11 bankruptcy, (c) a preferred "check size" in the range the Debtor were in need of, and (d) in some cases, a pre-existing relationship with the Debtor.  My team and I explored with interested parties a variety of financing options and structures, including providing DIP financing on a junior or unsecured basis and providing priming DIP financing.  Of the parties contacted, approximately 21 executed nondisclosure agreements and were granted access to a virtual data room with a Confidential Information Memorandum and other due diligence information.  Three (3) parties ultimately progressed to the point of providing the Debtor preliminary expressions of interest in a financing transaction before the Debtor was notified of DK's purchase of the Wells Fargo position.  Upon learning of the DK transaction, two of the three parties informed Capstone that they no longer were interested in considering a financing transaction.  The remaining interested party continued to evaluate a financing transaction but, as of the filing of the Second DIP Motion, it had not provided a written proposal to provide DIP financing, and its verbal proposal did not contemplate providing the Debtor with sufficient capital to fund its budget for the Chapter 11 Case.

16.     At the same time, the Debtor, with Capstone's assistance, engaged in extensive discussions and negotiations with DK (the "Proposed DIP Lender") to obtain DIP financing.  These discussions included providing DK with information regarding the Debtor's current operational, commercial, and financial circumstances; preparing and reviewing with DK a detailed budget and funding plan to support the Debtor's business and allowing it to obtain raw material so that it ultimately could resume normal levels of production; and negotiating the terms of the DIP Facility.

5

17. Given these circumstances, I believe that the proposed DIP Facility represents the best and only possible DIP financing option currently available to the Debtor. Absent approval of the proposed DIP Facility, the Debtor's going concern value and the proposed transaction process in the Chapter 11 Cases will be at significant risk. I believe, therefore, that the proposed DIP Facility is now the Debtor's only viable source for the liquidity it needs to navigate the chapter 11 process and position and complete a value-maximizing Chapter 11 Case.[3]

### THE DIP FACILITY WAS NEGOTIATED IN GOOD FAITH AND AT ARM'S LENGTH

18. The Debtor, with the help of Capstone and the Debtor's legal advisors, actively negotiated the terms and provisions of the proposed DIP Facility. These negotiations were conducted in good faith and at arm's length and were at times heated and contentious. Indeed, over weeks of negotiations, the parties exchanged numerous draft term sheets, proposed budgets, and draft financing orders, and negotiated on numerous calls, before ultimately arriving at the proposed DIP Facility. Accordingly, I believe that the DIP Facility was negotiated in good faith and arm's length.

### THE TERMS OF THE DIP FACILITY ARE FAIR AND REASONABLE UNDER THE CIRCUMSTANCES

19. Based on my knowledge of the Debtor's financial position and the financing market at this time, I believe that the economic terms of the proposed DIP Facility were the subject of arm's-length negotiations, are an integral component of the overall terms of the proposed DIP Facility, and were required by the DIP Lender as consideration for the proposed DIP Facility. The Debtor

---

[3] While Capstone has assisted the Debtor in arranging the DIP financing, it also has been executing a comprehensive process to sell the Debtor's assets pursuant to section 363 of the Bankruptcy Code. To date, Capstone has contact approximately 152 potential buyers. Those potential buyers that have executed a non-disclosure agreement have been given access to a virtual data room to support their due diligence review of a transaction. Capstone and the Debtor also have conducted several face-to-face or virtual meetings with prospective buyers to address questions and provide additional information in support of their consideration of an acquisition of the Debtor's assets.

and DIP Lender focused on the DIP size necessary to fund the Chapter 11 Case and run a process for the sale, refinancing, or restructuring of the Debtor's businesses and assets. The DIP Lender ultimately agreed to provide the proposed DIP Facility, in accordance with the terms and conditions set forth in the DIP Term Sheet.

20. The economic terms of the DIP Facility are reasonable in light of other DIP loans made under comparable circumstances. The monetary terms of the DIP Facility, including the fixed 15% interest rate, 5.0% closing fee, and the so-called 1.25x "MOIC" are not unreasonable given the current interest rate environment, considering the amount of capital that the DIP Lender proposes to provide, which the Debtor desperately needs, the anticipated short duration of the DIP Facility, and the fact that the DIP Facility is junior to the prepetition secured debt. Moreover, the DIP Lender's conditions related to the sale process (e.g., its requirement that it be designated as the "Stalking Horse Buyer" pursuant to the proposed bidding procedures) are typical of a DIP lender that seeks to use its debt position as currency in a sale of a debtor's assets. Notably, given the very short timeline to complete a sale, I believe that any lender who was not interested in bidding its claim to obtain ownership would have necessarily charged as much or more (or not ultimately pursued a transaction) given the relatively limited return that it could otherwise expect for a loan that was repaid in only 6-8 weeks.

## CONCLUSION

21. For the foregoing reasons, I believe that granting the DIP Motion and approving the DIP Facility, along with continued use of cash collateral, is necessary and appropriate to the Debtor's efforts to maximize value for the benefit of all stakeholders.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

*/s/ Geoffrey Frankel*
_____
Geoffrey Frankel

Dated: November 12, 2025
　　　　Cincinnati, Ohio

4935-7915-7113, v. 3