*Execution Version*

---

ASSET PURCHASE AGREEMENT

DATED AS OF DECEMBER 22, 2025

BY AND AMONG

**DK CTL AEROSPACE OPCO LLC**

AND

**CTL-AEROSPACE, INC.**

---

TABLE OF CONTENTS

Page

## ARTICLE 1

### DEFINITIONS

1.1     Definitions.................................................................................................2
1.2     Other Definitions and Interpretive Matters..................................................19

## ARTICLE 2

### PURCHASE AND SALE

2.1     Purchase and Sale .......................................................................20
2.2     Excluded Assets ..........................................................................23
2.3     Assumed Liabilities ......................................................................25
2.4     Excluded Liabilities ......................................................................26
2.5     Assignment and Assumption of Contracts...................................28
2.6     Further Assurances........................................................................32

## ARTICLE 3

### PURCHASE PRICE

3.1     Consideration; Closing Payments.................................................32
3.2     Available Funds Above Wind-Down Expenses .............................33
3.3     Allocation of Purchase Price.........................................................33
3.4     Post-Closing Accounts Receivable ...............................................34
3.5     Withholding ..................................................................................34

## ARTICLE 4

### CLOSING AND DELIVERIES

4.1     Closing Date..................................................................................34
4.2     Buyer's Deliveries ........................................................................35
4.3     Seller's Deliveries.........................................................................35

## ARTICLE 5

### REPRESENTATIONS AND WARRANTIES OF SELLER

5.1     Organization and Good Standing...................................................36
5.2     Authority; Validity; Consents ......................................................36
5.3     Subsidiaries...................................................................................37

i

| | | |
|---|---|---|
| 5.4 | No Conflict | 37 |
| 5.5 | Real Property | 37 |
| 5.6 | Environmental and Health and Safety Matters | 38 |
| 5.7 | Title to Acquired Assets | 38 |
| 5.8 | Taxes | 39 |
| 5.9 | Legal Proceedings | 39 |
| 5.10 | Compliance with Legal Requirement; Permits. | 39 |
| 5.11 | Labor Matters | 40 |
| 5.12 | Employee Benefits | 41 |
| 5.13 | Intellectual Property; Data Security; Data Privacy. | 42 |
| 5.14 | Contracts | 42 |
| 5.15 | Sufficiency of Assets | 42 |
| 5.16 | Insurance | 42 |
| 5.17 | Brokers or Finders | 43 |
| 5.18 | Interests of Affiliates | 43 |
| 5.19 | Bank Accounts | 43 |
| 5.20 | Credit Support | 43 |
| 5.21 | Financial Statements | 43 |
| 5.22 | Undisclosed Liabilities | 43 |
| 5.23 | Absence of Certain Changes | 44 |
| 5.24 | Material Suppliers; Material Customers | 45 |
| 5.25 | Products; Warranties | 45 |
| 5.26 | Warranties Exclusive | 45 |

## ARTICLE 6

### REPRESENTATIONS AND WARRANTIES OF BUYER

| | | |
|---|---|---|
| 6.1 | Organization and Good Standing | 46 |
| 6.2 | Authority; Validity; Consents | 46 |
| 6.3 | No Conflict | 46 |
| 6.4 | Credit Bid and Release | 46 |
| 6.5 | Solvency | 47 |
| 6.6 | Brokers or Finders | 47 |
| 6.7 | Legal Proceedings | 47 |

## ARTICLE 7

### ACTIONS PRIOR TO THE CLOSING DATE

| | | |
|---|---|---|
| 7.1 | Access and Reports | 47 |
| 7.2 | Operations Prior to the Closing Date | 48 |
| 7.3 | Regulatory Filings; Cooperation. | 51 |
| 7.4 | Bankruptcy Court Matters | 53 |
| 7.5 | Break-Up Fee | 54 |
| 7.6 | Disclosure Schedules | 54 |
| 7.7 | Sale Free and Clear | 56 |

4912-0790-9240 v41

7.8    Acquisition Proposals ................................................................................56
7.9    Consents .....................................................................................................57
7.10   Seller WARN Liabilities ............................................................................57

# ARTICLE 8

## ADDITIONAL AGREEMENTS

8.1    Taxes .........................................................................................................58
8.2    Bulk Sales .................................................................................................59
8.3    Payments Received; Mail and Other Communications ............................59
8.4    Assumed Contracts: Adequate Assurance and Performance ...................60
8.5    Employee Matters .....................................................................................60
8.6    Post-Closing Books and Records and Personnel .....................................62
8.7    Casualty Loss ............................................................................................64
8.8    Change of Name ........................................................................................64

# ARTICLE 9

## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

9.1    Accuracy of Representations ....................................................................65
9.2    Seller's Performance .................................................................................65
9.3    No Order ....................................................................................................65
9.4    Governmental Authorizations ...................................................................65
9.5    Seller's Deliveries ....................................................................................66
9.6    DIP Orders ................................................................................................66
9.7    Sale Order .................................................................................................66
9.8    Assumed Contracts ...................................................................................66
9.9    Consents ....................................................................................................66
9.10   Possession .................................................................................................66
9.11   Encumbrance Releases ..............................................................................66
9.12   Material Adverse Effect ............................................................................67
9.13   Lien Releases ............................................................................................67
9.14   No Default; No Termination Event ...........................................................67
9.15   Final Disclosure Schedules ......................................................................67
9.16   Form W-9 ..................................................................................................67
9.17   Additional Agreements .............................................................................67
9.18   Waiver of Closing Conditions ..................................................................67

# ARTICLE 10

## CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLER TO CLOSE

10.1   Accuracy of Representations ....................................................................67
10.2   Sale Order .................................................................................................68
10.3   Buyer's Performance .................................................................................68

4912-0790-9240 v41

10.4    No Order ...........................................................................................................68
10.5    Governmental Authorizations .........................................................................68
10.6    Buyer's Deliveries ...........................................................................................68
10.7    Purchase Price .................................................................................................68
10.8    Additional Agreements ....................................................................................68
10.9    Waiver of Closing Conditions ........................................................................68

## ARTICLE 11

### TERMINATION

11.1    Termination Events ..........................................................................................68
11.2    Seller Termination Condition .........................................................................70
11.3    Effect of Termination.......................................................................................71

## ARTICLE 12

### GENERAL PROVISIONS

12.1    Survival ............................................................................................................72
12.2    Confidentiality .................................................................................................72
12.3    Public Announcements ....................................................................................72
12.4    Notices .............................................................................................................72
12.5    Waiver...............................................................................................................73
12.6    Entire Agreement; Amendment .......................................................................74
12.7    Assignment ......................................................................................................74
12.8    Severability ......................................................................................................74
12.9    Expenses ..........................................................................................................74
12.10   Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver........74
12.11   Counterparts.....................................................................................................75
12.12   Parties in Interest; No Third-Party Beneficiaries; No Amendment ...............75
12.13   Remedies..........................................................................................................75
12.14   Specific Performance .......................................................................................75
12.15   Limitations on Damages ..................................................................................76
12.16   Non-Recourse ..................................................................................................76
12.17   Joinder..............................................................................................................76

4912-0790-9240 v41

**SCHEDULES**

Attached

**EXHIBITS**

Exhibit A                    Form of Assignment and Assumption Agreement

4912-0790-9240 v41

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT, (including the Schedules and Exhibit hereto (collectively this "***Agreement***"), dated as of December 22, 2025 (the "***Execution Date***"), is made and entered into by and among DK CTL Aerospace Opco LLC, a Delaware limited liability company, as designee of DKOF VI Trading Subsidiary LP (together with its Affiliates, "***Buyer***"), and CTL-Aerospace, Inc., an Ohio corporation (the "***Company***" or the "***Seller***"). Capitalized terms used herein and not otherwise defined herein have the meanings set forth in Article 1.

## RECITALS

WHEREAS, the Company is engaged in the manufacture, sale, and distribution in the aerospace and aviation industry, serving commercial, military, space and defense markets as a tier 2 manufacturer, as well as providing maintenance, repair and overhaul services for gas turbine engines.

WHEREAS, on the September 8, 2025, Seller filed a voluntary petition (the "***Bankruptcy Case***") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Ohio (the "***Bankruptcy Court***");

WHEREAS, in accordance with the Bidding Procedures and subject to the terms and conditions set forth in this Agreement and the entry of the Sale Order, Seller desires to sell to Buyer the Acquired Assets, Buyer desires to purchase from Seller the Acquired Assets and assume the Assumed Liabilities, and the Parties intend to effectuate the transactions contemplated by this Agreement;

WHEREAS, Seller, DKOF VI Trading Subsidiary LP (the "***DIP Lender***" and the "***Prepetition Lender***") have authorized and directed that Buyer credit bid the DIP Obligations and the Prepetition Obligations (each as defined herein) pursuant to the terms and subject to the conditions set forth in this Agreement;

WHEREAS, upon the Closing, the Acquired Assets and Assumed Liabilities shall be purchased and assumed by Buyer (or an Affiliate thereof) pursuant to the Sale Order, free and clear of all Encumbrances (other than Permitted Encumbrances), pursuant to sections 105, 363 and 365 of the Bankruptcy Code, and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure;

WHEREAS, the Parties intend for the Seller, after the Closing of the sale contemplated by this Agreement, to receive and hold as part of the Purchase Price the Retained Cash Amount, and to use the same as may be permitted by the Bankruptcy Court and this Agreement;

WHEREAS, Seller's ability to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court; and

WHEREAS, the board of directors, managing member or similar governing body of

Seller has determined that it is advisable and in the best interests of Seller and its constituencies to enter into this Agreement and to consummate the transactions provided for herein, subject to entry of the Sale Order, and each has approved the same.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the foregoing and of the representations, warranties, covenants, agreements and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties, subject to the Sale Order and the terms hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE 1

### DEFINITIONS

1.1    <u>Definitions</u>.

For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"*Accounts Receivable*" means, with respect to Seller, all accounts receivable, notes receivable, purchase orders, negotiable instruments, chattel paper, notes and other rights to payment, including those consisting of all accounts receivable in respect of services rendered or products sold to customers by such Seller, any other miscellaneous accounts receivable of such Seller, and any claim, remedy or other right of such Seller related to any of the foregoing, together with all unpaid financing charges accrued thereon and any payments with respect thereto.

"*Acquired Assets*" has the meaning set forth in <u>Section 2.1</u>.

"*Acquisition Proposal*" means any oral or written inquiry, proposal or offer from any Person (other than Buyer or any of its Affiliates) with respect to an Alternative Transaction.

"*Action*" means any legal action, suit, petition, plea, charge, claim, demand, hearing, inquiry, arbitration, complaint, grievance, summons, litigation, mediation, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, inquest, audit, examination, investigation or similar matter commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority.

"*Actual Assumed Payroll Expenses*" has the meaning set forth in <u>Section 2.3(f)</u>.

"*Actual Wind-Down Expenses*" means, in each case solely to the extent incurred following the Closing and in any event not to exceed in the aggregate an amount equal to the Retained Cash Amount, any and all administrative costs and expenses of Seller that Seller actually incurred during the Bankruptcy Case (whether before, on, or after the Closing) in connection with winding down its bankruptcy estate pursuant to a plan of liquidation (including payment of all administrative and priority claims required to be paid pursuant to such plan of liquidation) or conversion to Chapter 7. Actual Wind-Down Expenses shall include, and may be adjusted as necessary to provide for payment of, (in each case solely to the extent incurred following the Closing) (i) Seller Retained Professional Fees (ii) Liabilities under the WARN Act, if any, (x)

2

relating to any act or omissions of Seller prior to Closing, including with respect to the terminations set forth in <u>Section 8.5(a)</u> herein or (y) with respect to any Employees or former employees of Seller, excluding the Buyer Employees, for any act or omission of Seller after the Closing (any such Liabilities covered by the foregoing clause (ii), the "***Seller WARN Liabilities***"), (iii) professional fees and expenses of estate professionals incurred (after Closing) pursuant to the solicitation and implementation of the plan of liquidation and of the negotiation, drafting and implementation of this Agreement, including during the wind-down of Seller's estate, (iv) administrative expenses that are Excluded Liabilities that are entitled to administrative expense priority pursuant to Section 503 of the Bankruptcy Code, (v) the reimbursement to UCC for up to $50,000.00 of reasonable and documented professional fees (subject to Bankruptcy Court approval) incurred by UCC following the Closing in connection with the wind-down of Seller (the "***UCC Professional Fees***") and (vi) all claims required to be paid pursuant to the plan of liquidation including the anticipated expenses of the wind-down of Seller's estate from and after the effective date of the plan of liquidation and any obligations or expenses incurred by Seller to perform their obligations under this Agreement. For the avoidance of doubt, in no event shall the amount of Actual Wind Down Expenses exceed the Retained Cash Amount.

"***Affiliate***" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Exchange Act.

"***Affiliate Transactions***" has the meaning set forth in <u>Section 5.18</u>.

"***Agreement***" has the meaning set forth in the introductory paragraph, including any amendments to said Agreement.

"***Allocation Statement***" has the meaning set forth in <u>Section 3.3</u>.

"***Alternative Transaction***" means any sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, asset sale, share issuance, consent solicitation, exchange offer, tender offer, recapitalization, plan of reorganization or liquidation, share exchange, business combination, joint venture, debt incurrence, or similar transaction involving the Company and/or any of its Subsidiaries (including, for the avoidance of doubt, a transaction premised on a sale of assets under section 363 of the Bankruptcy Code), or the debt, equity, or other interests in the Company and/or any of its Subsidiaries that is an alternative to the transactions contemplated by this Agreement.

"***Annual Financial Statements***" has the meaning set forth in <u>Section 5.21</u>.

"***Anti-Corruption Laws***" means the U.S. Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, and any applicable Legal Requirement related to bribery or corruption.

"***Anti-Money Laundering Laws***" means the Money Laundering Control Act of 1986 (18 U.S.C. §§ 1956-1957), the USA PATRIOT ACT ((Pub. L. No. 107-56), the Bank Secrecy Act (31 U.S.C. §§5311-5332)), the UK Proceeds of Crime Act 2002, the UK Terrorism Act 2000 and any applicable Legal Requirement related to terrorist financing or money laundering, including know-your-customer (KYC) and financial recordkeeping and reporting requirements.

"***Antitrust Law***" means, collectively, the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder, title 15 of the United States Code §§ 1-7, as amended (the Sherman Act), Title 15 of the United States Code §§ 12-27 and Title 29 of the United States Code §§ 52-53, as amended (the Clayton Act), the Federal Trade Commission Act (15 U.S.C.§ 41 et seq.), as amended, and the rules and regulations promulgated thereunder, and all other national, state, local or foreign Legal Requirement in effect from time to time that are designed or intended to (i) prohibit, restrict or regulate actions or transactions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition and (ii) regulate transactions involving foreign investments, including any Legal Requirement that provide for review of national security matters in any jurisdiction.

"***Applicable Rate***" means, for a particular day, the prime rate as reported in The Wall Street Journal published for such day or, if such rate is regularly reported in The Wall Street Journal, but is not reported on such day, such rate as most-recently reported in The Wall Street Journal (or, if such rate is no longer reported in The Wall Street Journal, a comparable rate), calculated on a daily basis based on a 365-day year.

"***Apportioned Taxes***" has the meaning set forth in Section 8.1(b).

"***Approved Schedule Changes***" has the meaning set forth in Section 7.6(a)(v).

"***Assignment of Leases***" means an Assignment and Assumption of Seller's Interest in Leases, in a form mutually agreeable to Buyer and Seller, to be entered into prior to Closing

"***Assumed Benefit Plan***" shall mean any Benefit Plan listed on Schedule 2.1(u).

"***Assumed Contracts***" has the meaning set forth in Section 2.5(a)(i).

"***Assumed Liabilities***" has the meaning set forth in Section 2.3.

"***Assumed PTO Liabilities***" has the meaning set forth in Section 2.3(e).

"***Assumed Trade Payables***" has the meaning set forth in Section 2.3(b).

"***Assumption Agreement***" means the Assignment and Assumption Agreement, in substantially the form attached hereto as Exhibit A.

"***Auction***" means the auction for the sale of Seller's assets conducted by Seller if, and only if, any Qualified Bid (other than this Agreement) is received pursuant to the terms and conditions of the Bidding Procedures Order.

"***Bankruptcy Case***" has the meaning set forth in the recitals.

"***Bankruptcy Code***" means title 11 of the United States Code, sections 101 *et seq*.

"***Bankruptcy Court***" has the meaning set forth in the recitals.

"***Benefit Plan***" means any plan, program, policy, arrangement or agreement that is a pension, profit-sharing, savings, retirement, employment, consulting, offer letter, severance pay, notice pay, termination, executive compensation, incentive compensation, deferred compensation, bonus, stock purchase, stock option, phantom stock or other equity or equity-based compensation, change in control, retention, salary continuation, vacation, sick leave, disability, death benefit, group insurance, hospitalization, medical, dental, life (including all individual life insurance policies as to which Seller is the owner, the beneficiary, or both), Code section 125 "cafeteria" or "flexible" benefit, employee loan, educational assistance, fringe benefit or other similar plan, program, policy, arrangement or agreement, whether written or oral, including any (i) "employee benefit plan" within the meaning of Section 3(3) of ERISA or (ii) other employee benefit plans, agreements, programs, policies, arrangements or payroll practices, whether or not subject to ERISA (including any funding mechanism therefor now in effect or required in the future as a result of the transaction contemplated by this Agreement or otherwise) under which any current or former officer, director, employee, leased employee, retiree, consultant, contractor or agent (or their respective representatives or beneficiaries) of Seller has any present or future right to benefits.

"***Bid Deadline***" has the meaning set forth in Section 7.4(b).

"***Bidding Procedures***" means bid procedures, attached as Annex 1 to the Bidding Procedures Order filed with the Bankruptcy Court on November 10, 2025 (with changes approved by Buyer and Seller).

"***Bidding Procedures Order***" means the *Order Establishing Bidding Procedures Relating to the Sales of all or a Portion of the Debtor's Assets Docket No. 90 and 152 entered in the Bankruptcy Case on November 12, 2025,* Docket No. 159, as amended by Docket No. 195.

"***Bill of Sale***" means a Bill of Sale, in a form mutually agreeable to Buyer and Seller, to be entered into prior to Closing.

"***Break-Up Fee***" means a cash amount equal to $365,000.00, which amount, upon entry of the Stalking Horse Order, shall, if and when required to be paid hereunder, constitute a super priority administrative expense of Seller under section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of any kind, including those specified in sections 503(b) or 507(b) of the Bankruptcy Code junior only to the Carve Out and the obligations owing under the DIP Facilities and be paid as provided in Section 11.3.

"***Business***" means the business and operations of the Seller and each of their respective Subsidiaries (wherever such business and operations are situated or conducted) as presently conducted by Seller, including, but not limited to, the manufacture, sale, and distribution in the aerospace and aviation industry, serving commercial, military, space and defense markets as a tier 2 manufacturer, as well as providing maintenance, repair, and overhaul services for gas turbine engines.

"***Business Day***" means any day of the year on which national banking institutions in New York, New York are open to the public for conducting business and are not required or authorized to close.

"***Business Software***" has the meaning set forth in Section 5.13(c).

"***Buyer***" has the meaning set forth in the introductory paragraph and shall also include any Buyer Designee.

"***Buyer Designee***" has the meaning set forth in <u>Section 2.1</u>.

"***Buyer Employees***" has the meaning set forth in <u>Section 8.5(a)</u>.

"***Buyer Schedule Change***" has the meaning set forth in <u>Section 7.6(a)(vi)</u>.

"***Carve Out***" has the meaning set forth in the DIP Orders.

"***Claim***" means a "claim" as defined in section 101(5) of the Bankruptcy Code.

"***Closing***" has the meaning set forth in <u>Section 4.1</u>.

"***Closing Date***" means the date and time as of which the Closing occurs as set forth in <u>Section 4.1</u>.

"***Closing Required Permits***" means all Governmental Authorizations (including Permits) held by Seller that, in the good faith judgment of Buyer, are necessary or appropriate to operate and conduct the Business as of the Execution Date.

"***COBRA***" or "***COBRA Act***" means the Consolidated Omnibus Budget Reconciliation Act of 1995, as subsequently amended, and any similar state law.

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Collective Bargaining Agreement***" has the meaning set forth in <u>Section 5.11(a)</u>.

"***Company***" has the meaning set forth in the introductory paragraph.

"***Contract***" means any agreement, contract, obligation, promise, undertaking, lease (including any Leases), sublease, purchase order, arrangement, license, commitment, insurance policy or other binding arrangement or understanding (in each case whether written or oral), and any amendments, modifications or supplements thereto.

"***Cooperation Period***" has the meaning set forth in <u>Section 2.5(c)</u>.

"***Copyrights***" has the meaning assigned thereto under the definition of "Intellectual Property".

"***Credit Bid and Release***" has the meaning set forth in <u>Section 3.1(a)(ii)</u>.

"***Credit Support***" means all guaranties, letters of credit, reimbursement agreements, bonds, deposits, prepayments amounts and other credit or contractual assurances of a comparable nature made or issued by or for the account of Seller for the benefit of a counterparty under an Assumed Contract or otherwise in connection with the Business.

6

"***Cure Costs***" means all monetary liabilities, including pre-petition monetary liabilities, of Seller that must be paid or otherwise satisfied to cure all of Seller's monetary defaults under the Assumed Contracts pursuant to section 365 of the Bankruptcy Code at the time of the assumption thereof and assignment to Buyer as provided hereunder as such amounts are determined by the Bankruptcy Court.

"***Customer Record Retention Requirements***" has the meaning set forth in Section 8.6(b).

"***Data Protection Laws***" means all applicable Legal Requirement pertaining to data protection, data privacy, data security, data breach notification, data localization, cross-border data transfer and similar matters.

"***Determination Date***" has the meaning set forth in Section 2.5(a)(i). "***DIP Escrow Account***" means the escrow account opened and funded in connection with the DIP Facility as further described in that certain Escrow Agreement, dated November 14, 2025, between Buyer, Seller and Agency Services LLC, as Escrow Agent, as may be amended from time to time.

"***DIP Facility***" has the meaning set forth in the DIP Term Sheet.

"***DIP Lender***" has the meaning set forth in the recitals.

"***DIP Obligations***" means all principal, interest and all other amounts in respect of the obligations outstanding under the DIP Facility.

"***DIP Orders***" means, collectively, the Interim DIP Order and the Final DIP Order.

"***DIP Recovery Amount***" has the meaning set forth in Section 11.2.

"***DIP Term Sheet***" has the meaning set forth in the DIP Orders.

"***Disclosure Schedules***" means the Disclosure Schedules attached hereto, dated as of the Execution Date, delivered by Seller to Buyer in connection with the execution of this Agreement and upon Buyer and Seller mutually agreeing on the form of the Final Disclosure Schedules, which Disclosure Schedules, including those delivered on the Draft Disclosure Schedule First Delivery Date and Draft Schedule Second Delivery Date and the Final Disclosure Schedules shall be made available to potential bidders.

"***Disputed Contract***" has the meaning set forth in Section 2.5(a)(i).

"***Disputed Contract Determination***" has the meaning set forth in Section 2.5(a)(v).

"***Documents***" means all of the documents that are used or useful in, held for use in, or intended to be used in, or that arise in any way out of, the Business of the Seller.

"***Draft Disclosure Schedule***" has the meaning set forth in Section 7.6(a)(iii).

"***Draft Disclosure Schedule First Delivery Date***" has the meaning set forth in

Section 7.6(a)(ii).

"***Draft Disclosure Schedule Second Delivery Date***" has the meaning set forth in Section 7.6(a)(iii).

"***Employees***" means all employees of Seller as of the Closing Date.

"***Encumbrance***" means any charge, Lien, Claim, right, demand, mortgage, lease, debt, losses, damage, demand, fine, judgment, penalty, liability, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, premium, sublease, license, sublicense, hypothecation, deed of trust, pledge, security interest, option, right of use or possession, right of first offer or first refusal, rights of others, put, call, easement, restrictive covenant, right of way, imperfection of title, community property interest, collateral assignment, infringement, preemptive right, conditional sale, servitude, conditional sale agreement, title retention agreement or restriction (whether on voting, sale, transfer, defenses, set-off or recoupment rights, disposition or otherwise), proxy, encroachment, encumbrance, third party interest or other restriction or limitation of any kind whatsoever, whether imposed by Contract, Legal Requirement, equity or otherwise.

"***Environmental, Health and Safety Laws***" means any and all Legal Requirement concerning or relating to (a) public health and safety, (b) worker/occupational health and safety related to Hazardous Substances, (c) pollution or protection of natural resources, endangered or threatened species, or the environment or (d) the presence, use, manufacturing, refining, production, generation, handling, transportation, treatment, recycling, storage, disposal, distribution, importing, labeling, testing, processing, discharge, Release, threatened Release, control, or cleanup of, exposure to, or other action or failure to act involving Hazardous Substances.

"***Equipment***" means all furniture, fixtures, equipment, computers, machinery, vehicles, apparatus, attachments, appliances, fittings, lighting fixtures, doors, cabinets, partitions, mantels, motors, pumps, screens, plumbing, heating, air conditioning, waste disposal and storing, wiring, telephones, televisions, monitors, security systems, carpets, floor coverings, wall coverings, office equipment, laboratory equipment, computers, registers, safes, trash containers, meters and scales, combinations, codes and keys, implements, telephone systems, signage, supplies, communications equipment, information technology assets, and any attached and associated hardware, routers, devices, panels, cables, manuals, cords, connectors, cards, and vendor documents, and including all warranties of the vendor applicable thereto, and all other tangible personal property of every kind and description, and Improvements used, or held for use, in connection with the operation of the Business, wherever located.

"***Equity Interests***" means any shares of any class of capital stock, membership interests, partnership interests or other equity or equity-based interests (including securities convertible or exchangeable into equity interests) in any Person, which are issued and outstanding (including all rights to receive all beneficial interest in any such items), and any outstanding warrants, options, voting agreements or other Contracts or obligations pursuant to which such Person is or may become obligated to issue, sell, purchase, return or redeem or vote or abstain from voting any shares of capital stock, membership interests, partnership interests or other equity interests.

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended and the regulations issued thereunder.

"***ERISA Affiliate***" means any trade or business, whether or not incorporated, that, together with Seller, is or would be considered a "single employer" within the meaning of section 414 of the Code or section 4001 of ERISA.

"***Estimated Assumed Payroll Expenses***" has the meaning set forth in Section 2.3(f).

"***Ex-Im Laws***" means (a) applicable Legal Requirement related to (i) export controls, including the U.S. Export Administration Regulations administered by the U.S. Department of Commerce and U.S. International Traffic in Arms Regulations administered by the U.S. Department of State and (ii) import controls and customs laws, including those administered by U.S. Customs and Border Protection and (b) U.S. anti-boycott laws administered by the U.S. Department of Commerce and U.S. Department of the Treasury.

"***Exchange Act***" means the Securities Exchange Act of 1934, as amended.

"***Excluded Assets***" has the meaning set forth in Section 2.2.

"***Excluded Cash Amount***" has the meaning set forth in Section 2.2(l).

"***Excluded Contracts***" has the meaning set forth in Section 2.5(a)(i).

"***Excluded Customer Contracts***" means all Contracts with customers of the Business (other than those set forth on Schedule 2.5(a)).

"***Excluded Liabilities***" has the meaning set forth in Section 2.4.

"***Execution Date***" has the meaning set forth in the introductory paragraph.

"***Extension Period***" has the meaning set forth in Section 11.1(c)(i).

"***Extension Period Outside Date***" has the meaning set forth in Section 11.1(c)(i).

"***Federal Aviation Act***" means the Federal Aviation Act of 1958, as amended, and the rules and regulations promulgated thereunder.

"***Final Allocation Statement***" has the meaning set forth in Section 3.3.

"***Final DIP Order***" means the *Final Order (A) Authorizing the Debtor to Obtain Postpetition Financing, (B) Authorizing the Debtor to Use Cash Collateral, (C) Granting Adequate Protection to the Prepetition Secured Party, (D) Modifying the Automatic Stay, (E) Vacating the Final Hearing set for December 3,2025, and (F) Granting Related Relief* entered in the Bankruptcy Case on December 4, 2025, Docket No. 182.

"***Final Disclosure Schedules***" has the meaning set forth in Section 7.6(a)(viii).

"***Final Order***" means a judgment or Order of the Bankruptcy Court (or any other

9

court of competent jurisdiction) entered on the docket in the Bankruptcy Case (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (A) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (B) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such Order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such Action or Order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such Order, shall not cause an Order not to be a Final Order.

"*Financial Statements*" has the meaning set forth in Section 5.21.

"*First Group Disclosure Schedules*" has the meaning set forth in Section 7.6(a)(ii).

"*Governmental Authority*" means any United States federal, state or local or any foreign government, multi-national organization, quasi-governmental authority, or other similar recognized governmental authority or regulatory or administrative authority, agency or commission or any court, tribunal or judicial body having jurisdiction.

"*Governmental Authorization*" means any approval, consent, license, Permit, waiver or other authorization issued, granted or otherwise made available by or under the authority of any Governmental Authority.

"*Hazardous Substance*" means (a) any substance, material or waste which is regulated by, or for which liability or standards of conduct may be imposed, under any Environmental, Health and Safety Laws, including any substance, material or waste that is defined or regulated as a "pollutant," "contaminant," "hazardous waste," "hazardous material," "hazardous substance," "toxic substance," or "toxic waste" under any Environmental, Health and Safety Laws, and (b) petroleum or any fraction thereof, petroleum products, natural gas, natural gas liquids, asbestos or asbestos-containing materials, lead or lead-containing materials, radioactive materials, radon, toxic mold, urea formaldehyde, per- or polyfluoroalkyl substances, and polychlorinated biphenyls.

"*Improvements*" means the buildings, structures, fixtures, systems, facilities, easements, rights-of-way, privileges, improvements, parking areas, landscaped areas, PP&E, licenses, appurtenances and all other rights and benefits appurtenant or in any way related to and/or demised under any lease of, or other contract or agreement for the use of, the Leased Real Properties, as applicable.

"*Indebtedness*" means, at any time and with respect to any Person: (a) all indebtedness of such Person for borrowed money or indebtedness issued or incurred in substitution or exchange for indebtedness for borrowed money; (b) all indebtedness of such Person for the deferred price of property or services, including reimbursement and other obligations for surety

bonds; (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments; (d) non-contingent obligations of such Person to reimburse any bank or other Person in respect of amounts paid under a letter of credit, banker's acceptance or similar instrument; (e) equity securities of such Person subject to repurchase or redemption other than at the sole option of such Person; (f) "earnouts", purchase price adjustments, profit sharing arrangements, deferred purchase money amounts and similar payment obligations or continuing obligations of any nature of such Person arising out of purchase and sale contracts; (g) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person that does not constitute Acquired Assets (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (h) all obligations of such Person under leases which have been or should be, in accordance with GAAP, recorded as capital leases, to the extent required to be so recorded that do not relate to Acquired Assets; (i) all vendor financing arrangements that do not relate to Acquired Assets; (j) off-balance sheet liabilities and/or pension plan or multiemployer plan liabilities of such Person; (k) all Indebtedness of others referred to in clauses (a) through (j) above guaranteed directly or indirectly by such Person, or in effect guaranteed directly or indirectly by such Person through an agreement (i) to pay or purchase such Indebtedness or to advance or supply funds for the payment or purchase of such Indebtedness, (ii) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Indebtedness, (iii) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (iv) otherwise to assure a creditor against loss in respect of such Indebtedness; (l) all Indebtedness referred to in clauses (a) through (k) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness and (m) for clause (a) through (l) above, all accrued interest thereon, if any, and any termination fees, prepayment penalties, "breakage" cost or similar payments associated with the repayments of such Indebtedness.

"*Intellectual Property*" means all rights, title, and interests, including all intellectual property and intangible rights owned, used or licensed by Seller and used or held for use in the Business, in and to the following throughout the world: (a) patents, patent applications and inventions (whether or not patentable), and all reissues, continuations, continuations-in-part, revisions, divisionals, extensions and reexaminations thereof (collectively, "*Patents*"); (b) all trademarks, service marks, trade dress, trade names, corporate names, logos, slogans, social media identifiers/handles, Internet domain names, and all other indicia of origin, whether registered or unregistered, and registrations and pending applications to register the foregoing, and all goodwill associated therewith (collectively, "*Trademarks*"); (c) all copyrights, works of authorship and Business Software, whether registered or unregistered, including all copyright registrations and applications (collectively, "*Copyrights*"); (d) all trade secrets, know-how and confidential or proprietary business information including, methods, models, techniques, processes, financial, business and marketing plans, and customer and supplier lists (collectively, "*Trade Secrets*"); (e) technical and computer data, databases, and all content contained on Internet sites; (f) all registrations, applications, renewals, extensions, restorations and any other recordings with a Governmental Authority for any of the foregoing; (g) all copies and tangible and intangible forms of any of the foregoing including documentation and other material recording or embodying any

11

of the foregoing; and (h) all other intellectual property and proprietary rights.

"*Intellectual Property Assignment Agreement*" means the Intellectual Property Assignment Agreement, in a form mutually agreeable to Buyer and Seller, to be entered into prior to Closing.

"*Interim Balance Sheet*" has the meaning set forth in Section 5.21.

"*Interim Balance Sheet Date*" has the meaning set forth in Section 5.21.

"*Interim DIP Order*" means the *Interim Order (A) Authorizing the Debtor to Obtain Postpetition Financing, (B) Authorizing the Debtor to Use Cash Collateral, (C) Granting Adequate Protection to the Prepetition Secured Party, (D) Modifying the Automatic Stay, (E) Scheduling a Final Hearing, and (F) Granting Related Relief* entered in the Bankruptcy Case on November 12, 2025, Docket No. 160.

"*Interim Financial Statements*" has the meaning set forth in Section 5.21.

"*Inventory*" has the meaning set forth in Section 2.1(f).

"*IRS*" means the Internal Revenue Service of the United States.

"*Key Person*" means individuals listed on Schedule 1.1(a).

"*Knowledge*" means, with respect to any matter in question, in the case of Seller, the actual knowledge of any of the individuals listed on Schedule 1.1(b) is deemed to have after due investigation and inquiry.

"*Lease*" and "*Leases*" shall have the meaning assigned thereto under the definition of "Leased Real Property."

"*Leased Real Property*" means, as of the Execution Date, all real property and real property interests leased, subleased, licensed, sublicensed or otherwise used or occupied by Seller, as tenant, subtenant, lessee, sublessee, licensee, sublicensee or otherwise, and all leases, subleases, licenses, sublicenses, occupancy agreements, access agreements, memoranda, amendments, restatements, modifications, supplements, and assignments relating to the foregoing (each a "*Lease*", and collectively, the "*Leases*") together with, to the extent leased by Seller in connection with the Business or the Acquired Assets, all buildings and other structures, facilities or Improvements located thereon, all fixtures, systems, Equipment and items of personal property of Seller attached or appurtenant thereto, and all easements, licenses, rights and appurtenances relating to the foregoing (and any present or future rights, title and interests arising from or related to the foregoing).

"*Legal Requirement*" means any federal, state, provincial, county, local, municipal, foreign, international, or multinational law (statutory, common or otherwise), constitution, treaty, convention, ordinance, equitable principle, code, rule, regulation or Order enacted, adopted, promulgated or applied by any Governmental Authority.

"***Liability***" means Claim or Encumbrance of any kind or nature whatsoever (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due).

"***Lien***" means any "interest" as that term is used in section 363(f) of the Bankruptcy Code, mortgage, deed of trust, pledge, assignment, successor liability, security interest, encumbrance, easement, condition, covenant, reservation, lien, mechanics lien, claim, charge, hypothecation, warrant, deemed trust, action, easement, charge or otherwise, or claim of any kind or nature whatsoever in respect of any property, other than any license of Intellectual Property, including any of the foregoing created by, arising under, or evidenced by any conditional sale or other title retention agreement, the interest of a lessor under a capital lease, any financing lease having substantially the same economic effect as any of the foregoing, or the filing of a financing statement naming the owner of the property as to which such lien relates as the debtor under the Uniform Commercial Code or any comparable Legal Requirement in any other jurisdiction.

"***Material Adverse Effect***" means any fact, state of facts, change, circumstance, occurrence, effect, event, result or development that individually or in the aggregate (taking into account all other such facts, states of fact, changes, circumstances, occurrences, effects, events, results or developments) has had, or would be reasonably expected to have, a material adverse effect on (x) the Business, the Acquired Assets or the assets, properties, prospects, condition (financial or otherwise), liabilities or results of operations of the Business (excluding the Excluded Assets and the Excluded Liabilities), taken as a whole or (y) the ability of Seller to consummate the transactions contemplated by this Agreement or to perform any of their obligations under this Agreement, but, with respect to clause (x) only, excluding any fact, state of facts, change, circumstance, occurrence, effect, event, result or development to the extent that it results from or arises out of (i) the Bankruptcy Case; (ii) the execution and delivery of this Agreement or the announcement thereof, including the initiation of litigation by any Person with respect to this Agreement; (iii) any adoption, implementation, modification, repeal or other changes in Legal Requirement or accounting regulations or principles, or in interpretations of any of the foregoing; (iv) any specific action required to be taken pursuant to the terms of this Agreement; (v) any change or effect of economic, business or political conditions (including outbreak, continuation or escalation of any military conflict, declared or undeclared war, armed hostilities, civil unrest, public demonstrations or acts of foreign or domestic terrorism or sabotage (including hacking, ransomware or any other electronic attack), or any escalation or worsening of any such conditions) or the securities, debt, banking, capital, credit or financial markets, or in interest or exchange rates, in each case, in any country or region; (vi) any epidemic, pandemic or outbreak of disease, or any escalation or worsening of such conditions; (vii) any natural or manmade disasters or calamities, weather conditions including hurricanes, floods, tornados, tsunamis, earthquakes and wild fires, cyber outages, or other force majeure events, or any escalation or worsening of such conditions; or (viii) any other regional, national or international calamity, crisis or emergency; provided that, in the cases of immediately preceding clauses (iii), (v), (vi), (vii) and (viii), such fact, state of facts, change, circumstance, occurrence, effect, event, result or development shall be taken into account to the extent that Seller is disproportionately affected, taken as a whole, as compared to other companies in the same industry as Seller.

"***Material Contract***" means any of the following Contracts to which Seller is a party or by which it is bound in connection with the Business or the Acquired Assets: (i) Contracts with

a term greater than or equal to one (1) year (as renewed, as applicable), (ii) any Contract that requires Seller to pay or incur aggregate Liabilities greater than or equal to $100,000.00 per annum, (iii) employment Contracts, (iv) Contracts with respect to Intellectual Property, (v) collective bargaining agreements, (vi) partnership or joint venture agreements, and any other Contract relating to the ownership of, investments in or loans and advances to any Person, including minority equity investments, (vii) Contracts containing a covenant on the part of Seller not to compete with respect to the operation of the Business or which provide for "exclusivity" or any similar requirement in favor of any Person other than Seller, (viii) Contracts relating to the acquisition or disposition by Seller outside the Ordinary Course of Business of any material assets or any material business (whether by merger, sale or purchase of stock, sale or purchase of assets or otherwise) to the extent any actual or contingent material obligations of Seller thereunder remain in effect, (ix) Contracts with any Governmental Authority, (x) any settlement or similar agreement which imposes any payment or other material obligations of Seller after the Closing Date, (xi) Contracts relating to borrowed money or other Indebtedness or the mortgaging, pledging or otherwise placing an Encumbrance on any material asset or group of material assets of Seller or any letter of credit arrangements, or any guaranty therefor, (xii) powers of attorney or other similar Contracts or grant of agency, (xiii) Contracts with a Material Supplier and a Material Customer or (xiv) any other Contracts that are otherwise material to the assets, operations or financial conditions of Seller and the Business.

"*Material Customers*" means the ten (10) largest customers of the Business for the year ended December 31, 2024, and the nine (9) months ended September 30, 2025.

"*Material Suppliers*" means the ten (10) largest suppliers of the Business for the year ended December 31, 2024, and the nine (9) months ended September 30, 2025.

"*Multiemployer Plan*" has the meaning set forth in Section 5.12(b).

"*Order*" means any order, writ, injunction, judgment, verdict, ruling, decision, subpoena, mandate, precept, command, directive, consent, approval, award, decree or similar determination or finding entered, issued, made or rendered by any Governmental Authority or an arbitrator, mediator or other quasi-judicial or judicially sanctioned Person.

"*Ordinary Course of Business*" means, with respect to any Person, the ordinary and usual course of normal day to day operations of such Person and its business, consistent with its past practice (including with respect to quality, quantity and frequency).

"*Other Rights and Interests*" means (i) easements, rights of way, privileges, licenses, hereditaments, appurtenances and all other rights and benefits appurtenant or in any way related to, or demised under any lease of or other context or agreement for the use of, the Leased Real Property and (ii) all strips and gores and any land lying in the bed of a public road, highway or other access way, open or proposed adjourning such Leased Real Property, in each case, to the extent Seller has a legally recognized interest therein.

"*Outside Date*" has the meaning set forth in Section 11.1(c)(i).

"*Party*" or "*Parties*" means, individually or collectively, Buyer and Seller.

"***Patents***" has the meaning assigned thereto under the definition of "Intellectual Property".

"***Permits***" means any and all permits, licenses, approvals, authorizations, clearances, consents, waivers, franchises, filings, accreditations, registrations, certifications, certificates of occupancy, easements, rights of way, notifications, exemptions, clearances, and authorizations, together with all modifications, renewals, amendments, supplements and extensions thereof, of or from any Governmental Authority or any other Person that are necessary for Seller to own the Acquired Assets or operate the Business.

"***Permitted Encumbrances***" means any Permitted Liens (as defined in the Prepetition Credit Agreements) other than those set forth on Schedule 1.1(c) but which shall include encumbrances on Tooling Equipment.

"***Person***" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, unincorporated organization, estate, trust, association, organization or other legal entity or group (as defined in section 13(d)(3) of the Exchange Act) or Governmental Authority.

"***Personal Data***" means any individually identifiable information (or information that, in combination with other information, could allow the identification of an individual, household or device or could be reasonably linked to an individual, household or device), including demographic, health, behavioral, biometric, financial, nonpublic, geolocation, IP addresses, network and hardware identifiers, employee, and any other information that is protected under any Data Protection Laws, or which Seller is required to safeguard under any of its contractual obligations.

"***Petition Date***" means September 8, 2025.

"***Post-Closing Tax Period***" has the meaning set forth in Section 8.1(b).

"***Pre-Closing Tax Period***" has the meaning set forth in Section 8.1(b).

"***Pre-Paid Expenses***" means all deposits (including customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), advances, pre-paid or deferred charges and expenses, prepayments, rights under warranties or guarantees, vendor rebates and other refunds of every kind and nature (whether or not known or unknown or contingent or non-contingent) that relate to the Business, except professional fee retainers.

"***Prepetition Lender***" has the meaning set forth in the recitals.

"***Prepetition Claims Credit Bid and Release***" has the meaning set forth in Section 3.1(a)(ii).

"***Prepetition Obligations***" means all principal, interest and all other amounts in respect of the obligations outstanding pursuant to the Prepetition Credit Agreements. "***Prepetition Credit Agreements***" has the meaning set forth in the Interim DIP Order.

"***Previously Omitted Contract***" has the meaning set forth in Section 2.5(b)(i).

"***Previously Omitted Contract Designation***" has the meaning set forth in Section 2.5(b)(i).

"***Previously Omitted Contract Notice***" has the meaning set forth in Section 2.5(b)(ii).

"***Products***" means any and all products of the Business that Seller market, distribute or sell, in any medium or through any form, as of the Execution Date.

"***Professional Fees Escrow Account***" means the account opened and/or controlled by Seller for the sole purpose of holding and disbursing the Professional Fees Escrow Amount.

"***Professional Fees Escrow Amount***" means the estimated amount of professional fees and expenses expected to be incurred by the estate and UCC professionals, including, but not limited to, Cozen O'Conner, retained pursuant to section 327 of the Bankruptcy Code within the Bankruptcy Case.

"***Professional Fees Escrow Excess***" means an amount (if any) equal to the difference of (i) the amount of the Professional Fees Escrow Funds as of the Closing (including, for the avoidance of doubt, any Professional Fee Escrow Shortfall funded in accordance with Section 3.1(b)(ii)), *minus* (ii) the amount of professional fees and expenses actually accrued and documented, by invoice or otherwise, by the estate and UCC professionals, including, but not limited to, Cozen O'Conner, retained pursuant to section 327 of the Bankruptcy Code within the Bankruptcy Case, in each case, but not yet paid prior to the Closing Date (subject to Bankruptcy Court approval).

"***Professional Fees Escrow Funds***" means, as of such time of determination, the amount of funds remaining in the Professional Fees Escrow Account.

"***Professional Fees Escrow Shortfall***" means an amount (if any) equal to the difference of (i) the amount of professional fees and expenses accrued by the estate and UCC professionals, including, but not limited to, Cozen O'Conner, retained pursuant to section 327 of the Bankruptcy Code within the Bankruptcy Case, in each case, but not yet paid prior to the Closing Date (subject to Bankruptcy Court approval), *minus* (ii) the amount of the Professional Fees Escrow Funds as of the Closing.

"***Proposed Schedule Amendments***" has the meaning set forth in Section 7.6(a)(iv).

"***Protection Event***" has the meaning set forth in Section 11.3(b).

"***Purchase Price***" has the meaning set forth in Section 3.1.

"***Qualified Bid***" has the meaning set forth in the Bidding Procedures, as those terms are amended and described in Section 7.4(b).

"***Records and Documents***" has the meaning set forth in Section 8.6(a).

"***Records Retention Period***" has the meaning set forth in <u>Section 8.6(b)</u>.

"***Release***" means (a) any releasing, spilling, discharging, dumping, disposing, leaking, pumping, injecting, pouring, depositing, dispersing, emitting, emptying, escaping, leaching or migrating into the indoor or outdoor environment, including ambient air, soil, surface water, groundwater and surface or subsurface strata and (b) the abandonment or discarding of barrels, tanks, containers or receptacles, whether or not sealed or closed, containing, or which formerly contained, Hazardous Substances.

"***Representative***" means, with respect to a particular Person, any director, manager, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"***Retained Cash Amount***" means an amount equal to (i) $1,671,000.00 *plus* (ii) the amount (if any) necessary to fund Seller WARN Liabilities incurred on or prior to the Closing (if any), *plus* (iii) Estimated Assumed Payroll Expenses reimbursed to Seller pursuant to <u>Section 2.3(f)</u>.

"***Closing Date Retained Cash Amount***" means an amount equal to the difference (if any) of the (i) Retained Cash Amount, *minus* (ii) the Excluded Cash Amount.

"***Retained Cash Deficiency Amount***" means an amount set forth in <u>Section 3.1(b)(iv)</u>.

"***Sale Order***" means an Order of the Bankruptcy Court, in the form agreed to by Seller and Buyer, or otherwise acceptable to Buyer, pursuant to, *inter alia*, sections 105, 363 and 365 of the Bankruptcy Code authorizing and approving, *inter alia*, the sale of the Acquired Assets to Buyer and/or the Buyer Designees, as applicable, on the terms and conditions set forth herein, free and clear of all Encumbrances (other than Permitted Encumbrances), and the assumption and assignment of the Assumed Contracts to Buyer and/or the Buyer Designees, as applicable, and containing findings of fact and conclusions of law that Buyer and/or the Buyer Designees, as applicable, has acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code.

"***Sales Taxes***" has the meaning set forth in <u>Section 8.1(a)</u>.

"***Sanctioned Country***" means any country or region (i) that is the subject or target of comprehensive Sanctions (including Cuba, Iran, North Korea, Syria, Crimea, the so-called Donetsk People's Republic and so-called Luhansk People's Republic, Kherson, Zaporizhzhia and other regions of Ukraine that are the subject or target of comprehensive Sanctions); (ii) whose government is the subject or target of Sanctions (including Venezuela) or (iii) that is otherwise the subject or target of broad Sanctions (including Russia, Belarus and Afghanistan).

"***Sanctions***" means any economic, financial or trade sanctions or trade embargoes administered or enforced from time to time by (a) the United States Government (including those administered by OFAC, the U.S. Department of State and the U.S. Department of Commerce), (b) the United Nations Security Council, (c) the European Union and each member state thereof (including those administered by the EU Council or EU Commission, when acting in furtherance of the EU's Common and Foreign Security Policy), (d) the United Kingdom (including those

administered by His Majesty's Treasury and the Department of Business, Innovation and Skills),
(e) Canada and (f) Australia.

"*Second Group Disclosure Schedules*" has the meaning set forth in Section
7.6(a)(iii).

"*Seller*" has the meaning set forth in the introductory paragraph.

"*Seller Retained Professional Fees*" means an aggregate amount equal to the
reasonable and documented out of pocket fees and expenses incurred by any professionals retained
by Seller pursuant to section 327 of the Bankruptcy Code or any other estate professionals,
including, but not limited to, all Seller's attorneys, advisors, and consultants, including but not
limited to, Capstone Partners and Coolidge Wall LPA, in each case, solely to the extent such out-
of-pocket fees and expenses, with respect to hourly or monthly professional fees, have been
authorized to be paid by the Bankruptcy Court in orders approving retention applications or
otherwise. For the avoidance of doubt, (i) the definition of Seller Retained Professional fees will
not include any expenses or fees incurred by any professionals retained by Buyer, and (ii) Seller
shall not be responsible for Buyer professional fees and expenses after Closing.

"*Seller Wind-Down Access*" has the meaning set forth in Section 8.6(c).

"*Stalking Horse Order*" means an order to be entered by the Bankruptcy Court in
the Bankruptcy Case approving any bid protections provided for in this Agreement.

"*Straddle Period*" has the meaning set forth in Section 8.1(b).

"*Subsidiary*" means any entity with respect to which a specified Person (or a
Subsidiary thereof) has the power, through the ownership of securities or otherwise, to elect a
majority of the managers, directors or similar managing body.

"*Successful Bidder*" has the meaning set forth in the Bidding Procedures.

"*Tax*" or "*Taxes*" (and with correlative meaning, "*Taxable*" and "*Taxing*") means
(i) any U.S. federal, state, provincial, local, non-U.S. or other income, alternative, minimum, add-
on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth,
capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and
services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary,
recording, premium, severance, natural resources, real property, personal property, ad valorem,
intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social
security, disability, workers' compensation, payroll, health care, withholding, estimated or other
similar tax, duty, levy or other governmental charge or assessment or deficiency thereof (including
all interest and penalties thereon and additions thereto, whether disputed or not) and (ii) any
liability for any items described in clause (i) payable by reason of contract, transferee liability or
operation of law (including Treasury Regulations Section 1.1502-6) or otherwise.

"*Tax Return*" means any return, declaration, report, claim for refund, information
return or other document (including any related or supporting estimates, elections, schedules,
statements, or information) filed or required to be filed in connection with the determination,

assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"*Third-Party Licenses*" means each Contract through which material third party Intellectual Property owned by a third party is licensed to Seller or the Business.

"*Tooling Equipment*" has the meaning set forth in <u>Section 2.2(n)</u>.

"*Topping Bid Condition*" has the meaning set forth in <u>Section 11.2</u>.

"*Trade Secrets*" has the meaning assigned thereto under the definition of "Intellectual Property".

"*Trademarks*" has the meaning assigned thereto under the definition of "Intellectual Property".

"*Transaction Documents*" means this Agreement including the Schedules, the Assumption Agreement, the Bill of Sale, the Intellectual Property Assignment Agreement, the Assignment of Leases and any other agreements, instruments or documents in mutually agreeable forms entered into by Buyer and Seller at the Closing pursuant to this Agreement.

"*Transfer Taxes*" has the meaning set forth in <u>Section 8.1(a)</u>.

"*Transferred Permits*" has the meaning set forth in <u>Section 2.1(m)</u>.

"*UCC*" means the Official Committee of Unsecured Creditors of the Company within this Bankruptcy Case.

"*Union*" and "*Unions*" has the meaning set forth in <u>Section 5.11</u>.

"*WARN Act*" means the Worker Adjustment and Retraining Notification Act of 1988, as amended and including any similar state, province or local Legal Requirement, or any other applicable Legal Requirement for employees outside the United States, regarding the termination or layoff of employees, and any similar state law.

1.2    <u>Other Definitions and Interpretive Matters</u>.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

<u>Calculation of Time Period</u>. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

<u>Day</u>. Any reference in this Agreement to days (but not Business Days) means

19

calendar days.

Dollars. Any reference in this Agreement to $ means United States dollars.

Schedules. All Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number. Any reference in this Agreement to gender includes all genders, and words imparting the singular number only include the plural and vice versa.

Headings. The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement. All references in this Agreement to any "**Section**" or "**Article**" are to the corresponding Section or Article of this Agreement unless otherwise specified.

Herein. Words such as "**herein**", "**hereof**" and "**hereunder**" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

Including. The word "**including**" or any variation thereof means "**including, without limitation,**" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

Or. The word "**or**" shall be disjunctive but not exclusive.

(b)  No Strict Construction. Buyer, on the one hand, and Seller, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer, on the one hand, and Seller, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Without limiting the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

## ARTICLE 2

### PURCHASE AND SALE

2.1  Purchase and Sale. Subject to the entry of the Sale Order and upon the terms and subject to the conditions of this Agreement, on the Closing Date, Seller shall unconditionally sell, transfer, assign, convey and deliver to Buyer and/or one or more other Persons designated by Buyer (each, a "**Buyer Designee**"), and Buyer shall purchase, acquire and accept from Seller, free and clear of any and all Encumbrances (other than Permitted Encumbrances), all of Seller's direct or indirect right, title and interest in, to or under the Business, including all of Seller's properties, rights, Claims and assets (other than the Excluded

Assets) of every kind and description (wherever situated or located, real, personal or mixed, tangible or intangible, whether identifiable or contingent, owned, leased or licensed) used, held for use in, or useful in, or intended to be used in, or that arise in any way out of, the Business, whether or not reflected on the books and records of Seller, as the same shall exist on the Closing Date (collectively, the "***Acquired Assets***"). Without limiting the generality of the prior sentence, the Acquired Assets shall include, whether they relate exclusively to the Business or not (except where so noted in the following list or in any definition used in the following list) all of Seller's direct or indirect right, title and interest in, to and under the following; <u>provided</u>, <u>however</u>, for clarity, if a Contract or Permit is not assignable it shall not be an Acquired Asset, unless and until it becomes assignable:

(a)    all Accounts Receivable;

(b)    all Pre-Paid Expenses;

(c)    all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit, bank accounts and other bank deposits, instruments and investments of Seller other than the Excluded Cash Amount;

(d)    all Intellectual Property owned by Seller; <u>provided</u>, <u>however,</u> if not assignable pursuant to its term and no consent for such assignment is obtained, then it shall not be an Acquired Asset until, and if, it becomes assignable;

(e)    all Equipment, whether owned or leased (and, to the extent leased, any Contract or rights related thereto if such Contract is an Assumed Contract);

(f)    all inventory of any kind or nature (including but not limited to all finished goods, work in process, raw materials, components, packaging and all other materials and supplies to be consumed, used or held for use by the Business in the production of finished goods) and Products, related to the Business and maintained, held or stored by or for Seller on the Closing Date, whether or not prepaid, and wherever located, held or owned, and any prepaid deposits for any of the same ("***Inventory***");

(g)    to the extent permitted by Legal Requirement, all Documents and other books and records (including financial and accounting files (but excluding (x) personnel files of any Employee or former employee of Seller and (y) the general corporate files and records of Seller, insofar as they relate to the organization, existence or capitalization of Seller)), and correspondence, and all customer sales, marketing, advertising, packaging and promotional materials, files, data, Business Software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, other technical information and data, vendor lists, supplier lists, and all other business and other records;

(h)    all Assumed Contracts;

(i)    all Leased Real Property under any Lease that is an Assumed Contract (and any agreement and rights related thereto or under the applicable Lease to the extent that such agreement or Lease is an Assumed Contract) together with all interests in and to all Improvements located thereon or attached thereto, and other appurtenances thereto, and rights in

21

respect thereof including all Other Rights and Interests in respect thereof, and copies (and originals in Seller's possession or control) of all instruments, Leases and agreements evidencing Seller's interest in the same, and any existing surveys, zoning reports, architectural and engineering blueprints, plans and specifications and reports, and legal descriptions, in each case, concerning such Leased Real Properties that are in the possession or control of Seller, which shall be deemed to be delivered to the extent located at any of the Leased Real Property;

(j)      all security deposits with respect to any Lease that is an Assumed Contract;

(k)      all rights under or arising out of all insurance policies (other than director and officer insurance policies), including third party property and casualty insurance proceeds and other insurance proceeds;

(l)      all goodwill, customer and referral relationships, other intangible property and all privileges, set-offs, indemnification rights, causes of action, actions, Claims and demands and rights of any kind as against others (whether by contract or otherwise) relating to, arising from or associated with any of the Acquired Assets (including the Intellectual Property), the Assumed Liabilities and/or the Business or otherwise;

(m)      all Permits that relate to the Business or the Acquired Assets, to the extent transferable, including those designated as "Transferred Permits" on Schedule 2.1(m) (the "**_Transferred Permits_**"); provided, however, if not assignable pursuant to its terms and no consent for such assignment is obtained, then it shall not be an Acquired Asset until, and if, it becomes assignable;

(n)      all claims, interests, rights, rebates, refunds, abatements, remedies, recoveries and benefits of Seller, and all claims and causes of action, for Taxes or otherwise, arising under or relating to any of the Acquired Assets, the Assumed Liabilities or the Business, including those arising out of Assumed Contracts, express or implied warranties, representations, licenses and guarantees from suppliers, manufacturers, contractors or others to the extent relating to the operation of the Business or affecting the Equipment, Improvements, Inventory or other tangible Acquired Assets or ordered by Seller prior to the Closing Date (and in any case, any component thereof); provided, however, any Tax refunds for the Taxes derived from the Pre-Closing operations of the Seller, in each case to the extent listed on Schedule 2.1(n), shall remain the property of the Seller;

(o)      all rights, but not obligations, under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with Employees or former employees and agents of Seller or with third parties (including any non-disclosure or confidentiality, non-compete, or non-solicitation agreements entered into in connection with or in contemplation of the Auction);

(p)      all telephone, telex and telephone facsimile numbers and other directory listings;

(q)      all domain names, URLs and web sites;

22

(r)    all Business Software; provided, however, if not assignable pursuant to its terms and no consent for such assignment is obtained, then it shall not be an Acquired Asset until, and if it becomes assignable;

(s)    all credits, deposits, prepaid amounts and other rights to refunds of Taxes paid by or with respect to Seller which refunds are attributable to Pre-Closing Tax Periods;

(t)    all assets, if any, listed on Schedule 2.1(t) (regardless of whether such assets are covered by any of the foregoing); and

(u)    all Assumed Benefit Plans set forth in Schedule 2.1(u) and all assets, trust agreements, insurance policies, administrative services agreements, and other contracts, files, and records in respect thereof.

2.2    Excluded Assets. Notwithstanding anything to the contrary in this Agreement (including Section 2.1, other than as set forth on Schedule 2.1(t)), nothing herein shall be deemed to sell, transfer, assign, convey or deliver any of the Excluded Assets to Buyer or any of the Buyer Designees, and Seller shall retain all right, title and interest to, in and under, and all Liabilities with respect to, the Excluded Assets (except for the Tooling Equipment as further described in Section 2.2(n)). For all purposes of and under this Agreement, the term "*Excluded Assets*" shall consist of only the following items, assets and properties (unless otherwise set forth on Schedule 2.1(t)):

(a)    subject to Section 2.1(g), the limited liability company, partnership and corporate books and records of internal limited liability company, partnership and corporate proceedings, minute books, organizational or governing documents, stock ledgers, Tax records, work papers and other records of Seller as they pertain to ownership, organization, qualification to do business or existence of Seller; provided, however, that copies of the foregoing items (including copies of Tax records and work papers of Seller) shall be made available by Seller to Buyer at Buyer's request; provided, however, that with respect to Tax Returns of the Seller, at the written request of Buyer, Seller shall make available to Buyer all information contained in its Tax Returns relating to the Tax attributes or otherwise to the Tax matters of the Business or the Acquired Assets for periods (or portions thereof) commencing after the Closing Date;

(b)    any Contract that is not an Assumed Contract, including all Excluded Customer Contracts;

(c)    any Collective Bargaining Agreements;

(d)    with respect to any Benefit Plans that are not Assumed Benefit Plans, any and all assets, trust agreements, insurance policies, administrative services agreements, and other contracts, files, and records in respect thereof;

(e)    all current and prior director and officer insurance policies of Seller and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries, in each case to the extent set forth on Schedule 2.2(e);

23

(f)    all personnel files and other records relating to any Employee or former employee of the Seller;

(g)    the general corporate files and records of Seller, insofar as they relate to the organization, existence or capitalization of Seller, as well as any other records or materials relating to the Seller generally and not primarily involving or primarily related to the Acquired Assets or the operations of the Business; provided, that copies of such files and records shall be made available to Buyer upon reasonable request to the extent permitted by applicable law;

(h)    the insurance policies of the Seller, to the extent set forth on Schedule 2.2(h);

(i)    documents (x) that Seller is required by Legal Requirement to retain, (y) that if transferred would violate any applicable Legal Requirement (including with respect to privacy) or (z) that are subject to any attorney-client, work product or similar privilege with respect to work performed in anticipation of or in connection with the preparation or administration of the Bankruptcy Case, this Agreement or the transactions contemplated by this Agreement;

(j)    any rights, claims or causes of action of Seller under this Agreement or any other Transaction Document;

(k)    all Equity Interests of Seller and any Subsidiary thereof;

(l)    all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit, bank accounts and other bank deposits, instruments and investments of Seller equal to (but for the avoidance of doubt not to exceed) the Retained Cash Amount (the "***Excluded Cash Amount***");

(m)    refunds for Taxes of Seller, whether known or unknown, if any, accrued prior to the Closing Date, in each case, to the extent set forth in Schedule 2.2(m);

(n)    all equipment or inventory owned by Seller's customers, past and current, known as "***Tooling Equipment***", possession of which will transfer from Seller to Buyer at Closing, but ownership of which shall remain with the subject customer; provided, however, at Closing the Parties agree Buyer shall take possession of all Tooling Equipment, and the responsibility to store, care and preserve the same, as may be contractually required or as has been historically undertaken by Seller; and

(o)    all assets, if any, to the extent expressly set forth on Schedule 2.2(o) (regardless of whether such assets are covered by any of the foregoing); and

(p)    bank accounts and accounts related to the self-insured health Benefit Plans and FSA accounts set forth on Schedule 2.2(p), which shall be not included when measuring the Retained Cash Amount and will be in addition to the Retained Cash Amount; provided, however, that the self-insured health Benefit Plan and FSA related accounts will be not be an Excluded Asset if the self-insured health Benefit Plan and FSA, as applicable, is an Assumed Benefit Plan.

24

2.3 <u>Assumed Liabilities</u>. Subject to entry of the Sale Order, upon the terms and subject to the conditions of this Agreement, on the Closing Date, Buyer or Buyer Designee shall, effective at the time of the Closing, assume and agree to discharge and perform when due, only the following Liabilities of Seller (the "***Assumed Liabilities***"), and no other Liabilities (including, for the avoidance of doubt all Excluded Liabilities):

(a) all Liabilities under the Assumed Contracts that are required to be performed after the Closing Date (including sponsorship of any Benefit Plan that is an Assumed Benefit Plan and all Liabilities under or related thereto), solely to the extent they arise or relate to periods of time after the Closing Date and obligations of Seller under open purchase orders with suppliers under the Assumed Contracts (but excluding any liability or obligation relating to or arising out of such Assumed Contract as a result of (i) any breach of such Assumed Contract occurring prior to the Closing or (ii) any indemnification or similar obligation arising from periods prior to the Closing Date; <u>provided</u>, <u>however</u>, that this exclusion shall not negate the assumption of Cure Costs provided for herein);

(b) all trade and accounts payable set forth on <u>Schedule 2.3(b)</u>, solely to the extent set forth on (and, for the avoidance of doubt, solely with respect to (and to the extent of) the amount set forth on) such <u>Schedule 2.3(b)</u> (collectively, the "***Assumed Trade Payables***");

(c) all Cure Costs;

(d) other than as set forth in <u>Section 2.4</u> or as set forth on <u>Schedule 2.3(d)</u>, or as set forth in <u>Section 8.5(b)</u> herein, all Liabilities relating in any way to any Buyer Employees with respect to any act or omission after the Closing Date, including payroll, vacation, sick leave, unemployment benefits, COBRA, WARN, notice pay, retirement benefits, pension benefits, employment agreements or arrangements, severance, retention or termination agreements or arrangements, employee stock option, equity compensation, equity-based compensation, employee stock purchase, employee benefits, Assumed Benefit Plans, compensation arrangements, or profit sharing plans, health care and other welfare plans or benefits (including COBRA), or any other employee plans, agreements, policies, or arrangements or benefits or other compensation of any kind;

(e) any accrued or earned, but unused/unpaid vacation, personal time off, or sick leave of Seller Employees or current directors, officers, consultants or contractors (collectively, the "***Assumed PTO Liabilities***");

(f) all accrued and unpaid payroll and payroll related expenses of the Seller, including the costs of health and other non-cash benefits for all Employees of Seller for the period commencing on the thirtieth (30th) day prior to the Closing Date through and until the day prior to Closing, with all such Employee costs on and after Closing solely the Buyer's responsibility, which amount shall be transferred by Buyer to Seller at Closing (collectively, the "***Actual Assumed Payroll Expenses***"); <u>provided</u>, <u>however</u>, that such amount transferred by Buyer shall only be used for Seller paying payroll and payroll related expenses of the Seller pursuant to this <u>Section 2.3(f)</u> and that the procedure for such reimbursement is subject to the terms and conditions of <u>Article 3</u> in all respects; for the avoidance of doubt, Seller and Buyer shall estimate the expected amount of the Actual Assumed Payroll Expenses (the "***Estimated Assumed Payroll***

*Expenses*"), and at Closing Buyer shall, in accordance with <u>Section 3.1(b)(i)</u>, wire to Seller said Estimated Assumed Payroll Expenses only to be used for Seller to pay payroll and payroll-related expenses of the Seller. Within ten (10) business days following Closing, either (i) Seller shall pay Buyer any excess of the Estimated Assumed Payroll Expenses over Actual Assumed Payroll Expenses or (ii) Buyer shall pay Seller any excess of Actual Assumed Payroll Expenses over the Estimated Assumed Payroll Expenses.

(g)    any Liabilities relating to the Assumed Benefits Plans; and

(h)    the other Liabilities, if any, to the extent expressly set forth on <u>Schedule 2.3(h)</u> (regardless of whether such assets are covered by any of the foregoing).

The assumption by Buyer or any of its applicable Buyer Designees of the Assumed Liabilities shall not, in any way, enlarge the rights of any third parties relating thereto. For the avoidance of doubt, Assumed Liabilities shall not include any Liability relating to or arising out of any violation of law by, or any Action against, Seller or any breach, default or violation by Seller of or under any Assumed Contracts (other than to the extent solely incurred as a direct result of the Bankruptcy Case), all of which shall constitute Excluded Liabilities; <u>provided</u>, <u>however</u>, that this exclusion shall not negate the assumption of Cure Costs provided for herein.

2.4    <u>Excluded Liabilities</u>. Notwithstanding any provision in this Agreement to the contrary, neither Buyer nor any Buyer Designee shall assume, nor shall Buyer or any of its applicable Buyer Designees be obligated to assume or be obliged to pay, perform or otherwise discharge, any Liability of, or Liability against, Seller, Seller's Subsidiaries, the Business or the Acquired Assets, of any kind or nature, whether absolute, accrued, contingent or otherwise, whether due or to become due and whether or not assets, and whether or not known or unknown or currently existing or hereafter arising or matured or unmatured, direct or indirect, and however arising, other than the Assumed Liabilities, and Seller shall be solely and exclusively liable with respect to all Liabilities of Seller, other than the Assumed Liabilities (such Liabilities other than Assumed Liabilities, collectively, the "***Excluded Liabilities***"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include each of the following Liabilities of Seller and Seller's Subsidiaries other than the Assumed Liabilities:

(a)    all Actions pending on or before the Closing Date or to the extent against or giving rise to Liability against the Business or the Acquired Assets prior to the Closing Date even if instituted after the Closing Date; <u>provided</u>, <u>however</u>, that this exclusion shall not negate the assumption of Cure Costs provided for herein;

(b)    any obligation of Seller to indemnify any Person by reason of, or in connection with, the fact that such Person was a director, officer, manager, employee or agent of such Seller or any other Person;

(c)    all Liabilities with respect to any Excluded Asset, including (i) obligations arising under, in connection with or otherwise related to any Benefit Plans that are not Assumed Benefits Plans, (ii) all Contracts that are not Assumed Contracts (including, but not limited to, the Contracts set forth on <u>Schedule 2.4(c)</u> and <u>2.4(k)</u>(the "***Excluded Contracts***")), and (iii) all Excluded Customer Contracts;

26

(d) other than as set forth in <u>Schedule 2.4(d)</u>, <u>Section 2.3(e)</u>, <u>Section 8.5(f)</u> and <u>Section 8.5(g)</u>, all Liabilities relating to any Employees, former employees, or current or former directors, officers, consultants, contractors, or applicants for employment (and, in each case, their respective representatives or beneficiaries) of Seller for any action or inaction of Seller (or any of its predecessors) occurring prior to, on or after the Closing Date, including payroll, unemployment benefits, notice pay, retirement benefits, pension benefits, employment agreements or arrangements, severance, retention or termination agreements or arrangements, employee stock option, equity compensation, equity-based compensation, employee stock purchase, employee benefits, Benefit Plans (that are not Assumed Benefit Plans), compensation arrangements, or profit sharing plans, health care and other welfare plans or benefits (including COBRA), or any other employee plans, agreements, policies, or arrangements or benefits or other compensation of any kind; <u>provided</u>, <u>however</u>, Buyer shall assume the Assumed PTO Liabilities pursuant to <u>Section 2.3(e)</u>.

(e) other than as set forth in <u>Schedule 2.4(e)</u>, all Liabilities relating in any way to any Buyer Employees with respect to any act or omission on or before the Closing Date, including payroll, vacation, sick leave, unemployment benefits, COBRA, WARN, notice pay, retirement benefits, pension benefits, employment agreements or arrangements, severance, retention or termination agreements or arrangements, employee stock option, equity compensation, equity-based compensation, employee stock purchase, employee benefits, Benefit Plans (except with respect to any Assumed Benefit Plans), compensation arrangements, or profit sharing plans, health care and other welfare plans or benefits (including COBRA), or any other employee plans, agreements, policies, or arrangements or benefits or other compensation of any kind;

(f) any Liability under section 4062 of ERISA for the termination of a Benefit Plan or any current or future withdrawal liability owed or becomes owed to a Multiemployer Plan due to a partial or complete withdrawal defined under sections 4203 and 4205 of ERISA, or with respect to which Seller or any ERISA Affiliate has any Liability, contingent or otherwise, including with respect to the IRS, the United States Department of Labor or otherwise;

(g) Indebtedness of the Seller except as contemplated by <u>Section 2.3</u> above;

(h) subject to <u>Section 8.1</u> (i) all Liabilities with respect to (x) any Taxes imposed on or with respect to the Business or the Acquired Assets that are attributable to any Pre-Closing Tax Period or that arise as a consequence of the Closing or the other transactions contemplated by this Agreement; and (y) Taxes related to the Excluded Assets; and (ii) all Liabilities for Taxes of Seller or its stockholders or members for any Tax period (including any Liability of Seller for the Taxes of any other Person under Section 1.1502-6 of the U.S. Treasury Regulations (or any similar provision of state, local or non-U.S. law), as a transferee or successor, by contract or otherwise);

(i) all Liabilities for (i) legal, accounting, investment banking, reorganization, restructuring, brokerage or similar costs and expenses incurred or owed by Seller in connection with the administration of the Bankruptcy Case (including all Seller Retained Professional Fees) and administrative expenses and priority claims accrued through the Closing Date, including arising under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code and

specified post-closing administrative wind-down expenses of the bankruptcy estates pursuant to the Bankruptcy Code and (ii) all costs and expenses incurred in connection with the negotiation, execution and consummation of the transactions contemplated under this Agreement by Seller, including any retention bonuses, "success" fees, change of control payments and any other payment obligations of Seller or of any of its predecessors payable as a result of the consummation of the transactions contemplated by this Agreement and the documents delivered in connection herewith, unless otherwise set forth on Schedule 2.4(i);

(j)      all Liabilities relating to or arising out of any Excluded Asset;

(k)      all trade and accounts payable (or, if applicable, portions thereof) to the extent not expressly listed on Schedule 2.3(b) as Assumed Trade Payables (including, but not limited to, those trade and accounts payable set forth on Schedule 2.4(k)) (collectively, the "***Excluded Trade Payables***");

(l)      all Liabilities relating to the Acquired Assets based on events or conditions occurring or existing prior to the Closing and connected with, arising out of or relating to (and including, in each case, those Liabilities listed or described in Schedule 5.6) (i) Hazardous Substances or Environmental, Health and Safety Laws, (ii) claims relating to employee health and safety, including claims for injury, sickness, disease or death of any Person or (iii) compliance with any Legal Requirement relating to any of the foregoing;

(m)      all Liabilities to any equityholder of Seller or Seller Subsidiary;

(n)      any other Liabilities or other obligations of Seller not expressly assumed by Buyer pursuant to Section 2.3;

(o)      all unpaid sales or use Taxes arising from work performed prior to Closing, but not yet due and relating to Accounts Receivable (except for those sales or use Taxes accrued, but not yet collected, in each case to the extent set forth in Schedule 2.4(o)); and

(p)      all other Liabilities, if any, to the extent expressly set forth on Schedule 2.4(p) (regardless of whether such assets are covered by any of the foregoing).

2.5      Assignment and Assumption of Contracts.

(a)

(i) Schedule 2.5(a) sets forth a list of all executory Contracts (including all Leases) to which Seller is party and which are to be included in the Acquired Assets (the "***Assumed Contracts***") (subject to the terms of this Section 2.5) and Seller's good faith estimate of the Cure Costs associated with each Assumed Contract as of the Petition Date. From and after the Execution Date until the Closing Date, the Seller shall make such deletions to Schedule 2.5(a) as Buyer shall request in writing in Buyer's sole discretion. Any such deleted Contract shall be deemed to no longer be an Assumed Contract and, for the avoidance of doubt, Buyer shall not be responsible for any Cure Costs related thereto. The Parties acknowledge and agree that there will be no reduction in, or increase to, the Purchase Price as a result of (i) any change in Cure Costs or (ii) any addition or elimination of any Contract as an Assumed Contract.

All Contracts of Seller that are not listed on Schedule 2.5(a) shall not be considered an Assumed Contract or an Acquired Asset and shall be deemed "***Excluded Contracts***"; provided, that Buyer has the right at any time before the date that is the Closing Date (such date, the "***Determination Date***") to (x) amend Schedule 2.5(a) to designate any other contract which has not been rejected by Seller to be an Assumed Contract, and (y) to remove from Schedule 2.5(a) an Assumed Contract that is subject to a cure dispute with the counterparty thereto or other dispute with the counterparty thereto as to the assumption or assignment of such Assumed Contract that has not been resolved to the satisfaction of Buyer, in its sole discretion, prior to the Determination Date (any such Contract, a "***Disputed Contract***").

(ii)  Seller and Buyer shall cooperate in good faith prior to Closing and during the Cooperation Period, at Buyer's expense if during the Cooperation Period, to take all commercially reasonable actions required to assume and assign the Assumed Contracts to Buyer or any of its applicable Buyer Designees (provided such Buyer Designees have the authority to do so), including taking all actions required to obtain an Order containing a finding that the proposed assumption and assignment of the Assumed Contracts to Buyer satisfies all applicable requirements of section 365 of the Bankruptcy Code; provided, however, should Buyer require or request the services of Seller following the Closing, which can practically only be provided by Seller's professionals in order for Seller to provide its cooperation refenced herein, then, solely to the extent (i) not otherwise covered by the Actual Wind-Down Expenses, and (ii) specifically requested in writing by Buyer, Buyer (not Seller) shall pay for the reasonable and documented fees and expenses for such Seller's professional services.

(iii)  If prior to the Closing Date there are Contracts or Leases that have not been designated as an Assumed Contract or an Excluded Contract, Seller shall not, without Buyer's consent, assume or reject any such Contract or Lease pursuant to section 365 of the Bankruptcy Code and any Order of the Bankruptcy Court, until Buyer so directs Seller.

(iv) At Closing, (x) Seller shall, pursuant to the Sale Order and the Assumption Agreement, assume and assign to Buyer or the applicable Buyer Designee (the consideration for which is included in the Purchase Price) each of the Assumed Contracts that is capable of being assumed and assigned in connection with such assumption and assignment (as agreed to among Buyer and Seller or as determined by the Bankruptcy Court) and (y) Buyer shall assume and perform and discharge the Assumed Liabilities (if any) under the Assumed Contracts, pursuant to the Assumption Agreement, and the terms herein.

(v)  Prior to the Closing Date, Seller shall provide Buyer with a list of all Disputed Contracts and the amount of Cure Costs that has been proposed by each such non-Seller counterparty for such Disputed Contract; provided, that Buyer shall agree to any Cure Costs for any Contract irrevocably designated by Buyer in writing as an Assumed Contract, in which case the same shall be deemed an Assumed Cure Cost, if instructed to do so by Buyer. If Seller, with the consent of Buyer (which consent shall not be unreasonably withheld), and the non-Seller counterparty with respect to any Disputed Contract, are unable to agree on Cure Costs and/or the assumption and assignment of such Disputed Contract prior to the Closing Date, the Buyer shall follow the procedures set forth in the Bidding Procedures Order to resolve such dispute (a "***Disputed Contract Determination***"). Upon a Disputed Contract Determination that prohibits assumption and assignment to Buyer, such Disputed Contract will automatically be an Excluded

Contract. If assumption and assignment to Buyer is not prohibited, then Buyer may elect to re-designate such Assumed Contract as an Excluded Contract. If such Assumed Contract is not so re-designated, (x) Seller shall promptly take such steps, at Buyer's expense if occurring after Closing, as are reasonably necessary, including, if applicable and reasonably practicable, promptly on delivery of no less than five (5) Business Days' notice to the non-Seller counterparty to such Contract, to cause such Contract to be assumed by Seller and assigned to Buyer, including by executing and delivering to Buyer an Assignment and Assumption Agreement with respect to such Assumed Contract, and (y) Buyer shall pay the Cure Costs with respect to such Assumed Contract either (i) concurrently with Seller's assumption and assignment thereof to Buyer or (ii) as agreed in writing by Buyer and the applicable counterparty to such Assumed Contract, and execute and deliver to Buyer an Assignment and Assumption Agreement with respect to such Assumed Contract, in each case, other than with respect to any Cure Costs; provided, however, should Buyer require or request the services of Seller following the Closing, which can practically only be provided by Seller's professionals in order for Seller to provide its cooperation refenced herein, then, solely to the extent (i) not otherwise covered by the Actual Wind-Down Expenses, and (ii) specifically requested in writing by Buyer, Buyer (not Seller) shall pay for the reasonable and documented fees and expenses for such Seller's professional services.

(b)     Previously Omitted Contracts.

(i)     If prior to or following Closing until the date of confirmation of a plan of liquidation or any other plan is confirmed in the Bankruptcy Case, it is discovered that a Contract should have been listed on Schedule 2.5(a) but was not listed on Schedule 2.5(a) and has not been rejected by Seller (any such Contract, a "***Previously Omitted Contract***"), Seller, at Buyer's expense if occurring after Closing, shall, immediately following the discovery thereof (but in no event later than two (2) Business Days following the discovery thereof), notify Buyer in writing of such Previously Omitted Contract and all Cure Costs (if any) for such Previously Omitted Contract. Buyer shall thereafter deliver written notice to Seller, no later than ten (10) Business Days following notification of such Previously Omitted Contract from Seller, designating such Previously Omitted Contract as "Assumed" or "Rejected" (a "***Previously Omitted Contract Designation***"). A Previously Omitted Contract designated in accordance with this Section 2.5(b)(i) as "Excluded," or with respect to which Buyer fails to deliver a Previously Omitted Contract Designation, shall be an Excluded Contract.

(ii) If Buyer designates a Previously Omitted Contract as "Assumed" in accordance with Section 2.5(b)(i), Seller shall, at Buyer's expense if occurring after Closing, serve a notice (the "***Previously Omitted Contract Notice***") on the counterparties to such Previously Omitted Contract notifying such counterparties of the Cure Costs with respect to such Previously Omitted Contract and Seller's intention to assume and assign such Previously Omitted Contract in accordance with this Section 2.5. The Previously Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with ten (10) Business Days to object, in writing to Seller and Buyer, to the Cure Costs or the assumption of its Contract. If the counterparties, Seller and Buyer are unable to reach a consensual resolution with respect to the objection, Seller, at Buyer's expense if occurring after Closing, will seek an expedited hearing before Bankruptcy Court to determine the Cure Costs and approve the assumption. If no objection is served on Seller and Buyer, Seller, at Buyer's expense if occurring after Closing, shall, obtain an order of the Bankruptcy Court fixing the Cure Costs and approving the assumption of the

Previously Omitted Contract and, Buyer shall pay the Cure Costs associated thereto; provided, however, should Buyer require or request the services of Seller following the Closing, which can practically only be provided by Seller's professionals in order for Seller to provide its cooperation refenced herein, then, solely to the extent (i) not otherwise covered by the Actual Wind-Down Expenses, and (ii) specifically requested in writing by Buyer, Buyer (not Seller) shall pay for the reasonable and documented fees and expenses for such Seller's professional services.

(c)     Non-Assignment of Contracts and Permits. Notwithstanding anything contained in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Contract or any Permit, if, notwithstanding the provisions of sections 363 and 365 of the Bankruptcy Code together with any otherwise applicable non-bankruptcy law, an attempt at assignment or transfer thereof, without the consent or approval required or necessary for such assignment or transfer, would constitute a breach thereof, is otherwise not assignable, or in any way adversely affect any of the rights of Buyer, as the assignee or transferee of such Contract or Permit (as the case may be) thereunder. If, notwithstanding the provisions of sections 363 and 365 of the Bankruptcy Code and the commercially reasonable efforts of the Parties, such consent or approval is required but not obtained with respect to an Assumed Contract or a Permit, neither Seller nor Buyer shall be in breach of this Agreement nor shall the Purchase Price be adjusted nor (but subject to the satisfaction of the conditions set forth in Section 9.4 (unless waived by Buyer in its sole and absolute discretion)) shall the Closing be delayed in respect of the Assumed Contracts or the Permits; provided, however, if the Closing occurs, then, with respect to any Assumed Contract or Permit for which consent or approval is required but not obtained, from and after the Closing, Seller shall cooperate, so long as the Seller has not been dissolved, but in any case not longer than the earlier to occur of either (i) ninety (90) days after Closing or (ii) the pendency of the subject Bankruptcy Case (the "**_Cooperation Period_**"), at Buyer's expense if occurring after Closing and without further consideration, with Buyer in any reasonable arrangement Buyer may request to provide Buyer with all of the benefits of, or under, the applicable Assumed Contract or applicable Permit, including enforcement for the benefit of Buyer, at Buyer's expense if occurring after Closing, of any and all rights of Seller against any party to the applicable Assumed Contract or applicable Permit arising out of the breach or cancellation thereof by such party; provided, however, to the extent that any such arrangement has been made to provide Buyer with the benefits of, or under, the applicable Assumed Contract or applicable Permit, from and after Closing, Buyer shall be responsible for, and shall promptly pay all payment and other obligations under such Assumed Contract or Permit (all of which shall constitute, and shall be deemed to be, Assumed Liabilities hereunder), to the same extent as if such Assumed Contract or Permit had been assigned or transferred at Closing with respect to Assumed Contracts and Permits, and at such applicable later date specified in this Section 2.5(c) with respect to any additional Assumed Contracts. Any assignment to Buyer of any Assumed Contract or Permit that shall, notwithstanding the provisions of sections 363 and 365 of the Bankruptcy Code, require the consent or approval of any Person for such assignment as aforesaid shall be made subject to such consent or approval being obtained. For the avoidance of doubt, to the extent that Buyer's Employees or professionals perform services under the direction of Seller after Closing in order for Seller to ensure that Buyer benefits from such Contracts and/or Permits, then any such costs, including Buyer Employee costs and Seller's out of pocket expenses shall be the sole expense of Buyer.

2.6     Further Assurances. At and after the Closing, and without further consideration therefor, the Parties shall execute and deliver such further instruments and certificates as shall be reasonably necessary or desirable (i) to vest, perfect or confirm ownership (of record or otherwise) in Buyer and/or one or more Buyer Designees, Seller's right, title or interest in, to or under any or all of the Acquired Assets free and clear of all Encumbrances (other than Permitted Encumbrances) or (ii) to otherwise effectuate the purposes and intent of this Agreement and the other Transaction Documents or for aiding, assisting, collecting and reducing to possession any of the Acquired Assets and exercising rights with respect thereto. Each of the Parties shall, during the Cooperation Period, use good faith efforts to take, or cause to be taken, all actions, do or cause to be done all things as may be reasonably requested by the other Parties in good faith in order to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in Buyer or one of more Buyer Designees or otherwise to carry out this Agreement, and shall execute and deliver all deeds, bills of sale, instruments of conveyance, powers of attorney, assignments, assumptions and assurances, and as may be required to consummate the transactions contemplated by this Agreement for the avoidance of doubt, to the extent Buyer's Employees or professionals perform services under the direction of Seller in order for Seller to meet its obligations after Closing under this Section 2.6, then any such costs incurred after Closing, including Buyer's Employee costs, and Seller's out of pocket expenses shall be the responsibility of Buyer.

# ARTICLE 3

## PURCHASE PRICE

3.1     Consideration; Closing Payments.Consideration. The aggregate consideration (the "**Purchase Price**") for the purchase, sale, assignment and conveyance of Seller's right, title and interest in, to and under the Acquired Assets shall consist of:

(i) the assumption by Buyer or any of its applicable Buyer Designees, as applicable, of the Assumed Liabilities from Seller; and

(ii) the release of Seller that is an obligor under each of (x) the DIP Obligations in an aggregate amount equal to $17,550,000 principal amount, plus accrued and unpaid interest thereon (such amount, together with all other DIP Obligations, the "**DIP Claims Credit Bid and Release**"), and (y) the Prepetition Obligations in an aggregate amount equal to $15,148,248.59 principal amount, plus accrued and unpaid interest thereon (such amount, together with all other Prepetition Obligations, the "**Prepetition Claims Credit Bid and Release**" and, collectively with the DIP Claims Credit Bid and Release, such amounts, the "**Credit Bid and Release**"), in each case pursuant to section 363(k) of the Bankruptcy Code.

(b)     Buyer Closing Payments. At the Closing, Buyer shall irrevocably issue instructions to direct the escrow agent (as described in the DIP Facility) of the DIP Escrow Account to release the then-remaining funds in the DIP Escrow Account as follows:

(i) to the Seller, in accordance with wire instructions provided by Seller, an amount (if any) equal to the Closing Date Retained Cash Amount;

(ii) to the Professional Fees Escrow Account, in accordance with wire instructions provided by Seller, an amount equal to the Professional Fees Escrow Shortfall (if any); and

(iii)    to an account designated by Buyer, an amount equal to all remaining funds in the DIP Escrow Account (after giving effect to the payments contemplated by the foregoing clauses (b)(i) and (b)(ii)).

(iv)    Notwithstanding anything herein to the contrary, if at Closing the DIP Escrow Account has insufficient funds necessary to wire to Seller the full amount of the Closing Date Retained Cash Amount as set forth in Section 3.1 (the difference between the amounts paid from the DIP Escrow Account pursuant to Section 3.1(b)(i) and the Closing Date Retained Cash Amount, the "***Closing Date Retained Cash Deficiency Amount***"), then Buyer shall wire to Seller said Closing Date Retained Cash Deficiency Amount.

(c)    Other Closing Payments. As promptly as practicable after Closing, Seller shall irrevocably issue instructions to release from the Professional Fee Escrow Account to Buyer, in accordance with wire instructions provided by Buyer, an amount equal to the Professional Fees Escrow Excess (if any).

3.2    Available Funds Above Wind-Down Expenses. In the event that, upon the termination of the Bankruptcy Case the Retained Cash Amount exceeds the Actual Wind-Down Expenses, Seller shall promptly pay to Buyer in cash such difference, by wire transfer of immediately available funds, to an account specified in writing by Buyer.

3.3    Allocation of Purchase Price. Within ninety (90) days after the Closing Date, Buyer shall prepare and deliver to Seller (or Seller's designee) a statement allocating the sum of the Purchase Price, the Assumed Liabilities and other relevant items that are treated as purchase price for Tax purposes among the Acquired Assets in accordance with section 1060 of the Code and the Treasury Regulations promulgated thereunder (such statement, the "***Allocation Statement***"); provided such Allocation Statement is consistent with the methodology set forth on Schedule 3.3 of this Agreement. Within thirty (30) calendar days of delivery of the Allocation Statement, Seller shall notify Buyer of any proposed changes. The Parties shall consult with each other and attempt in good faith to resolve any issues arising as a result of the Allocation Statement. If the Parties cannot agree on the Allocation Statement, the dispute shall be resolved by a nationally recognized accounting firm mutually acceptable to Buyer and Seller (the "***Independent Accounting Firm***"). The expenses and fees of the Independent Accounting Firm shall be borne by Seller. "***Final Allocation Statement***" shall mean, as the case may be, the final Allocation Statement agreed to by the Parties or resolved by the Independent Accounting Firm. Unless otherwise required by law, the IRS or any other taxing authority, the Final Allocation Statement shall be final and binding on the Parties and the Parties shall file all relevant U.S. federal, state, local and non-U.S. Tax Returns (including IRS Form 8594 and any supplements to such form) in accordance with the Final Allocation Statement, and shall not take any position inconsistent therewith. If the IRS or any other taxation authority proposes a different allocation, Seller or Buyer, as the case may be, shall promptly notify the other party of such proposed allocation. Seller or Buyer, as the case may be, shall provide the other party with such information and shall take such actions (including executing

33

documents and powers of attorney in connection with such proceedings) as may be reasonably requested by such other party to carry out the purposes of this <u>Section 3.3</u>. Except as otherwise required by any Legal Requirement or pursuant to a "determination" under section 1313(a) of the Code (or any comparable provision of United States state, local, or non-United States law), (i) the transactions contemplated by <u>Article 2</u> of this Agreement shall be reported for all Tax purposes in a manner consistent with the terms of this <u>Section 3.3</u>; and (ii) neither Party (nor any of their Affiliates) will take any position inconsistent with this <u>Section 3.3</u> in any Tax Return, in any refund claim, in any litigation or otherwise. Notwithstanding the allocation of the Purchase Price set forth in the Allocation Statement, nothing in the foregoing shall be determinative of values ascribed to the Acquired Assets or the allocation of the value of the Acquired Assets in any plan or reorganization or liquidation that may be proposed.

3.4     <u>Post-Closing Accounts Receivable</u>. In the event Seller or its estate receives any payment in respect of the conduct of the Business after the Closing, Seller agrees to remit promptly (or cause to be remitted promptly) such funds to Buyer. For purposes of this <u>Section 3.4</u>, Seller and Buyer agree that the Parties shall treat Buyer as the beneficial owner of any post-Closing Accounts Receivable for income tax purposes.

3.5     <u>Withholding</u>. Buyer acknowledges that withholding is not required under current U.S. federal income tax law since Seller has provided Buyer with a properly completed Form W-9. To the extent required by applicable Legal Requirements (including, for the avoidance of doubt, applicable changes in U.S. federal income tax law), Buyer shall be entitled to deduct and withhold from the Purchase Price otherwise payable pursuant to this Agreement to Seller such amounts as Buyer is required to deduct and withhold under applicable Legal Requirements; <u>provided</u>, <u>however</u>, that such deductions shall not reduce the Retained Cash amount; provided, however, that Buyer shall use commercially reasonable efforts to notify Seller of any anticipated deduction or withholding at least ten (10) Business Days prior to making the applicable payment and shall cooperate in good faith to minimize to the extent permissible under applicable Legal Requirements the amount of any such deduction or withholding. The Parties shall use commercially reasonable efforts to cooperate to mitigate or eliminate any such withholding to the maximum extent permitted by applicable law. To the extent that amounts are so deducted and withheld, such amounts shall be treated for all purposes of this Agreement as having been paid to Seller.

# ARTICLE 4

## CLOSING AND DELIVERIES

4.1     <u>Closing Date</u>. Upon the terms and subject to the conditions hereof, the closing of the sale of the Acquired Assets and the assumption of the Assumed Liabilities (other than those pertaining to Previously Omitted Contracts pursuant to <u>Section 2.5(b)</u> and Disputed Contracts pursuant to <u>Section 2.5(a)(i)</u>) contemplated hereby (the "***Closing***") shall take place remotely by electronic mail or other electronic exchange of documents, among and between the Parties and/or their respective counsel, no later than three (3) Business Days following the date on which all the conditions set forth in <u>Article 9</u> and <u>Article 10</u> have been satisfied or (if permissible) waived by the Party entitled to waive such condition (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or (if

permissible) waiver of such conditions), or on such other date and time as Seller and Buyer may mutually agree in writing. The date and time at which the Closing actually occurs, which shall be on or before January 30, 2026, is hereinafter referred to as the "***Closing Date***"; provided, however, in the event deliveries set forth in Sections 4.2 or 4.3 are not provided by the Closing Date, Buyer may elect to extend the Closing Date by up to thirty (30) days in order for those deliveries to be met by both Parties. Upon consummation of the Closing, the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities hereunder, and the Closing, shall be deemed to have occurred as of 12:01 a.m. Eastern Time on the Closing Date.

4.2     Buyer's Deliveries. At the Closing, Buyer shall deliver (or cause one or more of its Affiliates or Buyer Designees to deliver) to Seller:

(a)     the Assumption Agreement, duly executed by Buyer or the applicable Buyer Designee;

(b)     the Assignment of Leases, duly executed by Buyer or the applicable Buyer Designee;

(c)     the Intellectual Property Assignment Agreement, duly executed Buyer or the applicable Buyer Designee;

(d)     each other Transaction Document to which Buyer is a party, duly executed by Buyer;

(e)     the certificates of Buyer to be received by Seller pursuant to Sections 10.1 and 10.3;

(f)     the Purchase Price, which will be deemed delivered (without further action, or further payment, by any Person) pursuant to Section 3.1 at the Closing, and

(g)     such other documents as (i) are set forth on Schedule 4.2(g), and (ii) Seller may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement.

4.3     Seller's Deliveries. At the Closing, Seller shall deliver to Buyer:

(a)     the Bill of Sale, the Assumption Agreement, the Assignment of Leases and each other Transaction Document to which Seller is a party, duly executed by Seller;

(b)     the Intellectual Property Assignment Agreement, duly executed by Seller, in form reasonably acceptable to the Parties and customary for recordation with the appropriate Governmental Authorities;

(c)     with respect to the Leased Real Properties included in the Acquired Assets, possession of such Leased Real Properties;

(d)     a copy of the Sale Order;

(e)    the certificates of Seller to be received by Buyer pursuant to Sections 9.1 and 9.2;

(f)    a valid IRS Form W-9 from the Seller;

(g)    such other bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, that are customary for a transaction of this nature and necessary to vest in Buyer (or a Buyer Designee) all of Seller's right, title and interest of Seller in, to or under any or all the Acquired Assets;

(h)    a certificate of good standing from Seller, certified by the appropriate Governmental Authority in its jurisdiction of incorporation or formation; and

(i)    such other documents as Buyer may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement, including the documents and instruments described in Article 9 of this Agreement.

## ARTICLE 5

### REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer as follows, except as disclosed in the Disclosure Schedules attached hereto, which representations and warranties shall expire immediately after Closing:

5.1    Organization and Good Standing. Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. Seller has all requisite corporate or limited liability company power and authority to own or lease and to operate and use the Acquired Assets and to carry on the Business as presently conducted. Seller is duly qualified or licensed to do business and is in good standing in each jurisdiction where the character of its Business or the nature of the Acquired Assets makes such qualification or licensing necessary, except for such failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, have a Material Adverse Effect. Schedule 5.1 contains a correct and complete list of each jurisdiction where the Seller is qualified or licensed to do business.

5.2    Authority; Validity; Consents. Seller has, subject to entry of the Sale Order, the requisite corporate or limited liability company power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which Seller is a party and to consummate the transactions contemplated hereby and thereby, and the execution, delivery and performance of this Agreement and such other Transaction Documents by Seller and the consummation by Seller of the transactions contemplated herein and therein have been duly and validly authorized by all requisite corporate or limited liability company action. This Agreement has been duly and validly executed and delivered by Seller and each other Transaction Document required to be executed and delivered by Seller at the Closing will be duly and validly executed and delivered by Seller at the Closing.

This Agreement and the other Transaction Documents, in each case, assuming due execution and delivery by each of the other parties hereto as applicable, constitute, with respect to Seller, the legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except as such enforceability is limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity (regardless of whether considered in a proceeding in equity or at law). Subject to entry of the Sale Order, Seller is not required to give any notice to, make any registration, declaration or filing with or obtain any consent, waiver or approval from, any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby and thereby, except (a) for notices, filings and consents required in connection with the Bankruptcy Case, (b) for the notices, filings and consents set forth on Schedule 5.2, and (c) where failing to give such notice, make such registration, declaration or filing or obtain such consent, waiver or approval would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

5.3     Subsidiaries. Except as set forth in Schedule 5.3, Seller (a) does not have any direct or indirect Subsidiaries, (b) does not have any direct or indirect interest in, or is under any current or prospective obligation to receive an interest in, any shares or other Equity Interest in any other Person, or (c) is not a member of or participant in any partnership, joint venture or similar entity.

5.4     No Conflict. Except as set forth in Schedule 5.4, to Seller's Knowledge, neither the execution and delivery by Seller of this Agreement or the Transaction Documents to which it is a party nor the consummation of the transactions contemplated hereby or thereby nor compliance by it with any of the provisions hereof or thereof (either alone or in combination with another event), subject to the Sale Order, (a) conflict with or result in a violation of (i) any provision of the organizational documents of Seller or (ii) any judgment, order, writ, injunction, decree, statute, law, ordinance, rule or regulation in any material respect binding upon Seller.

5.5     Real Property.

(a)     Owned Real Property. Seller does not own, and has ever owned, any fee simple interest in any real property and any ownership rights or interests appurtenant thereto.

(b)     Leased Real Property. Schedule 5.5 contains a complete and accurate list and description of all Leased Real Property held or used for, or necessary to the operation of the Business. No Affiliate of Seller or any other Person has any ownership or leasehold interest in any of the Leased Real Property (except for the third party landlords or tenants under the Leases).

(c)     The Leased Real Properties constitute all interests in real property currently used, occupied or held for use in connection with the Business in the Ordinary Course of Business Seller has not received any written notice that any Leased Real Property (or any portion thereof) is not in compliance with any Legal Requirement including fire, health, building, use, and occupancy. To Seller's knowledge, each parcel of Leased Real Property is properly zoned for its

present use under applicable zoning ordinances, and there are no pending or threatened actions or proceedings that could result in a modification or termination of such zoning.

(d)     To the Knowledge of Seller, there is no threatened or contemplated, condemnation or eminent domain proceeding (or any consensual agreement in lieu thereof) or rezoning application or proceeding with respect to any Leased Real Property.

(e)     To the Knowledge of Seller, Seller has (i) all certificates of occupancy and/or use and Permits of any Governmental Authority necessary or useful for the current use and operation of the Leased Real Property and (ii) fully complied with all conditions of such Permits applicable to it. Seller has not received written notice of any outstanding violation, default or notice of cancellation or termination of any such Permit.

5.6     <u>Environmental and Health and Safety Matters</u>. To the Knowledge of Seller, and except as set forth on <u>Schedule 5.6</u>:

(a)     the Acquired Assets (including the Leased Real Properties) and Seller's operation of the Business are in compliance in all material respects with all Environmental, Health and Safety Laws;

(b)     neither the Transaction Documents nor the consummation or performance of any of the transactions contemplated hereby will result in any liabilities for site investigation or cleanup, or require the consent of any Person, pursuant to any Environmental, Health and Safety Law, including any so-called "transaction-triggered" or "responsible property transfer" requirements; and

(c)     Seller has not assumed or undertaken any material liabilities, including any obligation for corrective or remedial action, of any other Person relating to Environmental, Health and Safety Laws.

5.7     <u>Title to Acquired Assets</u>. Immediately prior to Closing, Seller will have, and, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by <u>Section 4.3</u>, and upon entry of the Sale Order and payment of any Cure Costs, Seller will thereby transfer to Buyer or the applicable Buyer Designee, and Buyer or the applicable Buyer Designee will (subject to <u>Section 2.5(c)</u>) be vested, to the maximum extent permitted by sections 105, 363 and 365 of the Bankruptcy Code, with good, valid, exclusive and marketable title to, or, in the case of property leased or licensed by Seller, a valid, binding and enforceable leasehold or licensed interest in, all of the Acquired Assets, free and clear of all Encumbrances, except (a) for the Assumed Liabilities and (b) for Permitted Encumbrances. To Seller's Knowledge, the Acquired Assets consisting of personal property are suitable for the purposes for which they are presently used. Other than to the extent resulting from the Bankruptcy Case, since January 1, 2025, Seller has not taken any action, or failed to take any action, which action or failure would preclude or prevent Buyer as a legal matter from conducting the Business after the Closing as currently conducted in all material respects. Except as may exist as a result from the Bankruptcy Case, no Acquired Asset is subject to any agreement, written or oral, for its sale or use by any Person other than Seller.

5.8     Taxes. Except as set forth in Schedule 5.8, Seller has (i) timely filed all Tax Returns required to be filed with the appropriate Governmental Authorities (taking into account any extension of time to file granted to Seller) and (ii) all such Tax Returns are correct and complete in all respects and were prepared in substantial compliance with all applicable law in all respects.

5.9     Legal Proceedings. Except for the Bankruptcy Case and as set forth on therein or Schedule 5.9, there is no Action or Order pending, outstanding or, to Seller's Knowledge, threatened against or related to the Business or Seller, whether at law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Authority, nor, to Seller's Knowledge, are there any investigations relating to the Business or Seller, pending or threatened by or before any arbitrator or any Governmental Authority, which, if determined adversely, would reasonably be expected to be material to the Business or the Acquired Assets, taken as a whole.

5.10     Compliance with Legal Requirement; Permits.

(a)     Except as set forth on Schedule 5.10(a) and subject to the Bankruptcy Case, Seller has, to Seller's Knowledge, conducted the Business and own and operate the Acquired Assets in accordance, in all material respects, with all Legal Requirements, Orders and Permits applicable to Seller and the Acquired Assets, and the Business is in compliance with all applicable Legal Requirements, Orders and Permits and has obtained all approvals, authorizations and clearances necessary for owning and operating the Acquired Assets and has made all necessary filings with all Governmental Authorities having jurisdiction necessary for owning and operating the Acquired Assets as currently conducted. Except as set forth on Schedule 5.10(a), neither Seller nor, to Seller's Knowledge, within the last three (3) years, any of its Representatives have received any written notice or other communication from a Governmental Authority that alleges that the Business is not in material compliance with any Legal Requirement, Order or Permit applicable to the Business or the operations or properties of the Business or the Acquired Assets or that states the intention on the part of any issuing authority to cancel, suspend or modify any Permit necessary for the current operation and conduct of the Business and the Acquired Assets.

(b)     To Seller's Knowledge, Seller holds all of the Permits (including Permits required pursuant to Environmental, Health and Safety Laws) necessary in all material respects for the occupation of its facilities, to operate the Acquired Assets and conduct the Business as currently conducted, and all such Permits are set forth on Schedule 5.10(b). To Seller's Knowledge, all of the Permits are final, unappealed, valid, in good standing and in full force and effect, and other than to the extent resulting from the Bankruptcy Case, no Seller is in default under or in violation of any such Permit, except where such default, or failure to be final, unappealed, valid, in good standing and in full force and effect would not, individually or in the aggregate, reasonably be expected to be material to the Business or the Acquired Assets, taken as a whole. Other than to the extent resulting from the Bankruptcy Case, since January 1, 2025, no suspension, revocation or cancellation of any of the Permits is threatened or, to Seller's Knowledge, contemplated, except with respect to regular periodic expirations and renewals thereof, which renewals Seller does not have reason to believe will not be granted. Since January 1, 2025, Seller has not had any Permits appealed, denied, revoked, restricted or suspended and, other than to the

39

extent resulting from the Bankruptcy Case, Seller is not currently a party to any proceedings involving the possible appeal, denial, revocation, restriction or suspension of any Permits or any of the privileges granted thereunder.

5.11   <u>Labor Matters</u>.

(a)   Seller is not party to or subject to any collective bargaining agreements, works council agreements, labor union contracts, trade union agreements, or other agreements, including imposed terms and conditions of employment (each a "***Collective Bargaining Agreement***") with any union, works council, or labor organization (each a "***Union***", and collectively, "***Unions***")), and, as of this date, no Collective Bargaining Agreement is being negotiated by Seller. In the past three (3) years, (i) no Union or group of Employees or former employees of Seller has sought to organize any employees for purposes of collective bargaining, made a demand for recognition or certification, sought to bargain collectively with Seller, or filed a petition for recognition with any Governmental Authority, and (ii) there have been no actual or threatened strikes, lockouts, slowdowns, work stoppages, boycotts, handbilling, picketing, walkouts, demonstrations, leafleting, sit-ins, sick-outs, or other forms of organized labor disruption with respect to Seller.

(b)   Seller has provided to Buyer true, complete and accurate lists as of November 21, 2025, of (i) each Employee, together with each such Employee's name, job title, start date, annual salary or hourly wage rate, citizenship, and whether or not any such individual is on an approved leave of absence.

(c)   Except as set forth in <u>Schedule 5.11(c)</u>, Seller is and, has been for the past three (3) years, in compliance in all material respects with all applicable Laws respecting employment and employment or labor practices (including but not limited to all applicable Laws relating to wages, hours, paid time off, employment policies, child labor, collective bargaining, employment discrimination, disability rights or benefits, equal opportunity, plant closures and layoffs, civil rights, classification of employees, classification of service providers as employees and/or independent contractors, affirmative action, termination of employment, WARN, safety and health, workers' compensation, immigration, pay equity and the collection and payment of withholding or social security), and there are no proceedings pending or, to the knowledge of the Seller, threatened against the Seller, by or on behalf of any applicant for employment, any Employee or former employee, current or former independent contractor or any class of the foregoing, relating to any of the foregoing applicable Laws, or alleging any material breach of any express or implied contract of employment or service, wrongful termination of employment or service, or alleging any other discriminatory, wrongful or tortious conduct in connection with the employment or service relationship.

(d)   Except as set forth in <u>Schedule 5.11(d)</u>, for the past three (3) years, to Seller's Knowledge, no Employee or former employee or current or former independent contract of the Seller (i) has been or is currently subject to any disciplinary proceedings, or (ii) is being investigated for, or has been investigated for or accused of engaging in, any misconduct including, without limitation, harassment, sexual harassment, sexual assault, sexual misconduct, discrimination, retaliation, or any other conduct that could reasonably be expected to cause damage to the reputation or business of the Seller. Seller has not entered into any settlement agreements

related to allegations of misconduct (including, without limitation, harassment, sexual harassment, sexual assault, sexual misconduct, discrimination, retaliation, or any other conduct that could reasonably be expected to cause damage to the reputation or business of the Seller). Seller has promptly, thoroughly, and impartially investigated all allegations of harassment, sexual harassment, sexual assault, sexual misconduct, discrimination, and/or retaliation and has taken prompt and reasonable corrective action with respect to each allegation with potential merit.

5.12    Employee Benefits.

(a)    Except as set forth in Schedule 5.12(a), Seller does not sponsor, administer, maintain or contribute to, or have any obligation to sponsor, maintain or contribute to, or have any direct or indirect liability, whether contingent or otherwise, with respect to any Benefit Plan. All references to "Seller" in this Section 5.12(a) shall refer to Seller, each of its Subsidiaries and any ERISA Affiliate.

(b)    Except as set forth in Schedule 5.12(b), no Benefit Plan is, and Seller and its ERISA Affiliates do not maintain, sponsor, contribute to, or have any obligation to contribute to or have any obligation to contribute to, or have any liability (contingent or otherwise) with respect to, and within the last six (6) years, have not sponsored, maintained, contributed to or had any obligation to contribute to or any liability (contingent or otherwise) with respect to, (i) subject to Title IV of ERISA or Section 412 of the Code, (ii) a "defined benefit plan" (as defined in Section 3(35) of ERISA) or any other plan that is or was subject to Section 302 or Title IV of ERISA, (iii) a "multiemployer plan" (within the meaning of Section 3(37) of ERISA) ("*Multiemployer Plan*"), (iv) a "multiple employer plan" (within the meaning of Section 413 of the Code), (v) a plan or arrangement that provides or promises to provide post-retirement or post-termination health or life insurance or other similar benefits (other than health continuation coverage required by Part 6 of Subtitle B of Title I of ERISA or Section 4980B of the Code), (vi) a "multiple employer welfare arrangement" within the meaning of Section 3(40) of ERISA, (vii) an "employee pension benefit plan" within the meaning of Section 3(2) of ERISA and that is not intended to be qualified under Section 401(a) of the Code or (viii) a non-U.S. pension plan.

(c)    Except as set forth on Schedule 5.12(c), Seller has no obligation to create any additional employee benefit or compensation plans, policies or arrangements or, except as may be required by law, to modify any Benefit Plan. Seller may amend or terminate any Benefit Plan (other than an employment agreement or any similar agreement that cannot be terminated without the consent of the other party) at any time without incurring liability thereunder, other than in respect of accrued and vested obligations and medical or welfare claims incurred prior to such amendment or termination. Seller has no commitments or obligations, and Seller has not made any representations to any employee, officer, director, contractor or consultant, whether or not legally binding, to adopt, amend, modify or terminate any Benefit Plan, in connection with the consummation of the transactions contemplated by this Agreement or otherwise.

(d)    Each Benefit Plan that is intended to be qualified under Section 401(a) of the Code is the subject of a favorable determination letter from the IRS or can rely on an opinion letter from the IRS to the prototype plan sponsor and, to the Knowledge of Seller, no event has occurred since the date of the most recent determination letter or application therefor relating to any such Benefit Plan that would reasonably be expected to cause the revocation of such

41

determination letter from the IRS or the unavailability of reliance on such opinion letter from the IRS.

5.13    Intellectual Property; Data Security; Data Privacy.

(a)    Schedule 5.13(a) sets forth a true and complete list as of the date hereof of all U.S. and foreign (i) Patents; (ii) Trademarks; (iii) Copyrights, and (iv) other material Intellectual Property, in each case which are owned by a Seller as of the Execution Date.

(b)    Schedule 5.13(b) sets forth a true, accurate and complete list as of the date hereof of all pending or, to Seller's Knowledge, threatened Intellectual Property challenges either by a third-party or by a Seller.

(c)    Schedule 5.13(c) sets forth a list of all software that both (i) relates to and is material to the Business and (ii) was developed by or for the Business or Seller in which Seller has an ownership interest (the "*Business Software*"). No open-source software is incorporated into, integrated, distributed or bundled with Business Software in a manner that would require distribution of the source code of the Business Software to any third party.

(d)    Schedule 5.13(d) lists each Contract through which material third party Intellectual Property owned by a third party is licensed to Seller or the Business (the "*Third-Party Licenses*") that is used or held for use in the conduct of the Business as currently conducted, excluding Contracts for Business Software and any "off the shelf," "shrink-wrap" or "click-through" end-user software licenses. Seller has not received any written notice of any pending cancellation or non-renewal of any such Third-Party License.

5.14    Contracts. Schedule 5.14 sets forth a complete list, as of the Execution Date, of all Material Contracts (including Leases) to which Seller is a party and the Cure Costs with respect thereto. Except as set forth on Schedule 5.14, Seller has not assigned, delegated or otherwise transferred to any third party any of its rights or obligations with respect to any such Contract.

5.15    Sufficiency of Assets. (a) The Acquired Assets will, as of the Closing Date, constitute all of the assets, properties currently used by Seller for Buyer to conduct the Business in materially the same manner operated by Seller during the twelve (12) month period immediately prior to the Execution Date and (b) none of the Acquired Assets are owned by any Person other than Seller (other than Tooling Equipment, possession and the duty of care of which, but not ownership, is assumed by Buyer).

5.16    Insurance. Seller maintains the insurance policies set forth on Schedule 5.16, which Schedule 5.16 sets forth all insurance policies covering the property, assets, Employees, and operations of the Business (including policies providing property, casualty, liability and workers' compensation coverage). Such policies are in full force and effect. Seller has paid all premiums on such policies due and payable prior to the Closing Date. To Seller's Knowledge, Seller has not done anything by way of action or inaction that invalidates any such policies in whole or in part.

5.17    <u>Brokers or Finders</u>. Other than the Seller Retained Professional Fees and professional fees of UCC Seller is not a party to any lease brokerage, commission or finder's agreement, and Seller has not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable.

5.18    <u>Interests of Affiliates</u>. No Affiliate of Seller, or any of their respective equityholders, officers, directors, or employees, has any right, title or interest in or to any of the Acquired Assets, regardless of kind or character (whether real, personal or mixed, tangible or intangible, contingent or otherwise). The Business, as currently conducted, has been conducted solely by Seller and not through any other Affiliate of Seller. Other than as set forth on <u>Schedule 5.18</u> and employment relationships and the payment of compensation and benefits in the Ordinary Course of Business, no obligations, Contracts or other Liabilities exist between Seller, on the one hand, and any Affiliate of Seller or its respective equityholders, officers, directors or employees, on the other hand ("***Affiliate Transactions***"), that relate to the operation of the Business, the use of the Acquired Assets or the Assumed Liabilities.

5.19    <u>Bank Accounts</u>. Schedule 5.19 sets forth a true, complete and correct list of each bank, deposit, securities, lock box or cash collection, management or other account or sub-account of Seller, including the title and number of the account and the financial or other institution at which such account is located (designating each authorized signatory).

5.20    <u>Credit Support</u>. <u>Schedule 5.20</u> sets forth all Contracts or other requirements pursuant to which Seller has, or is required to provide, performance, surety or similar bonds, letters of credit or similar third-party assurances or Credit Support, and the amount of such bonds, letters of credit or assurances or Credit Support and the issuer thereof.

5.21    <u>Financial Statements</u>. Seller has delivered to Buyer the consolidated balance sheets of the Company and its Subsidiaries as of, and consolidated statements of operations, income, changes in stockholder's equity and cash flows for, the fiscal years ended December 31, 2024, and December 31, 2023 (collectively, the "***Annual Financial Statements***"). Seller has also delivered to Buyer unaudited condensed consolidated balance sheets for the Company and its Subsidiaries as of September 30, 2025 (such date, the "***Interim Balance Sheet Date***", and such balance sheet, the "***Interim Balance Sheet***"), and the condensed consolidated statements of operations and cash flows for the period then ending (collectively, the "***Interim Financial Statements***").

5.22    <u>Undisclosed Liabilities</u>. To Seller's Knowledge, Seller has no material Liabilities which, under GAAP, should be accrued or disclosed on a balance sheet of Seller similar to that included in the Financial Statements (including the footnotes thereto), other than Liabilities (a) reflected in, reserved against or otherwise described in the Interim Balance Sheet, (b) that have arisen since the Interim Balance Sheet Date in the Ordinary Course of Business and are similar in character and amount to the Liabilities set forth in the Interim Balance Sheet or (c) that are otherwise disclosed on <u>Schedule 5.22</u>.

5.23     <u>Absence of Certain Changes</u>. Except as set forth on <u>Schedule 5.23</u>, in the Ordinary Course of Business, as required or as directed by the Bankruptcy Court, or as expressly contemplated by this Agreement or the DIP Orders, from December 31, 2024 to the Petition Date, Seller has not:

(a)     terminated, modified or amended any Assumed Contract or taken any action which materially violates, conflicts with or resulted in breach of any provision of, or constitutes a default under, any Assumed Contract;

(b)     (A) purchased or otherwise acquired any material properties or assets (tangible or intangible) or sold, leased, transferred or otherwise disposed of any Acquired Assets, except for purchases of materials and sales of Inventory in the Ordinary Course of Business, (B) permitted, allowed or suffered any of the Acquired Assets to be subjected to any Encumbrance (other than Permitted Encumbrances), or (C) removed any Equipment or other material assets (other than Inventory) from the Leased Real Properties other than in the Ordinary Course of Business;

(c)     waived or released any claim or rights included in or related to the Acquired Assets or the Business with a value individually or in the aggregate in excess of $100,000 or revalued any of the Acquired Assets, except for adjustments to the value of Inventory in the Ordinary Course of Business;

(d)     entered into any Material Contracts with any third party related to the Acquired Assets or the Business, other than in the Ordinary Course of Business;

(e)     made, or made any material commitments for, capital expenditures in excess of $100,000;

(f)     (A) hired any employee or independent contractor having base or guaranteed compensation in excess of $150,000; (B) terminated any Key Person (other than for "cause"); (C) increased the annual base level of compensation of any Employee or independent contractor or former employee of Seller whose rate prior to such increase was in excess of $150,000; (D) other than in the Ordinary Course of Business and in accordance with the Budget (as defined in the Interim DIP Order), paid any bonus, benefit, or other direct or indirect incentive compensation; (E) awarded any equity compensation awards (whether phantom or equity); (F) created any new severance pay, termination pay, vacation pay, company awards, salary continuation for disability, sick leave, deferred compensation, bonus, or other employee bonus, policy, benefit, or arrangement made to, for, or with any Employee or former employee, or otherwise modified, amended or terminated any such bonus, policy, benefit, or arrangement; (G) entered into any employment, compensation, severance, non-competition, or similar contract (or amended or waived any rights under any such contract) to which Seller is a party other than in the Ordinary Course of Business; (H) adopted any new employee benefit plan with respect to Employees that would be a Benefit Plan if it existed on the Execution Date (including any employment agreement, severance agreement, change in control agreement, or transaction or retention bonus agreements); or (I) amended or terminated any Benefit Plan, except as required by applicable Legal Requirements;

(g)    suffered any material damage or destruction to or loss of any material assets or properties whether or not covered by insurance;

(h)    changed in any way Seller's accounting methods, principles or practices other than required by changes in GAAP;

(i)    incurred any Indebtedness other than pursuant to the Prepetition Credit Agreements and the DIP Facility;

(j)    allowed any material Permit held by Seller to terminate, expire or lapse; or

(k)    agreed or committed to do any of the foregoing.

5.24    Material Suppliers; Material Customers. Schedule 5.24(a) sets forth a true, correct and complete list of the ten (10) largest suppliers (the "*Material Suppliers*") of the Business for the year ended December 31, 2024, and the two hundred fifty (250) days ended September 8, 2025, together with, in each case, the amount of purchases from such supplier in the applicable period. Schedule 5.24(b) sets forth a true, correct and complete list of the ten (10) largest customers (the "*Material Customers*") of the Business for the year ended December 31, 2024, and the two hundred fifty (250) days ended September 8, 2025, together with, in each case, the amount of purchases from such customers in the applicable period.

5.25    Products; Warranties. Except as set forth on Schedule 5.9 or Schedule 5.25, there is no currently pending Action for product liability, warranty or other claims by a third party against the Business (whether based on contract or tort and whether relating to personal injury, including death, or economic loss) in excess of $100,000.00, individually, or $300,000.00, in the aggregate, or series of related claims, arising from (i) the services or Products rendered by the Business during the last three (3) years, or (ii) the operation of the Business during the last three (3) years.

5.26    Warranties Exclusive. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF THE BUSINESS, ANY OF THEIR ASSETS (INCLUDING THE ACQUIRED ASSETS), LIABILITIES (INCLUDING THE ASSUMED LIABILITIES) OR OPERATIONS, INCLUDING, WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OR NON-INFRINGEMENT, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY. BUYER HEREBY ACKNOWLEDGES AND AGREES THAT BUYER IS PURCHASING THE ACQUIRED ASSETS ON AN "AS IS, WHERE IS" BASIS AFTER GIVING EFFECT TO THE TERMS CONTAINED HEREIN.

## ARTICLE 6

### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows:

6.1     <u>Organization and Good Standing</u>. Buyer is a limited liability company, validly existing and in good standing under the laws of the State of Delaware. Buyer has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.

6.2     <u>Authority; Validity; Consents</u>. Buyer has the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated herein have been duly and validly authorized by all requisite limited liability company or corporate actions in respect thereof. This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is a Party will be duly and validly executed and delivered by Buyer, as applicable, at the Closing. This Agreement and the other Transaction Documents to which Buyer is a party constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except in each case as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Except as set forth on <u>Schedule 6.2</u>, Buyer is not or will not be required to give any notice to or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a Party or the consummation or performance of any of the transactions contemplated hereby or thereby, except for such notices, filings and consents, the failure of which to provide, make or obtain, would not, individually or in the aggregate, materially affect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

6.3     <u>No Conflict</u>. Neither the execution and delivery by Buyer of this Agreement or the Transaction Documents to which it is a party nor the consummation of the transactions contemplated hereby or thereby nor compliance by it with any of the provisions hereof or thereof (a) conflict with or result in a violation of (i) any provision of the organizational documents of Buyer or (ii) any judgment, order, writ, injunction, decree, statute, law, ordinance, rule or regulation in any material respect binding upon Buyer or (b) violate, conflict with, or result in a breach of any of the terms of, or constitute a default under, or give rise to any right of termination, modification, cancellation or acceleration under, (i) any note, bond, mortgage, indenture, deed of trust, contract, commitment, arrangement, license, agreement, lease or other instrument or obligation to which Buyer is a party or by which Buyer may be bound or to which any of Buyer's assets may be subject or affected in any material respect and that, in each case, is material to the business of Buyer, or (ii) any material license, permit, authorization, consent, order or approval of, or registration, declaration or filings with, any Governmental Authority.

6.4     <u>Credit Bid and Release</u>. Buyer is duly authorized, to, among other things, enter into and perform and comply with this Agreement and consummate the transactions contemplated hereby, including the making and consummation of the Credit Bid and Release.

6.5     <u>Solvency</u>. As of the Closing and immediately after consummating the transactions contemplated by this Agreement and the other transactions contemplated by the Transaction Documents, Buyer and its subsidiaries (taken as a whole) will not, (a) be insolvent (either because their financial condition is such that the sum of their debts is greater than the fair value of their assets or because the present fair value of their assets will be less than the amount required to pay their Liability (calculated as the amount that would reasonably be expected to become an actual and matured Liability) on their debts as they become absolute and matured); (b) have unreasonably small capital with which to engage in their respective businesses; or (c) have incurred or plan to incur debts beyond their ability to repay such debts as they become absolute and matured.

6.6     <u>Brokers or Finders</u>. Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated by this Agreement for which Seller is or will become liable.

6.7     <u>Legal Proceedings</u>. Other than the Bankruptcy Case and claims made hereto, there is no Action or Order pending, outstanding or, to Buyer's knowledge, threatened against or affecting Buyer, whether at law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Authority, that will materially and adversely affect Buyer's performance under this Agreement or the consummation of the transactions contemplated by this Agreement.

# ARTICLE 7

## <u>ACTIONS PRIOR TO THE CLOSING DATE</u>

7.1     <u>Access and Reports</u>.

(a)     During the period from and including the Execution Date through and including the Closing Date or the earlier termination of this Agreement in accordance with the provisions of <u>Article 11</u>, Seller shall (i) afford Buyer and its Representatives full access, upon reasonable notice during normal business hours, to its personnel, the Leased Real Properties and Improvements, landlords, tenants, licensors, licensees, suppliers, properties, facilities, books, Permits, Contracts and records, and furnish promptly to Buyer all information concerning the Acquired Assets, the Business, properties, any Benefit Plans and personnel as may be reasonably requested; (ii) furnish to Buyer such financial and operating data and other information relating to Seller, the Business and the Acquired Assets as may be reasonably requested (including Tax Returns); (iii) with Seller's permission, which shall not be unreasonably withheld, permit Buyer to make such reasonable inspections and, at Buyer's expense, copies as Buyer may require and (iv) instruct the executive officers and senior business managers, employees, counsel, auditors and financing advisors of Seller to reasonably cooperate with Buyer and its Representatives regarding the same. No investigation pursuant to this <u>Section 7.1</u> or by Buyer or its Representatives at any time prior to or following the Execution Date shall affect or be deemed to modify any representation or warranty made by the Seller herein. Notwithstanding anything contained in this Agreement to the contrary, none of Buyer or its Representatives or any Buyer Designees shall have any right to perform or conduct, or cause to be performed or conducted, any invasive

environmental sampling or testing at, in, on or underneath any of Seller's properties without written consent from the Company, which consent shall not be unreasonably withheld. Notwithstanding anything to the contrary set forth herein, Buyer is not responsible for, and Seller hereby releases Buyer from, any liability or obligations relating to the mere discovery of any conditions existing on or affecting the Leased Real Property, including the existence of any Hazardous Substances, and soil or groundwater contamination.

(b)      This <u>Section 7.1</u> shall not require Seller to permit any access to, or to disclose (i) any information that, in the reasonable, good faith judgment (after consultation with counsel, which may be in-house counsel) of the Company, is reasonably likely to result in any violation of any Legal Requirement or any Contract to which the Company or Seller is a party or cause any privilege (including attorney-client privilege) that Seller would be entitled to assert to be undermined with respect to such information and such undermining of such privilege could in the Company's good faith judgment (after consultation with counsel, which may be in-house counsel) adversely affect in any material respect Seller's position in any pending or, what the Company believes in good faith (after consultation with counsel, which may be in-house counsel) could be, future litigation or (ii) if the Company or Seller, on the one hand, and Buyer or any of its Affiliates, on the other hand, are adverse parties in a litigation, any information that is reasonably pertinent thereto; provided, that, in the case of clause (i), the parties hereto shall cooperate in seeking to find a way to allow disclosure of such information to the extent doing so (A) would not (in the good faith belief of the Company (after consultation with counsel, which may be in-house counsel)) be reasonably likely to result in the violation of any such Legal Requirement or Contract or be reasonably likely to cause such privilege to be undermined with respect to such information or (B) could reasonably (in the good faith belief of the Company (after consultation with counsel, which may be in-house counsel)) be managed through the use of customary "clean-room" arrangements pursuant to which non-employee Representatives could be provided access to such information.

7.2      <u>Operations Prior to the Closing Date</u>. Seller covenants and agrees that, except (v) as expressly contemplated by this Agreement, (w) as disclosed in <u>Schedule 7.2</u>, (x) with the prior written consent of Buyer (which consent shall not be unreasonably withheld) or (y) as otherwise required by Legal Requirement, the Interim DIP Order, the Final DIP Order or the Bankruptcy Court, after the Execution Date and prior to the Closing Date:

(a)      Seller shall, subject to and taking into consideration the pending Bankruptcy Case and available funds:

(i) carry on the Business in the Ordinary Course of Business in accordance with the Budget (as defined in the Interim DIP Order);

(ii) maintain, preserve and protect the Business (including with respect to the operations, organization and goodwill of the Business and the making of capital expenditures with respect to Business as provided in the Actual Wind-Down Expenses, forecasts and schedules that have been made available to Buyer and its Affiliates and Representatives) and the Acquired Assets in the condition in which they exist on the Execution Date in all material respects;

(iii) manage Inventory, the timing of collection of accounts receivable and the payment of accounts payable in the Ordinary Course of Business;

(iv) maintain its books, accounts and records in accordance with past custom and practice;

(v) use commercially reasonable efforts to pay all post-petition trade and accounts payables and collect all Accounts Receivable after the Petition Date in the Ordinary Course of Business;

(vi) use commercially reasonable efforts to (A) retain employees who are in good standing and (B) maintain their relationships with and preserve for the Business the goodwill of their suppliers, customers, Governmental Authorities, lessors, directors, managers, officers, Key Persons and other Persons with whom they have material business relationships; provided, however, that Seller shall not be required to offer retention bonuses, unless Buyer requests the same and agrees to include any such bonuses as an Assumed Liability;

(vii)    (A) comply in all respects with all Legal Requirement applicable to them or having jurisdiction over the Business or any Acquired Asset, (B) comply in all respects with all Anti-Corruption Laws, Anti-Money Laundering Laws, Ex-Im Laws and Sanctions, (C) comply in all respects with contractual obligations applicable to or binding upon them pursuant to Assumed Contracts and (D) maintain in full force and effect all Permits and comply with the terms of each such Permit;

(viii)    cause any of its current property insurance policies with respect to the Business or any of the other Acquired Assets (including the Leased Real Properties) not to be canceled or terminated or any of the coverage thereunder to lapse unless, simultaneously with such termination, cancellation or lapse, replacement, policies providing coverage equal to or greater than the coverage under the canceled, terminated or lapsed policies are in full force and effect;

(ix) maintain, preserve and protect in full force and effect the existence of all Intellectual Property owned by Seller;

(x) use commercially reasonable efforts not to take or agree to or commit to assist any other Person in taking any action that would reasonably be expected to (i) result in a failure of any of the conditions to the Closing or (ii) impair the ability of Seller or Buyer to consummate the Closing in accordance with the terms hereof or to materially delay such consummation;

(xi) use commercially reasonable efforts to obtain approval of the Stalking Horse Order, in each case in form and substance acceptable to the Buyer, and file a motion seeking the entry of the Sale Order in the Bankruptcy Case, in form and substance satisfactory to the Buyer, authorizing and approving the sale of the Acquired Assets to the Buyer;

(xii)    timely file all Tax Returns, and pay and/or make all deposits for said Taxes and employee-related FICA Taxes; provided, however, Seller shall use commercially reasonable efforts to file the 2024 federal, state and local income Taxes as soon as

49

is practical in light of the pending Bankruptcy Case;

(xiii)   use commercially reasonable efforts, at Buyer's expense, including Seller Retained Professional Fees, to cooperate with Buyer regarding the transfer of access to certain Acquired Assets which are not owned by Seller and/or enter into any additional purchase agreements or transition services agreements with Buyer, if Buyer and Seller, mutually determine, that certain Acquired Assets are not owned by Seller; and

(xiv)   take any action set forth on Schedule 7.2(a)(xiv).

(b)   Seller shall not:

(i)  take any action enumerated in Section 7.2(b) except as set forth on Schedule 7.2(b)(i);

(ii) sell, assign, transfer, lease, license or allow to lapse any rights in the Intellectual Property owned by the Seller (other than non-exclusive licenses to Intellectual Property granted in the Ordinary Course of Business);

(iii) without the prior written consent of Buyer (which consent shall not be unreasonably withheld), make, change or revoke any election relating to Taxes, change any annual accounting period for applicable Tax purposes, adopt or change any Tax accounting method, file any amended Tax Return (other than an amended Tax Return to obtain any U.S. federal, state, or local income Tax refund), enter into any closing agreement, settle any claim or assessment with respect to Taxes, knowingly surrender any right to claim a refund, offset or other reduction in Tax liability, or request or consent to any extension or waiver of the limitation periods applicable to any claim or assessment with respect to Taxes (other than an extension granted in the Ordinary Course of Business in connection with an extension for the filing of Tax Returns), in each case that adversely affects Taxes of the Business, the Acquired Assets or the Assumed Liabilities (other than Taxes that constitute Excluded Liabilities);

(iv) authorize, commit or agree to take, or commit to assist any other Person in taking, any of the actions set forth in this Section 7.2(b);

(v) make any alterations or improvements to the Leased Real Property other than in the Ordinary Course of Business;

(vi) amend, modify, restate, supplement or terminate any Lease or enter into any new Lease without (1) providing Buyer all relevant supporting documentation, as reasonably determined by Buyer, (2) delivering to Buyer a written request for Buyer's approval of such amendment, modification, termination or new Lease, and (3) obtaining such approval from Buyer;

(vii)   acquire any material properties or assets or sell, assign, license, transfer, convey, lease, sublease or otherwise dispose of any material assets of Seller related to the Business, including any assets that but for such sale, assignment, license, transfer, conveyance, lease, sublease or other disposition would constitute Acquired Assets, in each case;

(viii) enter into any new, or amend, waive or renew existing, Material Contracts;

(ix) subject to any Encumbrance or otherwise encumber or, except for Permitted Encumbrances, permit, allow or suffer to be encumbered, any of the Acquired Assets; or

(x) take any action set forth on Schedule 7.2(b)(x).

7.3    Regulatory Filings; Cooperation.

(a)    [Reserved.]

(b)    At Buyer's expense, Seller shall use commercially reasonable efforts to do, or cause to be done, all things necessary under the applicable Legal Requirement with the appropriate Governmental Authorities to put in place, to transfer, to amend, or to acquire all Transferred Permits that are necessary for the operation and conduct of the Business or Acquired Assets by or on the Closing Date, unless the applicable Legal Requirement regarding such a Permit require certain actions to be taken upon or after Closing, and, in that event, for not more than ninety (90) days after Closing, or until the expiration of the Cooperation Period, whichever occurs first, Seller shall, at Buyer's expense, use commercially reasonable efforts to do, or cause to be done, all things necessary or desirable under the applicable Legal Requirement with the appropriate Governmental Authorities which can only be taken or done after Closing to put in place, to transfer, to amend, or to acquire such remaining Permits as promptly as reasonably practicable after the Closing. In addition to the actions to be taken under Section 7.3, Seller, on the one hand, at Buyer's expense if occurring after Closing, and Buyer, on the other hand, shall use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, including using commercially reasonable efforts to accomplish the following: (i) taking all reasonable acts necessary to cause the conditions precedent set forth in Article 9 and Article 10 to be satisfied, (ii) obtaining, at the earliest practicable date, of all necessary Governmental Authorizations and the making of all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities, if any) and the taking of all reasonable steps as may be necessary to avoid any Action by any Governmental Authority, (iii) defending of any Actions challenging this Agreement or the consummation of the transaction contemplated by this Agreement, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Authority vacated or reversed, and (iv) executing and delivering any additional instruments necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement. Consistent with its obligations hereunder, Buyer shall plan and propose the strategy, timing, content, action, advocacy and resolution of matters related to such required filings and submission, and in the event of a disagreement between the Parties, the Buyer shall control and direct such matters; provided, however, should Buyer require or request the services of Seller following the Closing, which can practically only be provided by Seller's professionals in order for Seller to provide its cooperation refenced herein, then, solely to the extent (i) not otherwise covered by the Actual Wind-Down Expenses, and (ii) specifically requested in writing by Buyer, Buyer (not Seller)

shall pay for the reasonable and documented fees and expenses for such Seller's professional services.

(c)     For not more than ninety (90) days after Closing, or until the expiration of the Cooperation Period, whichever occurs first, Seller, on the one hand, at Buyer's expense if occurring after Closing, and Buyer, on the other hand, (i) shall promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) as far as reasonably practicable, shall permit the other to review in advance any proposed written or material oral communication or information submitted to any such Governmental Authority in response thereto, subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine. In addition, none of Parties shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated by this Agreement, unless such Party consults with the other Parties in advance and, to the extent permitted by any such Governmental Authority, gives the other Parties the opportunity to attend and participate thereat, in each case to the maximum extent practicable. Subject to restrictions under any Legal Requirement, each of Buyer, on the one hand, and Seller, on the other hand, shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective Representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine or which refer to valuation of the Business) or any such filing, notification or request for approval. Each Party shall also furnish the other Party, at Buyer's expense if occurring after Closing, with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval, including documenting and providing any transition services for any applicable Permit or regulatory approval to the extent permitted by applicable Law; provided, however, should Buyer require or request the services of Seller following the Closing, which can practically only be provided by Seller's professionals in order for Seller to provide its cooperation refenced herein, then, solely to the extent (i) not otherwise covered by the Actual Wind-Down Expenses, and (ii) specifically requested in writing by Buyer, Buyer (not Seller) shall pay for the reasonable and documented fees and expenses for such Seller's professional services.

(d)     Notwithstanding anything herein to the contrary:

(i)  none of Buyer's Affiliates or equityholders shall be required to, or be required to agree to: (A) sell, divest or dispose of, any assets, products, businesses, equity or interests; (B) any conditions relating to, or changes or restrictions in, any such assets, products, businesses, equity or interests; (C) any modification or waiver of the terms and conditions of this Agreement; or (D) any other condition that requires Buyer's affiliates or equity holders to take any action or refrain from taking any action that limits the freedom of action with respect to any assets, products, businesses, equity or interests of Buyer's Affiliates or equity holders;

52

(ii) Buyer shall not be required to, or required to agree to:(A) any material conditions relating to, or changes or restrictions in any of Buyer's or the Acquired Assets' assets, products, businesses or interests; (B) any material modification or waiver of the terms and conditions of this Agreement; or (C) any other condition that requires Buyer to take any action or refrain from taking any action that materially limits the freedom of action with respect to any assets, products, businesses, equity or interests of Buyer or the Acquired Assets; and

(iii)Neither Seller nor any Affiliate thereof shall agree to any sale, divestiture or disposal of, any assets, products, businesses or interests of any Person or the Business or any material restriction on any Person or the Business without the prior written consent of Buyer (which consent shall not be unreasonably withheld).

7.4    Bankruptcy Court Matters.

(a)    Notice of Designation. On or before December 22, 2025, at 4:00 p.m. Eastern Time, the Buyer shall have filed this Asset Purchase Agreement with the Bankruptcy Court and a notice of designation of Buyer as the "stalking horse" for the Acquired Assets. Objections to Seller's designation of Buyer as the "stalking horse" for the Acquired Assets must be filed on or before 4:00 p.m. Eastern Time on the date that is five (5) Business Days following the date on which the Buyer filed this Asset Purchase Agreement with the Bankruptcy Court.

(b)    Qualified Bids. Pursuant to the Bidding Procedures Order, any and all Qualified Bids shall have been submitted on or prior to January 9, 2026, at 4:00 p.m. Eastern Time (the "***Bid Deadline***"). If any Qualified Bid (other than this Agreement) is submitted prior to the Bid Deadline, the Auction shall have occurred on January 13, 2026, at 9:00 a.m. Central Time. To the extent any term or provision of this Agreement is inconsistent with the Bidding Procedures, the Parties agree to promptly cooperate and file with the Bankruptcy Court an application for approval of any amendment(s) as may be necessary for the Bidding Procedures not to be inconsistent with this Agreement.

(c)    Sale Order. On January 20, 2026, at 10:00 a.m. Eastern Time, or such other time based on the Bankruptcy Court's availability, the Bankruptcy Court shall have (i) held a hearing to consider approval of the Sale Order and (ii) entered the Sale Order, which shall be in form and substance acceptable to the Seller and Buyer. Any objections to the Bidding Procedures, Auction or Sale Order must be filed on or before the date and time specified in the preceding sentence.

(d)    Contracts. Seller has served on all non-Seller counterparties to all of their Contracts a notice specifically stating that Seller is or may be seeking the assumption and assignment of such Contracts and shall notify such non-Seller counterparties of the deadline for objecting to the Cure Costs, if any, which deadline is by no later than December 5, 2025 at 4:00 p.m. Eastern Time.

(e)    Bankruptcy Filings. From and after the Execution Date and until the Closing Date, Seller shall, to the extent practicable, deliver to Buyer, at least two (2) Business Days in advance, drafts of any and all material pleadings, motions, notices, statements, schedules, applications, reports and other papers to be filed or submitted in connection with this Agreement

for Buyer's prior review and comment, including any Tax motions, and such filings shall be acceptable to Buyer to the extent they relate to the Acquired Assets, any Assumed Liabilities or any of Buyer's obligations hereunder. Seller agrees to diligently prosecute the entry of the Stalking Horse Order and the Sale Order. In the event the entry of the Bidding Procedures Order, the Stalking Horse Order or the Sale Order is appealed, Seller shall use its best efforts to defend such appeal. Seller shall comply with all notice requirements (i) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and (ii) imposed by the Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith. Seller shall use its commercially reasonable efforts to cause the Sale Order to be entered and the Bidding Procedures Order, the Stalking Horse Order and the Sale Order become Final Orders as soon as practicable after entry. Notwithstanding the foregoing, nothing in this Agreement precludes the Parties from consummating the transactions contemplated by this Agreement if the Sale Order has been entered and has not been stayed and Buyer, in its sole discretion, waives in writing the condition set forth in Section 9.7 that the Sale Order be a Final Order.

7.5    Break-Up Fee. Notwithstanding anything in this Agreement to the contrary, from and after entry of the Stalking Horse Order, Seller agrees to pay Buyer the Break-Up Fee in the event this Agreement is terminated if and to the extent provided in Section 11.3. The Parties acknowledge and agree that the terms and conditions set forth in Section 11.3, with respect to the payment of the Break-Up Fee, shall become operative only if and to the extent that the Bankruptcy Court enters the Stalking Horse Order.

7.6    Disclosure Schedules.

(a)    Disclosure Schedules.

(i) On the Execution Date and in connection with the execution and delivery of this Agreement, Seller shall deliver to Buyer an initial draft of Schedule 2.1(u) (Assumed Benefit Plans), Schedule 2.3(b) (Assumed Trade Payables) and Schedule 2.5(a) (Assumed Contracts), as may be amended or supplemented by (a) all Approved Schedule Changes pursuant to Section 7.6(a)(v), and (b) to the extent applicable, all Buyer Schedule Changes pursuant to Section 7.6(a)(vi).

(ii) No later than December 30, 2025 (such date, the "***Draft Disclosure Schedules First Delivery Date***"), Seller shall deliver to Buyer an initial draft of the First Group Disclosure Schedules (as defined below) as may be amended or supplemented by (a) all Approved Schedule Changes pursuant to Section 7.6(a)(v), and (b) to the extent applicable, all Buyer Schedule Changes pursuant to Section 7.6(a)(vi). The "***First Group Disclosure Schedules***" means Sections 2.1(t), 2.2(m), 2.3(h) and 2.4(p) of the Draft Disclosure Schedules.

(iii) No later than January 6, 2026 (such date, the "***Draft Disclosure Schedules Second Delivery Date***"), Seller shall deliver to Buyer an initial draft of all remaining Disclosure Schedules that are not First Group Disclosure Schedules (as defined below) (such remaining sections of the Draft Disclosure Schedules, collectively, the "***Second Group Disclosure Schedules***", and together with the First Group Disclosure Schedules, the "***Draft Disclosure Schedules***") as may be amended or supplemented by (a) all Approved Schedule Changes pursuant to Section 7.6(a)(v), and (b) to the extent applicable, all Buyer Schedule Changes pursuant to

Section 7.6(a)(vi).

(iv) From and after the Draft Disclosure Schedule Delivery Date until the Closing Date, Seller shall as promptly as practicable deliver to Buyer proposed amendments and supplements to the Draft Disclosure Schedules with respect to all matters that, if existing, occurring or known at the Execution Date, would have been required to be set forth or described in the Disclosure Schedules or that is otherwise necessary to correct any information in the Disclosure Schedules that has been rendered inaccurate thereby, but in any event no later than three (3) Business Days after the discovery of such matter by Seller and in any event at least three (3) Business Days prior to the anticipated Closing Date (any such proposed amendment or supplement to the Draft Disclosure Schedule, the ("***Proposed Schedule Amendments***").

(v)  To the extent Buyer consents in writing (which consent shall not be unreasonably withheld) to the addition to some or all of any Proposed Schedule Amendments (any such Proposed Schedule Amendments (which, for the avoidance of doubt, may in Buyer's sole discretion include only some (and need not include all) of any such Proposed Schedule Amendments) approved in writing by Buyer, the "***Approved Schedule Changes***"), any such Proposed Schedule Amendments shall be incorporated into (and shall become part of) the Draft Disclosure Schedules.

(vi) At any time from and after the Draft Disclosure Schedule First Delivery Date, as applicable, until the Closing, Buyer may, in its sole discretion, amend, modify, and supplement Sections 2.1(n), 2.1(t), 2.1(u), 2.3(b), 2.3(d), 2.3(h), 2.4(c), 2.4(p), 2.5(a), 4.2(g), 7.2(a)(xiv), 7.2(b)(i), 7.2(b)(x), 7.9, 9.8, 9.9 and 9.17 of the Draft Disclosure Schedules (including, for the avoidance of doubt, by adding and removing disclosure items) (any such amendments, modifications, or supplements, a "***Buyer Schedule Change***"); provided, however, that with respect to Schedule 2.3(b), Buyer may only add items (and for the avoidance of doubt may not remove items) pursuant to this Section 7.6(a)(vi).

(vii)    Notwithstanding anything in this Section 7.6 to the contrary, (i) in no event will Seller be permitted to supplement or amend the Draft Disclosure Schedules without the prior written consent of Buyer (which consent shall not be unreasonably withheld) (any such supplements or amendments will not be deemed to modify the Draft Disclosure Schedules without the prior written consent of Buyer (which consent shall not be unreasonably withheld)).

(viii)   Prior to the Closing, Buyer and Seller shall mutually agree in writing on the final form of the Draft Disclosure Schedules (such mutually agreed final form of the Draft Disclosure Schedules, the "***Final Disclosure Schedules***") and such Final Disclosure Schedules shall serve as the "Disclosure Schedules" for all purposes under this Agreement. For the avoidance of doubt, in no event shall the Draft Disclosure Schedules (or any Approved Schedule Changes) be deemed to constitute mutual agreement of the Parties with respect to the Final Disclosure Schedules.

(b)    Notice of Developments. Seller shall promptly notify Buyer of, and furnish Buyer any information it may reasonably request with respect to, (i) any notice or other communication from any Person alleging that the consent of such Person is or may be required in

connection with the Acquired Assets or the transactions contemplated by this Agreement, (ii) any notice or other communication received from any Governmental Authority in connection with the transactions contemplated by this Agreement or relating to the Business, the Acquired Assets or the Assumed Liabilities, (iii) any material breach discovered by the Seller, or of which the Seller becomes aware, of its representations, warranties or covenants contained in this Agreement or any of the other Transaction Documents, or (iv) any Actions commenced relating to the Acquired Assets, the Assumed Liabilities or the Business of which it receives notice or any other fact, circumstance or event, the existence or occurrence of which Seller acquires knowledge, (A) which in any manner challenges or seeks to prevent, enjoin, materially alter or materially delay the transactions contemplated by this Agreement, (B) has resulted in, or would reasonably be expected to result in, a material breach of a representation or warranty made by the Seller under this Agreement or (C) has resulted in, or would be reasonably expected to result in, the failure of any condition set forth in Article 9 to be satisfied by the Outside Date.

       7.7    Sale Free and Clear. The Sale Order shall provide that, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Encumbrances other than Permitted Encumbrances and Assumed Liabilities (including, for the avoidance of doubt, all successor liability, including any successorship obligations with respect to any Collective Bargaining Agreement and/or Benefit Plan, (other than Assumed Benefit Plans) of, against or created by Seller or its bankruptcy estate, shall be fully released from and with respect to the Acquired Assets (other than as set forth on Schedule 7.7). On the Closing Date, the Sale Order shall provide that the Acquired Assets shall be transferred to Buyer and/or one or more Buyer Designees, as applicable, free and clear of all obligations, Liabilities and Encumbrances (including, for the avoidance of doubt, all successor liability, including any successorship obligations with respect to any Employees, former employees, Collective Bargaining Agreement and/or Benefit Plan (other than Assumed Benefit Plans), other than the Permitted Encumbrances and the Assumed Liabilities.

       7.8    Acquisition Proposals.

       (a)    From and after the conclusion of the Auction (or, if there is no Auction, from and after the determination by the Seller that this Agreement is the only Qualified Bid), Seller shall not, and shall not authorize or permit any of its Affiliates or their respective Representatives to, directly or indirectly, (A) encourage, solicit, initiate, facilitate or continue inquiries regarding an Acquisition Proposal; (B) enter into discussions or negotiations with, or provide any information to, any Person concerning a possible Acquisition Proposal; or (C) enter into any agreements or other instruments (whether or not binding) regarding an Acquisition Proposal; provided, for the avoidance of doubt, Seller and its Representatives may encourage, solicit, initiate, or facilitate an Acquisition Proposal in connection with any Alternative Transaction prior to the conclusion of the Auction. From and after the conclusion of the Auction (or, if there is no Auction, from and after the determination by Seller that this Agreement is the only Qualified Bid), Seller shall immediately cease and cause to be terminated, and shall cause its Affiliates and all of its and their Representatives to immediately cease and cause to be terminated, all existing discussions or negotiations with any Persons conducted heretofore with respect to, or that could reasonably be expected to lead to, an Acquisition Proposal.

(b)      In addition to the other obligations under this <u>Section 7.8</u>, from and after the conclusion of the Auction (or, if there is no Auction, from and after the determination by the Seller that this Agreement is the only Qualified Bid), Seller shall promptly (and in any event within two (2) Business Days after receipt thereof by Seller or its Affiliates or Representatives) advise Buyer orally and in writing (email being sufficient), of any specific offer of an Alternative Transaction, any request for information with respect to any Acquisition Proposal, or any inquiry which could reasonably be expected to result in, an Acquisition Proposal, the material terms and conditions of such request, Acquisition Proposal or inquiry, and the identity of the Person making the same.

(c)      Seller agrees that the rights and remedies for noncompliance with this <u>Section 7.8</u> shall include having such provision specifically enforced by any court having equity jurisdiction, it being acknowledged and agreed that any such breach or threatened breach shall cause irreparable injury to Buyer and that money damages would not provide an adequate remedy to Buyer.

7.9      <u>Consents</u>. Except as set forth in <u>Schedule 7.9</u>, and at the direction or identification of such efforts by Buyer and Seller, at Buyer's expense if occurring after Closing, shall use commercially reasonable efforts during the Cooperation Period to obtain or provide, at the earliest practicable date, each consent, waiver, approval, order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority required or necessary to consummate the transactions contemplated by this Agreement, including each consent, waiver, approval, order, Permit or authorization of, or declaration or filing with, or notification listed on <u>Schedule 7.9</u> (including consents from each landlord party to the Leases requiring the consent of such landlord party in connection with the consummation of the transaction contemplated herein); <u>provided</u>, <u>however</u>, should Buyer require or request the services of Seller following the Closing, which can practically only be provided by Seller's professionals in order for Seller to provide its cooperation refenced herein, then, solely to the extent (i) not otherwise covered by the Actual Wind-Down Expenses, and (ii) specifically requested in writing by Buyer, Buyer (not Seller) shall pay for the reasonable and documented fees and expenses for such Seller's professional services. All consents, waivers, approvals, orders, Permits, authorizations, declarations, filings, or notifications shall be in writing and in form and substance satisfactory to Buyer, and executed counterparts thereof shall be delivered to Buyer promptly after the receipt thereof or making thereof. Notwithstanding anything to the contrary in this Agreement, neither Buyer nor any of its Affiliates (nor, solely to the extent incurred following the Closing and unless Buyer otherwise agrees to pay such amounts, Seller) shall be required to pay any amounts in connection with obtaining any such consents, waivers, approvals, orders, Permits, authorizations, declarations, filings, or notifications. Notwithstanding anything herein to the contrary, the failure to obtain such consents, waivers, approvals, orders, Permits or authorizations, as may be described anywhere in this Agreement, shall not be a breach of this <u>Section 7.9</u> by Seller or Buyer.

7.10     <u>Seller WARN Liabilities</u>. From and after the Closing, Buyer covenants and agrees to reasonably promptly pay Seller amounts (if any) required for Seller to satisfy its obligations with respect to (or otherwise incurred in connection with) any Seller WARN Liabilities (excluding, for the avoidance of doubt, any Seller WARN Liabilities that Buyer and Seller agreed to include in the Retained Cash Amount at the Closing).

## ARTICLE 8

### ADDITIONAL AGREEMENTS

8.1     Taxes.

(a)     Except as set forth in Schedule 8.1(a), any sales Tax, use Tax or similar Tax attributable to the sale or transfer of the Acquired Assets and not exempted under the Sale Order or by section 1146(c) of the Bankruptcy Code ("***Sales Taxes***") and any real property transfer Tax, documentary stamp Tax or similar Tax attributable to the sale or transfer of the Acquired Assets and not exempted under the Sale Order or by section 1146(c) of the Bankruptcy Code ("***Transfer Taxes***") shall be borne by Seller. Seller and Buyer shall reasonably cooperate to (i) mitigate and/or eliminate the amount of Sales Taxes and/or Transfer Taxes resulting from the transactions contemplated herein and (ii) timely prepare and file any Tax Returns relating to such Sales Taxes and/or Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Sales Taxes and/or Transfer Taxes. Seller shall be responsible for preparing and filing all necessary Tax Returns or other documents with respect to Sales Taxes and Transfer Taxes; provided, however, that in the event any such Tax Return requires execution by Buyer, the Party responsible for preparing the Tax Return shall deliver it to Buyer not less than twenty (20) days before the due date thereof, and Buyer shall promptly execute such Tax Return and return it to the Party responsible for filing it.

(b)     All Liability for any *ad valorem* Taxes (including, for the avoidance of doubt, real or personal property Taxes, together with all assessments (special or general) or any similar changes or impositions) (the "***Apportioned Taxes***") with respect to the Acquired Assets for the portion of the Straddle Period that ends on the Closing Date (a "***Pre-Closing Tax Period***") shall be borne by Seller. In accordance with Seller's past methods and practices, unless otherwise required by applicable law, Seller shall prepare and file, or cause to be prepared and filed, all Tax Returns related to the Acquired Assets for the Pre-Closing Tax Period. All Liability for any Apportioned Taxes with respect to the Acquired Assets for a Tax period or year, or portion thereof that begins after the Closing Date (a "***Post-Closing Tax Period***") shall be borne by Buyer. The total amount of Apportioned Taxes allocable to the Pre-Closing Tax Period shall be the product of (i) such Tax for the entirety of such Straddle Period, multiplied by (ii) a fraction, the numerator of which is the number of days for such Straddle Period included in the Pre-Closing Tax Period and the denominator of which is the total number of days in such Straddle Period, and the balance of Apportioned Taxes shall be allocable to the to the Post-Closing Tax Period. At the Closing, Apportioned Taxes with respect to each Acquired Asset for the applicable Straddle Period shall be prorated in accordance with the foregoing provisions based on the Tax assessment for such Acquired Asset for such Straddle Period, if available, or if otherwise, based on the Apportioned Taxes paid with respect to such Acquired Asset during the preceding Tax year. With respect to any not yet delinquent Apportioned Taxes relating to a Straddle Period or Pre-Closing Tax Period, Buyer will be required to remit payment of all such Taxes to the applicable Governmental Authority.

(c)     Notwithstanding anything in this Agreement to the contrary, the amount of income Taxes of any Subsidiary of Seller the Equity Interests of which are Acquired Assets for any Straddle Period that is allocable to a Pre-Closing Tax Period shall be determined

based on a closing of the books, assuming that the taxable year of each such Subsidiary ends as of the end of the Closing Date.

(d)    Any Tax refunds or credits with respect to the Acquired Assets received by the Buyer that are attributable to a Pre-Closing Tax Period, in each case to the extent listed on Schedule 2.1(n), shall be for the account of the Seller, so long as the refund does not exceed the amounts that Seller otherwise owes to Buyer for any Tax liabilities pursuant to this Agreement.

(e)    Buyer and Seller shall, and shall cause their respective Affiliates to, cooperate and agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Acquired Assets (including access to books and records and Tax Returns and related working papers of the Seller dated before Closing) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, the prosecution or defense of any claims, suit or proceeding relating to any Tax, and the claiming by Buyer of any U.S. federal, state, local or non-U.S. business tax credits or incentives that Buyer may qualify for in any of the jurisdictions in which any of the Acquired Assets are located, and any regulatory filings or actions that facilitate Seller's ability to carry out the wind-down of Seller; provided, however, that neither Buyer nor Seller shall be required to disclose the contents of its income Tax Returns to any Person, other than as set forth in Schedule 3.3. Any expenses incurred in furnishing such information or assistance pursuant to this Section 8.1(e) shall be borne by Buyer.

8.2    Bulk Sales. The Parties intend that the Sale Order shall provide that compliance with the Legal Requirement relating to bulk sales and transfers is not necessary or appropriate under the circumstances. In furtherance of the foregoing, each Party hereby waives compliance by the Parties with "bulk sales," "bulk transfers" or similar Legal Requirement in respect of the transactions contemplated by this Agreement; provided, however, that Seller agrees (a) to pay and discharge when due or to contest or litigate all claims of creditors which are asserted against Buyer or the Acquired Assets by reason of the Seller's noncompliance, (b) to indemnify, defend and hold harmless Buyer from and against any and all such claims based upon, attributable to or resulting from the Seller's noncompliance and (c) to take promptly all necessary action to remove any Encumbrance which is placed on the Acquired Assets by reason of the Seller's noncompliance.

8.3    Payments Received; Mail and Other Communications. Seller, on the one hand, and Buyer, on the other hand, each agree that, after the Closing, each will hold and will promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements (using commercially reasonable efforts not to convert such checks into cash) or other property that they may receive on or after the Closing which belongs to the other and will account to the other for all such receipts. Seller agrees that at any time and from time to time after the Closing and for ninety (90) days thereafter, Buyer and its Affiliates shall have the right and authority to open all mail and other communications, in all formats (both tangible and intangible), including service of process, received by Buyer or its Affiliates pertaining to the Business, even if addressed to Seller, for processing or forwarding to Seller; provided, that after Closing, Seller and Buyer shall mutually agree on a set number of representatives of Seller, as designated by Seller and who are Buyer Employees, who shall be

present for the opening of mail and other communications, in all formats (both tangible and intangible), including service of process, received by Buyer or its Affiliates pertaining to the Business and addressed to Seller. Seller and Buyer agree to, at Buyer's expense, forward to the other all mail and other communications, in all formats (both tangible and intangible) pertaining to the Business received by each other at any time and from time to time after the Closing, (i) in Seller's case, solely to the extent it applies to pre closing periods (and solely to the extent necessary for the wind-down of Seller, and (i) in Buyer's case if it relates to the operations of the Business (both prior to the Closing and following the Closing).

8.4    Assumed Contracts: Adequate Assurance and Performance. Buyer shall use commercially reasonable efforts to provide adequate assurance of the future performance by Buyer of each Assumed Contract as required under section 365 of the Bankruptcy Code. During the Cooperation Period, Buyer and Seller agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assumed Contracts pursuant to section 365 of the Bankruptcy Code, such as furnishing timely requested and factually accurate affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's and Seller's employees and representatives available to testify before the Bankruptcy Court.

8.5    Employee Matters.

(a)    Employees. Prior to the Closing, Buyer shall set initial terms and conditions of employment, including wages, benefits, job duties and responsibilities and work assignments. Buyer shall determine which Employees, if any, to offer employment to, in its sole discretion. Only Employees who are offered and accept such offers of employment with Buyer based on the initial terms and conditions set by Buyer and further then actually commence employment with Buyer will become "***Buyer Employees***" after the Closing. Seller shall terminate, or shall cause to be terminated, on or prior to the Closing Date, the employment of all Employees; provided, that Seller need not terminate the employment of any Employee that does not receive an offer of employment from Buyer and who Seller determines will be required in connection with the wind-down of Seller. Notwithstanding the foregoing, nothing herein will, after the Closing Date, impose on Buyer any obligation to retain any Buyer Employee in its employment for any amount of time or on any terms and conditions of employment. Except as described in the remaining sentences of this Section 8.5, the employment of each such Buyer Employee with Buyer will commence immediately after the Closing Date. In the case of any individual who is offered employment by Buyer and accepts such offer, but who is absent from active employment and receiving short-term disability or workers' compensation benefits, the employment of any such individual with Buyer would commence upon his or her return to active work, and such individual would become a Buyer Employee as of such date. Other than as required anywhere in this Agreement or Schedules. and except as otherwise required by Legal Requirement, specified in this Agreement, or otherwise agreed in writing by Buyer, Buyer shall not be obligated to provide any severance, separation pay, notice pay, or other payments or benefits, including any employee retention payments or employee incentive plan payments, to any Employee on account of any termination of such Employee's employment by Seller or any of its Subsidiaries on or prior to Closing, and such benefits (if any) shall remain obligations of Seller.

(b)    <u>Access to Information</u>. After the Execution Date, at Buyer's expense, Seller shall provide Buyer and its Affiliates with access to the Employees and with information, including employee records and Benefit Plan data, reasonably requested by Buyer and such Affiliates, except as otherwise prohibited by any Legal Requirement.

(c)    <u>Change in Control; Severance or Similar Benefits</u>. Prior to the Closing Date, and to the extent necessary to implement this sentence, Seller shall amend, or cause to be amended, all Benefit Plans and take or cause to be taken all other actions as may be required or necessary to provide that (i) the transactions contemplated hereunder shall not constitute a "change in control" (or similar transaction) for purposes of providing or accelerating benefits or payments under any such Benefit Plans, and (ii) severance or separation payments and/or benefits (including payments of accrued vacation or other paid time off) shall not be payable to any Buyer Employee on account of the termination of such employee's employment with Seller, and that the termination by Seller of any Buyer Employee shall not constitute a "separation from service" under Treasury Regulations Section 1.409A-1(h).

(d)    <u>Payroll Taxes</u>. For purposes of payroll taxes with respect to Buyer Employees, Seller shall treat the transaction contemplated by this Agreement, as a transaction described in Treasury Regulations Sections 31.3121(a)(1)-1(b)(2) and 31.3306(b)(1)-(b)(2) (*i.e.*, Buyer shall be treated as a successor for payroll tax purposes). Seller's obligations under this <u>Section 8.5(d)</u> shall not require Seller to make any representation as to Buyer's qualifications as a successor employer, and Buyer shall be solely responsible for determining and applying any successor employer treatment for payroll tax purposes.

(e)    <u>No Third-Party Beneficiaries; Employment Status</u>. All provisions contained in this Agreement with respect to employee benefit plans or compensation of Buyer Employees are included for the sole benefit of the respective parties hereto. Nothing contained herein (i) shall confer upon any Employee, former, current or future employee of Seller or Buyer or any legal representative or beneficiary thereof any rights or remedies, including any right to employment or continued employment, of any nature, for any specified period, (ii) shall cause the employment status of any former, present or future employee of Seller or Buyer to be other than terminable at will, (iii) shall confer any third party beneficiary rights upon any Buyer Employee or any dependent or beneficiary thereof or any heirs or assigns thereof or (iv) shall be construed to establish or be treated as an amendment or modification of any employee benefit plan, program, agreement, arrangement, or policy.

(f)    <u>WARN Act</u>. Buyer shall be responsible for any Liabilities under the WARN Act, with respect to Buyer Employees relating to any act or omission of Buyer after the Closing. Subject to <u>Section 0</u>, Seller shall be responsible for any Liabilities under the WARN Act with respect to all Employees, and former employees, including those that become Buyer Employees relating to any act or omissions of Seller prior to or on the Closing, including with respect to the terminations set forth in <u>Section 8.5(a)</u> herein; <u>provided</u>, <u>however</u>, the foregoing shall not be construed to alter in any way the financial obligations for Retained Cash as defined herein. Seller shall be responsible for any Liabilities under the WARN Act with respect to any Employees or former employees of Seller, excluding the Buyer Employees, for any act or omission of Seller after the Closing.

(g)     COBRA. In the event that Seller or any ERISA Affiliate ceases to provide any group health plan to any Employee in connection with the transactions contemplated under this Agreement and Buyer becomes a "successor employer" to Seller or any ERISA Affiliate under paragraph (c) of Q&A-8 of 26 C.F.R. § 54.4980B -9, Buyer shall be solely responsible for any and all obligations and Liabilities arising under Section 4980B of the Code with respect to all "M&A qualified beneficiaries" (as defined in 26 C.F.R. § 54.4980B-9) with respect to the transactions contemplated under this Agreement beginning on the later of the following two dates and continuing as long as Buyer continues to maintain a group health plan (but subject to the rules in 26 C.F.R. § 54.4980B-7, relating to the duration of COBRA continuation coverage): (i) the date Seller or any ERISA Affiliate ceases to provide any group health plan to any Employee; or (ii) the Closing Date.

(h)     Additional Employee Matters. Buyer is not and shall not be obligated to, and does not, accept or adopt any employment contracts, Collective Bargaining Agreements, wage rates, employee benefits, employee policies, or any other terms and conditions of employment.

8.6     Post-Closing Books and Records and Personnel.

(a)     From and after the Closing Date, each Party hereto shall provide the other Parties hereto (and their respective Representatives) with access, at reasonable times and in a manner so as not to unreasonably interfere with their normal business, solely to the books and records (collectively, "***Records and Documents***") acquired pursuant to this Agreement as of the Closing Date so as to enable Buyer and Seller to prepare Tax, financial or court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Authorities, and to prosecute and defend legal Actions or for other like purposes, including Claims, objections and resolutions. If any Party desires to dispose of any such records, such Party shall, thirty (30) days prior to such disposal, provide the other Party with a reasonable opportunity to remove such records to be disposed of at the removing Party's expense.

(b)     Buyer shall retain all Records and Documents of the Seller transferred to Buyer for a period (the "***Records Retention Period***") equal to the longer of which is seven (7) years after the Closing Date and the dates set forth in Schedule 8.6(b) hereto, the "***Customer Record Retention Requirements***". Buyer shall be responsible for complying with all the Customer Record Retention Requirements (if any) set forth in Schedule 8.6(b). During the Records Retention Period, Buyer will not, and will not allow their Affiliates to, destroy or dispose of any such Records or Documents without the prior written consent of Seller. Neither Buyer nor Seller shall be obligated to provide the other party with access to any Records or Documents (including personnel files) where such access would violate any Law. Prior to Closing, Seller shall be entitled to make hard and/or electronic copies of tax, financial, legal, employment, regulatory and other such Records and Documents, as well as Records and Documents related to the Bankruptcy Case, as reasonably requested by Seller from and after the Closing Date until the 24-month anniversary of the Closing Date. Seller and its Representatives shall, at Buyer's expense, maintain commercially reasonable information retention and security policies regarding the Records and Documents referenced in the preceding sentence. Prior to Closing, Seller may remove from electronic and hard copies of any communication between Seller and Seller's counsel solely

to the extent directly related to the transactions contemplated by (and the negotiation of) this Agreement.

(c) From and after the Closing Date until the 24-month anniversary of the Closing Date, Buyer shall, at Buyer's expense, Seller and its Representatives reasonable access, upon reasonable notice during normal business hours, to certain software and hardware owned by Buyer and/or sublicensable to Seller by Buyer solely to review Records and Documents requested by Seller in connection with financial reporting tax matters, tax audits, legal, employment or regulatory matters, or third-party litigation relating to Excluded Assets (in each case solely to the extent (and subject in all respects to the additional terms and conditions) set forth on, Schedule 8.6(c), the "**_Seller Wind-Down Access_**"). For the avoidance of doubt, Seller shall receive access to applicable software to access Records and Documents, but no software shall be downloaded by Seller without Buyer's written consent (which consent shall not be unreasonably withheld). This Section 8.6(c) shall not require Buyer to permit any access to, or to disclose (i) any trade secrets, confidential information or other information that, in the reasonable, good faith judgment (after consultation with counsel, which may be in-house counsel) of Buyer, is reasonably likely to result in any violation of any Legal Requirement or any Contract or cause any privilege (including attorney-client privilege) that Buyer would be entitled to assert to be undermined with respect to such information and such undermining of such privilege could in Buyer's good faith judgment (after consultation with counsel, which may be in-house counsel) adversely affect in any material respect Buyer's position in any pending or, what Buyer believes in good faith (after consultation with counsel, which may be in-house counsel) could be, future litigation or (ii) if the Buyer or any of its Affiliates, on the one hand, and Seller or any of its Affiliates, on the other hand, are adverse parties in a litigation, any information that is reasonably pertinent thereto; provided, that, in the case of clause (i), the parties hereto shall cooperate in seeking to find a way to allow disclosure of such information to the extent doing so (A) would not (in the good faith belief of Buyer (after consultation with counsel, which may be in-house counsel)) be reasonably likely to result in the violation of any such Legal Requirement or Contract or be reasonably likely to cause such privilege to be undermined with respect to such information or (B) could reasonably (in the good faith belief of Buyer (after consultation with counsel, which may be in-house counsel)) be managed through the use of customary "clean-room" arrangements pursuant to which non-employee Representatives could be provided access to such information.

(d) In addition to and separate from form subparagraph(c) above, from and after the Closing Date during the Cooperation Period, Buyer shall (at Buyer's sole cost and expense) direct Buyer's Employees to provide information and services to Seller which are reasonably requested for purposes of assisting Seller with the Wind-Down Access. This Section 8.6(c) shall not require Buyer or any such Employees to permit any access to, or to disclose (i) any trade secrets, confidential information or other information that, in the reasonable, good faith judgment (after consultation with counsel, which may be in-house counsel) of Buyer, is reasonably likely to result in any violation of any Legal Requirement or any Contract or cause any privilege (including attorney-client privilege) that Buyer would be entitled to assert to be undermined with respect to such information and such undermining of such privilege could in Buyer's good faith judgment (after consultation with counsel, which may be in-house counsel) adversely affect in any material respect Buyer's position in any pending or, what Buyer believes in good faith (after consultation with counsel, which may be in-house counsel) could be, future litigation or (ii) if the Buyer or any of its Affiliates, on the one hand, and Seller or any of its Affiliates, on the other hand,

are adverse parties in a litigation, any information that is reasonably pertinent thereto; provided, that, in the case of clause (i), the parties hereto shall cooperate in seeking to find a way to allow disclosure of such information to the extent doing so (A) would not (in the good faith belief of Buyer (after consultation with counsel, which may be in-house counsel)) be reasonably likely to result in the violation of any such Legal Requirement or Contract or be reasonably likely to cause such privilege to be undermined with respect to such information or (B) could reasonably (in the good faith belief of Buyer (after consultation with counsel, which may be in-house counsel)) be managed through the use of customary "clean-room" arrangements pursuant to which non-employee Representatives could be provided access to such information

8.7     Casualty Loss. Notwithstanding any provision in this Agreement to the contrary, if, before the Closing, all or any portion of the Acquired Assets is (a) condemned or taken by eminent domain, or (b) is damaged or destroyed by fire, flood or other casualty, Seller shall notify Buyer promptly in writing (email being sufficient) of such fact, (i) in the case of condemnation or taking, Seller shall assign or pay, as the case may be, any proceeds thereof to Buyer at the Closing, and (ii) in the case of fire, flood or other casualty, Seller shall, at Buyer's option, either restore such damage or assign the insurance proceeds therefrom to Buyer at Closing; provided, in each case, that with respect to Leased Real Property, (A) Seller shall comply with all requirements applicable to a casualty or condemnation under the applicable Lease, and (B) if any casualty or condemnation would permit Seller to terminate such Lease, Seller shall notify Buyer of such right, and shall thereafter make such election(s) that Buyer so instructs in writing. Notwithstanding the foregoing, the provisions of this Section 8.7 shall not in any way modify Buyer's other rights under this Agreement, including any applicable right to terminate the Agreement if any condemnation, taking, damage or other destruction resulted in a Material Adverse Effect.

8.8     Change of Name. As promptly as reasonably practicable following the Closing, (a) Seller shall, and shall cause its direct and indirect Subsidiaries to, discontinue the use of its current name (and any other trade names or "d/b/a" names currently utilized by Seller or its direct or indirect Subsidiaries) and shall not subsequently change its name to or otherwise use or employ any name set forth on Schedule 8.8 without the prior written consent of Buyer (which consent shall not be unreasonably withheld), and Seller shall cause the names of Seller in the caption of the Bankruptcy Case to be changed to the new names of Seller as provided in the last sentence of this Section 8.8; provided, however, that Seller and each of its direct and indirect Subsidiaries may use its current name (and any other trade name or "d/b/a" names currently utilized by Seller or its direct or indirect Subsidiaries) included on any business cards, stationery and other similar materials following the Closing for a period of up to ninety (90) days solely for purposes of winding down the affairs of Seller and licenses granted by Seller to any third party with respect to the use of such names shall continue in accordance with the applicable terms of such licenses and (b) Seller shall be entitled to use and reference its name during the pendency of the Bankruptcy Case; provided, that, when utilizing such materials, other than in incidental respects, Seller and each of its direct and indirect Subsidiaries shall use commercially reasonable efforts to indicate its new name and reference its current name (and any other trade names or "d/b/a" names currently utilized by Seller or its direct Subsidiaries) as "formally known as" or similar designation. From and after the Closing, Seller covenants and agrees not to (and to cause each of its direct or indirect Subsidiaries not to) use or otherwise employ any of the trade names, corporate names, "d/b/a" names or any mark that is confusingly

64

similar to the Intellectual Property rights utilized by Seller and Seller's Subsidiaries in the conduct of the Business or any Acquired Asset. As promptly as reasonably practicable following the Closing, Seller shall file, and shall cause its direct and indirect Subsidiaries to file, all necessary organizational amendments with the applicable Secretary of State of Seller's jurisdiction of formation and in each State in which Seller is qualified to do business and with the Bankruptcy Court to effectuate the foregoing.

## ARTICLE 9

### CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to fulfillment, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived by Buyer, in its sole and absolute discretion:

9.1    Accuracy of Representations. The representations and warranties of Seller set forth in this Agreement shall be true and correct in all material respects (except that those representations and warranties which are qualified as to materiality or Material Adverse Effect or similar expressions shall be true and correct in all respects) as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (provided that representations and warranties which are confined to a specified date shall speak only as of such date), in each case; provided, that the representations and warranties of Seller set forth in Sections 5.1, 5.2, 5.3, 5.4, 5.5, 5.7, 5.10, 5.15, 5.17 and 5.18 shall be true and correct as of the Closing Date as though such representations and warranties had been made on and as of the Closing Date (provided that any such representations and warranties which are confined to a specified date shall speak only as of such date). Buyer shall have received a certificate of Seller to such effect signed by a duly authorized officer thereof.

9.2    Seller's Performance. The covenants and agreements that Seller is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects and Buyer shall have received a certificate of Seller to such effect signed by a duly authorized officer thereof.

9.3    No Order. No Governmental Authority shall have enacted, issued, promulgated, decreed or entered any Order, which is in effect and has the effect of restraining or preventing (or delaying beyond the Outside Date) the consummation of or imposing material modifications on the transactions contemplated by this Agreement.

9.4    Governmental Authorizations.

(a)    To the extent that consent under the Federal Aviation Act or any other applicable law is required or at the discretion of the Buyer deemed advisable, any waiting period (and any extension thereof) under the Federal Aviation Act shall have expired or shall have been terminated, and any approvals or consents that are necessary or deemed advisable by the Buyer under any other applicable law, including the antitrust legislation of any other relevant jurisdiction applicable to the purchase of the Acquired Assets or the Business contemplated by this

Agreement shall have been obtained (whether by lapse of time or express confirmation of the relevant Governmental Authority).

(b)     All of the Closing Required Permits shall have been transferred to, or obtained by, Buyer.

9.5     <u>Seller's Deliveries</u>. Each of the deliveries required to be made to Buyer pursuant to <u>Section 4.3</u> shall have been so delivered.

9.6     <u>DIP Orders</u>. The Bankruptcy Court shall have entered the Interim DIP Order and the Final DIP Order, and the Final DIP Order shall have become a Final Order.

9.7     <u>Sale Order</u>. The Bankruptcy Court shall have entered the Sale Order in form and substance, including with respect to all findings of fact and conclusions of law, acceptable to Buyer, and the Sale Order shall have become a Final Order.

9.8     <u>Assumed Contracts</u>. The Bankruptcy Court shall have approved and authorized the assumption and assignment of each Assumed Contract, except as would not have a material effect on the Business from and after the Closing, including the assignment and assumption of the Assumed Contracts set forth on <u>Schedule 9.8</u> on the terms set forth on such schedule; <u>provided</u>, <u>however</u>, if Buyer consents in writing to the Closing without any particular Assumed Contract, then this <u>Section 9.8</u> shall be deemed as fulfilled by Seller.

9.9     <u>Consents</u>. Buyer shall have received each consent, waiver, approval, order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Authority required to be obtained or made by Seller to consummate the transactions contemplated by this Agreement and the Transaction Documents, including each consent, waiver, approval, order, Permit or authorization of, or declaration or filing with, or notification listed on <u>Schedule 7.9</u>, in each case, in a form satisfactory to Buyer; <u>provided</u>, <u>however</u>, if Buyer consents in writing to the Closing without any such consent, waiver, approval, order, Permit or authorization, then this <u>Section 9.9</u> shall be deemed as fulfilled by Seller.

9.10     <u>Possession</u>. Seller shall have delivered to Buyer possession of all Leased Real Property, together with any and all keys, access cards, security passcodes and combinations, and any existing surveys and title policies concerning the Leased Real Property that are in the possession or control of Seller, which shall be deemed to be delivered to the extent located at any Leased Real Property.

9.11     <u>Encumbrance Releases</u>. Buyer shall have received all instruments and documents (including payoff letters) necessary to release any and all Encumbrances on the Acquired Assets that are not Permitted Encumbrances, including appropriate UCC financing statement amendments (termination statements) which shall, in each case, be in recordable form and in form and substance acceptable to Buyer and/or a nationally recognized title company acceptable to Buyer. Buyer shall have taken actions to release any Encumbrances on the Acquired Assets that are held by Buyer or are subject to the DIP Obligations or Prepetition Obligations.

9.12    Material Adverse Effect. Since the Execution Date, no Material Adverse Effect shall have occurred.

9.13    Lien Releases. Buyer shall have received duly executed copies of all agreements, termination statements, instruments, certificates and other documents necessary or appropriate, in form acceptable to Buyer, to commit to release any and all Liens against the Acquired Assets other than the Permitted Encumbrances.

9.14    No Default; No Termination Event. No Termination Event (as defined in the DIP Orders) and No Event of Default (as defined in the DIP Term Sheet) shall have occurred.

9.15    Final Disclosure Schedules. Buyer shall have agreed on the Final Disclosure Schedules.

9.16    Form W-9. On or prior to the Execution Date, Seller shall have delivered to Buyer a valid IRS Form W-9.

9.17    Additional Agreements. Buyer and Seller shall have entered into any mutually agreeable additional purchase agreements and/or transition services agreements for certain Acquired Assets, if applicable, with respect to those assets and/or services as set forth on Schedule 9.17 that are not owned by or provided by Seller.

9.18    Waiver of Closing Conditions. Upon the occurrence of the Closing, any condition set forth in this Article 9 that was not satisfied as of the Closing shall be deemed to have been waived, without recourse, as of and from the Closing.

## ARTICLE 10

### CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLER TO CLOSE

The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to fulfillment, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived by Seller, in its sole and absolute discretion:

10.1    Accuracy of Representations. The representations and warranties of Buyer set forth in this Agreement shall be true and correct in all material respects (except that those representations and warranties which are qualified as to materiality or Material Adverse Effect or similar expressions shall be true and correct in all respects) as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (provided that representations and warranties which are confined to a specified date shall speak only as of such date) in each case, unless the effect of all such breaches of representations and warranties taken together would not have, or be reasonably likely to have, in the aggregate, a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement. Seller shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

10.2 <u>Sale Order</u>. The Bankruptcy Court shall have entered the Sale Order in form and substance, including with respect to all findings of fact and conclusions of law, reasonably acceptable to Seller, and the Sale Order shall have become a Final Order.

10.3 <u>Buyer's Performance</u>. The covenants and agreements that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects, and Seller shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

10.4 <u>No Order</u>. No Governmental Authority shall have enacted, issued, promulgated, decreed, or entered any Order, which is in effect and has the effect of preventing (or delaying beyond the Outside Date) the consummation of or imposing material modifications on the transactions contemplated by this Agreement.

10.5 <u>Governmental Authorizations</u>. To the extent that consent under any applicable Antitrust Law is required or at the discretion of the Buyer deemed advisable, any waiting period (and any extension thereof) under any applicable Antitrust Law shall have expired or shall have been terminated, and any approvals or consents that are necessary or deemed advisable by the Buyer under any applicable Antitrust Law, including the antitrust legislation of any other relevant jurisdiction applicable to the purchase of the Acquired Assets or the Business contemplated by this Agreement, shall have been obtained (whether by lapse of time or express confirmation of the relevant Governmental Authority).

10.6 <u>Buyer's Deliveries</u>. Each of the deliveries required to be made to Seller pursuant to <u>Section 4.2</u> shall have been so delivered.

10.7 <u>Purchase Price</u>. Buyer shall have delivered the Purchase Price to Seller as set forth in <u>Section 3.1</u>, inclusive of the Credit Bid and Release, as set forth in <u>Article 3</u>.

10.8 <u>Additional Agreements</u>. Buyer and Seller shall have entered into any mutually agreeable additional purchase agreements and/or transition services agreements for certain Acquired Assets, if applicable, with respect to those assets and/or services as set forth on <u>Schedule 10.8</u> that are not owned by or provided by Seller.

10.9 <u>Waiver of Closing Conditions</u>. Upon the occurrence of the Closing, any condition set forth in this <u>Article 10</u> that was not satisfied as of the Closing shall be deemed to have been waived, without recourse, as of and from the Closing.

## ARTICLE 11

### <u>TERMINATION</u>

11.1 <u>Termination Events</u>. Anything contained in this Agreement to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing only as follows:

(a) by mutual written consent of Seller and Buyer;

(b)      by written notice of either Seller (if the Topping Bid Condition has been satisfied) or Buyer if, at the end of the Auction, Buyer is not determined by Seller to be the Successful Bidder;

(c)      by written notice of either Seller or Buyer:

(i)   if the Closing shall not have occurred on or prior to January 30, 2026 (the "*Outside Date*"); provided, however, that the Outside Date may be extended by Buyer, in its sole discretion, an additional thirty (30) days (such extended Outside Date, the "*Extension Period Outside Date*") if all conditions contained in Article 9 have been satisfied other than the conditions contained in Sections 9.4, 9.9 and 10.5 (the "*Extension Period*"); provided, further, that the right to terminate this Agreement under this Section 11.1(c)(i) shall not be available to any Party whose failure to fulfill any obligation under this Agreement shall have been the primary cause of the failure of the Closing to occur on or prior to the Outside Date; notwithstanding anything herein to the contrary, in the event that Buyer exercises it rights herein to implement the Extension Period, then Buyer shall be obligated to wire funds to Seller if, and only if, the Retained Cash as of the Extension Period Outside Date is less than $1,671,000.00, to the extent necessary to cover any expenses in excess of those expenses of the Seller beyond the Outside Date as contemplated by this Agreement, to insure that at Closing the Seller receives sufficient funds to satisfy the Retained Cash.

(ii) if a Governmental Authority issues a final, non-appealable ruling or Order permanently restraining, enjoining or otherwise prohibiting the transactions contemplated hereby where such ruling or Order was not requested, encouraged or supported by any of Seller or Buyer; provided, that the right to terminate this Agreement under this Section 11.1(c)(ii) shall not be available to any Party whose willful failure to fulfill any obligation under this Agreement shall have been the primary cause of the failure of the Closing to occur on or prior to the Outside Date;

(iii) if the Bankruptcy Court shall have entered an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, the Bankruptcy Case; or

(iv) upon the final, non-appealable ruling or denial of the Governmental Authorizations described in Section 7.3(b);

(d)      by written notice of Buyer, if Buyer is not then in material breach of its obligations under this Agreement:

(i)   in the event of any material breach by Seller of, or material failure to perform, any agreements, covenants, representations or warranties contained in this Agreement or in the Sale Order, which material breach or material failure to perform would result in Seller being unable to satisfy a condition set forth in Section 9.1 or Section 9.2 by the then-applicable Outside Date or shall not have been cured during the fifteen (15) day period following delivery by Buyer of notice to Seller of such material breach or material failure to perform. For purposes herein, Seller shall not be in material breach of this Agreement in the event that the transfer of any Acquired Asset, including, without limitation, Assumed Contracts and Permits, is not transferable by reason of a third party's failing to consent to or authorize any such assignment

to Buyer;

(ii) other than as contemplated by the Bidding Procedures Order, if Seller takes steps in furtherance of an Alternative Transaction or seeks to have the Bankruptcy Court enter an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, the Bankruptcy Case, or appointing a trustee in the Bankruptcy Case or appointing a responsible officer or an examiner with enlarged powers (other than a fee examiner) relating to the operation of Seller's businesses pursuant to section 1104 of the Bankruptcy Code in the Bankruptcy Case;

(iii) if any of the events set forth in clauses (a) through (c) of Section 7.4 shall not have occurred by the respective dates set forth therein;

(iv) upon the occurrence of any Termination Event (as defined in the DIP Orders);

(v) if, for any reason, Buyer (other than as a result of its own breach of this Agreement) is unable, pursuant to section 363(k) of the Bankruptcy Code, to credit bid all or any portion of the Purchase Price as set forth in Section 3.1; or

(vi) a Material Adverse Effect occurs;

(e)     by written notice of Seller, if Seller is not then in material breach of its obligations under this Agreement, in the event of any material breach by Buyer of, or material failure to perform, any agreements, covenants, representations or warranties contained in this Agreement or in the Sale Order, which material breach or material failure to perform would result in Buyer being unable to satisfy a condition set forth in Section 10.1 or Section 10.3 by the then-applicable Outside Date or shall not have been cured during the fifteen (15) day period following delivery by Seller of notice to Buyer of such material breach or material failure to perform; or

(f)     by written notice of Buyer, if, upon delivery of the Final Disclosure Schedules in the form satisfactory to Seller Buyer reasonably believes Buyer and Seller are not reasonably likely to mutually agree on the Final Disclosure Schedules in such form provided by Seller prior to the Sale Hearing; provided, however, should Seller propose to amend any Schedule(s) and Buyer rejects any such amended Schedule(s), then Buyer shall be deemed to have waived and released Seller under this Agreement from the contents of any representation and warranty made in any such rejected amended Schedule(s).

Each condition set forth in this Section 11.1, pursuant to which this Agreement may be terminated shall be considered separate and distinct from each other such condition. If more than one of the termination conditions set forth in Section 11.1 are applicable, the applicable party shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated. The Parties acknowledge and agree that no notice of termination or extension of the Outside Date provided pursuant to this Section 11.1 shall become effective until two (2) Business Days after the delivery of such notice to the other Parties, and only if such notice shall not have been withdrawn during such two (2) Business Day period or otherwise become invalid.

11.2   Seller Termination Condition. Seller may not terminate this Agreement pursuant to Section 11.1(b) unless (i) Seller has selected a Successful Bidder and corresponding

bid that provides for aggregate recovery to the holders of the DIP Obligations and the Prepetition Obligations of no less than $33,063,248.59 in cash (such amount, the "***DIP Recovery Amount***") plus the value of Assumed Liabilities, (ii) such Successful Bidder's purchase price (A) is at least $1,000,000.00 more than the DIP Recovery Amount plus the value of Assumed Liabilities and (B), in the event that there are multiple bids pursuant to the conditions of this clause (ii), such Successful Bidder's purchase price must be at least $375,000.00 more than the immediately preceding highest bid, and (iii) such Successful Bidder has entered into a binding agreement committing to the obligations in the foregoing clause (i) with respect to the DIP Recovery Amount (the foregoing clause (i), (ii) and (iii) collectively, the "***Topping Bid Condition***"). For purpose of determining the value of any Qualified Bid, including the proposal of Buyer in this Agreement, Seller may consider (i) the dollar amount of any Cure Costs Assumed, in addition to those set forth in the Agreement and Final Disclosure Schedules, and (ii) the value to the estate of any Assumed Trade Payables, Assumed Contracts, Assumed Benefit Plans and/or other Assumed Liabilities and the value of any cash or cash equivalents that are Excluded Assets, in each case, in addition to those set forth in this Agreement and Final Disclosure Schedules. To the extent that Seller considers any such item in evaluating any Qualified Bid, as compared to this Agreement, Seller must consistently value such items across both this Agreement and any such Qualified Bid.

11.3   Effect of Termination.

(a)   In the event of termination of this Agreement by Buyer or Seller pursuant to this Article 11, this Agreement shall become null and void *ab initio* and have no effect and all rights and obligations of the Parties under this Agreement shall terminate without any Liability of any Party to any other Party except (i) nothing herein shall relieve any Party from Liability for any breach of this Agreement occurring prior to such termination and (ii) this Section 11.3 (and, to the extent applicable to the interpretation or enforcement of such provision, Article 1 and Article 12), shall expressly survive the termination of this Agreement; provided, however, that following a valid termination of this Agreement, Buyer's sole and exclusive remedy against Seller pursuant to this Agreement shall be the collection of the Break-up Fee, if applicable hereunder; provided, however, in the event that Buyer terminates this Agreement due to Buyer, in its sole discretion, not being satisfied with the Final Disclosure Schedules submitted by Seller, and not accepting the same, such event shall not trigger the payment of the Break Up Fee.

(b)   Seller shall pay to Buyer (or its designee) (i) the Break-Up Fee by wire transfer of immediately available funds concurrently with the closing of a transaction with a Successful Bidder for the Acquired Assets that is not Buyer, which occurs no later one hundred twenty (120) days after termination of this Agreement, if this Agreement is terminated (A) by Buyer as a result of any Seller's breach of any of its representations, warranties, covenants or other agreements under this Agreement pursuant to Section 11.1(d)(i) or (B) by either Party pursuant to Section 11.1(b); provided, however, that Seller shall not be obligated to pay the Break-Up Fee more than once; provided, further, that, if Seller fails to pay any amounts due to Buyer pursuant to this Section 11.3(b) within the time period specified herein, Seller shall pay the costs and expenses (including reasonable legal fees and expenses) incurred by Buyer in connection with any Action taken to collect payment of such amounts, together with interest on such unpaid amounts at the Applicable Rate, calculated on a daily basis from the date such amounts were required to be paid until the date of actual payment. In the event the Break Up Fee becomes payable under the terms

if this Agreement, Seller acknowledges and agrees that Seller shall be liable for the entire Break-Up Fee payable by Seller pursuant to this Agreement,

(c)     Each Party acknowledges that the agreements contained in this Section 11.3 are an integral part of the transactions contemplated by this Agreement, that without these agreements such Party would not have entered into this Agreement, and that any amounts payable pursuant to this Section 11.3 do not constitute a penalty.

## ARTICLE 12

### GENERAL PROVISIONS

12.1     Survival. All covenants and agreements contained herein which by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to the Closing, survive the Closing in accordance with their terms. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder, shall not survive the Closing and shall thereupon terminate, including any Actions for damages in respect of any breach thereof.

12.2     Confidentiality. Following the Closing, Seller agrees to, and to cause its Affiliates to, treat and hold as confidential, and not use or disclose all or any of the information concerning the Business, the Acquired Assets, the negotiation or existence and terms of this Agreement or the business affairs of Buyer except disclosure of matters that become a matter of public record as a result of the Bankruptcy Case and the filings related thereto.

12.3     Public Announcements. Unless otherwise required by applicable Legal Requirement or by obligations of Buyer or Seller or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange, Buyer, on the one hand, and Seller, on the other hand, shall consult with each other before issuing any press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated by this Agreement or the activities and operations of the other and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld, conditioned or delayed). Notwithstanding the foregoing, Buyer shall not be restricted from making any public announcements or issuing any press releases after the Closing.

12.4     Notices

All notices, requests, demands, waivers and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered personally or sent by overnight courier or electronic mail:

(i)     If to Seller, then to:

CTL-Aerospace, Inc.
5616 Spellmire Drive

72

Cincinnati, Ohio 45246-4898
Attn: John Irwin, Scott Crislip, Michael Wartell
Email: jirwin@ctlaerospace.com; scrislip@ctlaerospace.com;
mwartell@blrosellc.com

with a copy (which shall not constitute notice) to:

Coolidge Wall Co., L.P.A.
33 W. First Street, Suite 200
Dayton, OH 45402
Attn:   Patricia J. Friesinger
Email: friesinger@coollaw.com

(ii)     If to Buyer:

Davidson Kempner Capital Management
9 West 57th Street, 29th Floor
New York, NY 10019
Attn: Anthony Sorrentino, Gregory Feldman and Kevin Coco
Email: asorrentino@dkp.com; gfeldman@dkp.com; kcoco@dkp.com

with a copy (which shall not constitute notice) to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Attn: Brad M. Kahn and Anna Kordas
Email: bkahn@akingump.com; akordas@akingump.com
and
2300 N. Field Street, Suite 1800
Dallas, TX 75201
Attn: Nicholas J. Houpt
Email: nhoupt@akingump.com

or to such other person or address as any party shall specify by notice in writing to the other party.
All such notices, requests, demands, waivers and communications shall be deemed to have been
received on the date on which so personally delivered or faxed or delivered by overnight courier
or electronic mail.

12.5    Waiver. Neither the failure nor any delay by any Party in exercising any
right, power, or privilege under this Agreement or the documents referred to in this Agreement
shall operate as a waiver of such right, power or privilege, and no single or partial exercise of
any such right, power, or privilege shall preclude any other or further exercise of such right,
power, or privilege or the exercise of any other right, power, or privilege. To the maximum
extent permitted by Legal Requirement, (a) no waiver that may be given by a Party shall be
applicable except in the specific instance for which it is given, and (b) no notice to or demand

73

on one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand.

12.6    Entire Agreement; Amendment. This Agreement (including the Disclosure Schedules) and the other Transaction Documents supersede all prior agreements between Buyer, on the one hand, and Seller, on the other hand, with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between Buyer, on the one hand, and Seller, on the other hand, with respect to their subject matter. This Agreement may not be amended, modified or supplements except by a written agreement executed by each of the Parties hereto.

12.7    Assignment. This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of the other Parties (which consent may be granted or withheld in the sole discretion of such other Party); provided, however, that Buyer shall be permitted to assign all or part of its rights or obligations hereunder to one or more Buyer Designees without the prior consent of Seller, so long as such Buyer Designee agrees in writing to Seller to be bound by the terms of this Agreement.

12.8    Severability. The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

12.9    Expenses. Except as otherwise expressly provided in this Agreement, including Section 11.3 and as set forth in the DIP Orders, whether or not the transactions contemplated by this Agreement are consummated, the Parties shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries and independent accountants) incurred in connection with this Agreement and the transactions contemplated hereby. Any and all fees required at any time by (i) any Governmental Authority or any Person on or before Closing to obtain or for the transfer of a Permit or (ii) incurred in connection with complying with any Antitrust Law on or before Closing, shall be the sole responsibility of Buyer.

12.10    Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of New York applicable hereto.

(b)      Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action; provided, however, that, if the Bankruptcy Case is closed, all Actions arising out of or relating to this Agreement shall be heard and determined in an Ohio state court or a federal court sitting in the State of Ohio, County of Hamilton, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Action and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action. The Parties consent to service of process by mail (in accordance with Section 12.4 or any other manner permitted by law).

(c)      THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF SELLER, BUYER OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

12.11   Counterparts. This Agreement and any amendment hereto may be executed in two or more counterparts, each of which shall be deemed to be an original of this Agreement or such amendment and all of which, when taken together, shall constitute one and the same instrument. Notwithstanding anything to the contrary in Section 12.4, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by telecopier, facsimile or email attachment that contains a portable document format (.pdf) file of an executed signature shall be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

12.12   Parties in Interest; No Third-Party Beneficiaries; No Amendment. This Agreement and the other Transaction Documents shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. This Agreement and the other Transaction Documents are for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind. Notwithstanding anything to the contrary, nothing in this Agreement shall constitute an amendment to any Benefit Plan.

12.13   Remedies. Neither the exercise of nor the failure to exercise a right of set-off or to give notice of a claim under this Agreement will constitute an election of remedies or limit Seller or Buyer in any manner in the enforcement of any other remedies that may be available to any of them, whether at law or in equity.

12.14   Specific Performance. With respect to the Parties' respective covenants under this Agreement, (a) each Party recognizes that if such Party breaches or refuses to perform any such covenant, monetary damages alone would not be adequate to compensate the non-

75

breaching Party or Parties for their injuries, (b) the non-breaching Party or Parties shall therefore be entitled, in addition to any other remedies that may be available, to obtain specific performance of the terms of such covenants, (c) if any Action is brought by the non-breaching Party or Parties to enforce such covenants, the Party in breach shall waive the defense that there is an adequate remedy at law, (d) each Party agrees to waive any requirement for the security or posting of any bond in connection with any Action seeking specific performance of such covenants and (e) each Party agrees that the only permitted objection that it may raise in response to any action for specific performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants; provided, however, nothing in this Section 12.14 modifies or amends Section 11.3(a).

12.15   Limitations on Damages. WITHOUT LIMITING ANY RIGHTS OF BUYER TO RECEIVE THE BREAK-UP FEE IN ACCORDANCE WITH SECTION 7.5 OR SECTION 11.3 OF THIS AGREEMENT, NO PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) SHALL, UNDER ANY CIRCUMSTANCE, BE LIABLE TO THE OTHER PARTY (OR ITS AFFILIATES OR REPRESENTATIVES) FOR ANY CONSEQUENTIAL, SPECIAL, EXEMPLARY OR PUNITIVE DAMAGES CLAIMED BY SUCH OTHER PARTY UNDER THE TERMS OF OR DUE TO ANY BREACH OF THIS AGREEMENT; PROVIDED, HOWEVER, THAT THE FOREGOING LIMITATION SHALL NOT APPLY TO THE EXTENT SUCH DAMAGES ARE PAYABLE TO A THIRD PARTY.

12.16   Non-Recourse. No past, present or future director, officer, employee, incorporator, member, partner or equity holder of the Parties will have any liability for any obligations or liabilities of Seller or Buyer, as applicable, under this Agreement, or any agreement entered into in connection herewith of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby; provided, that the foregoing shall not limit the rights of Buyer with respect to Acquired Assets. Any claim or cause of action based upon, arising out of, or related to this Agreement or any agreement, document or instrument contemplated by this Agreement may only be brought against Persons that are expressly named as parties hereto or thereto, and then only with respect to the specific obligations set forth herein or therein. Other than the Parties hereto, no Person shall have any liability or obligation for any of the representations, warranties, covenants, agreements, obligations or liabilities of any party under this Agreement or the agreements, documents or instruments contemplated hereby or of or for any action or proceeding based on, in respect of, or by reason of, the transactions contemplated hereby or thereby (including breach, termination or failure to consummate such transactions), in each case whether based on contract, tort, fraud, strict liability, other Legal Requirement or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of a party hereto or another Person or otherwise.

12.17   Joinder. At the Closing, any Person to whom Buyer assigns the right to receive the Acquired Assets at Closing shall execute a joinder in customary form, pursuant to which each such other Person will assume, and will be obligated with Buyer on a joint and several basis, to perform and satisfy each of Buyer's obligations under this Agreement.

[*Signature pages follow.*]

**IN WITNESS WHEREOF,** the Parties have caused this Asset Purchase Agreement to be executed and delivered by their duly authorized representatives, all as of the Execution Date.

DK CTL AEROSPACE OPCO LLC

By: _____
Name:  Gabriel T. Schwartz
Title:   Authorized Officer


CTL-AEROSPACE, INC.


By: _____
Name:
Title:

IN WITNESS WHEREOF, the Parties have caused this Asset Purchase Agreement to be executed and delivered by their duly authorized representatives, all as of the Execution Date.

DK CTL AEROSPACE OPCO LLC

By: _____
Name: Gabriel T. Schwartz
Title:   Authorized Officer

CTL-AEROSPACE, INC.

By: _____
*Michael wartell*
Michael wartell (Dec 22, 2025 14:32:23 AST)
Name:  Michael Wartell
Title:  Independent Director

## Disclosure Schedules

[*Attached*]

*Execution Version*

**INITIAL DRAFT DISCLOSURE SCHEDULES**

**to**

**ASSET PURCHASE AGREEMENT**

**dated as of December 22, 2025**

**by and among**

**DK CTL AEROSPACE OPCO LLC, as Buyer**

**and**

**CTL -AEROSPACE, INC., as Seller**

## **Disclosure Statement**

These Initial Draft Disclosure Schedules (the "Draft Disclosure Schedules") are being delivered in connection with that certain Asset Purchase Agreement (the "Agreement"), dated as of December 22, 2025, is made by and among DK CTL AEROSPACE OPCO LLC, a Delaware limited liability company ("Buyer") and CTL-AEROSPACE, INC, an Ohio corporation (the "Seller").

The Draft Disclosure Schedules are subject to the terms and conditions of the Agreement (including Section 7.6) and, in particular, the specific provisions of the Agreement having reference to that section. The headings contained in the Draft Disclosure Schedules are for convenience of reference only. Capitalized terms used but not otherwise defined in the Draft Disclosure Schedules shall have the meanings ascribed to them in the Agreement, unless otherwise provided. The Draft Disclosure Schedule numbers below correspond to the section numbers in the Agreement.

For purposes of the Draft Disclosure Schedules , each disclosure set forth in any section of the Draft Disclosure Schedules shall be deemed to have been set forth in all other sections of the Draft Disclosure Schedules to the extent it is reasonably understood under the circumstances of disclosure or the nature of the information itself and without reference to the underlying information that such disclosure is applicable to such other sections.

Nothing in the Draft Disclosure Schedules constitutes an admission of any liability or obligation of the Seller to any third person not a party to the Agreement, or an admission to any such third person against the interests of the Seller. Unless otherwise stated herein, or in the representation to which a Draft Disclosure Schedule relates, all statements made herein are made as of the Closing Date. In addition, exhibits attached hereto form an integral part of the Draft Disclosure Schedules and are incorporated fully herein by reference for all the purposes as set forth herein.

For the avoidance of doubt, these Draft Disclosure Schedules (i) are being delivered pursuant to the terms of Section 7.6(a)(i) of the Agreement, and (ii) will not be deemed "Disclosure Schedules" or "Final Disclosure Schedules" for any purposes under the agreement.

**Schedule 2.1(u)**
**Assumed Benefit Plans**

- CTL Aerospace, Inc. Retirement Savings Plan
- Anthem PPO $750 Group Medical Insurance
- Anthem HSA $2500 Group Medical Insurance
- Anthem Group Medical – SF (Fixed Costs) Medical Admin
- MetLife Group Vision Insurance
- MetLife Basic Group Life and AD&D Insurance
- MetLife Voluntary Group Life and AD&D Insurance
- MetLife Worksite Accident Insurance
- MetLife Worksite Critical Illness Insurance
- MetLife Hospital Indemnity Insurance
- Guardian Group Dental PPO Buy-Up (High) Insurance
- Guardian Group Dental PPO Base (Low) Insurance
- Lincoln National Life Insurance Company Group Short-Term Disability Insurance (Class 1 – All others)
- Lincoln National Life Insurance Company Group Long-Term Disability Insurance (Class 2 – Managers)
- Lincoln National Life Insurance Company Employee Assistance Program
- HSA Banking Health Savings Account
- Stop Loss Plan ISL $125K ASL 125%

**Schedule 2.3(b)**
**Assumed Trade Payables**

| POC # | Trade AP Counterparty | Assumed Amount |
|---|---|---|
| 42 | Composites One LLC | $453,419.74 |
| 19 | Rudolph Brothers | $349,220.55 |
| 85 | Axiom Materials | $252,806.69 |
| 58 | Albany Engineered Composites | $246,304.80 |
| 103 | Airtech International, Inc. | $191,491.17 |
| 54 | R.S. Hughes | $179,621.40 |
| 102 | Valence Surface Technology | $175,069.94 |
|  | Rhinestahl CTS | $162,183.56 |
| 20 | Prospect Mold | $127,872.50 |
| 60 | Mainstream Waterjet | $102,079.01 |
| 108 | Acuren | $98,082.89 |
|  | GE Avio | $93,800.00 |
| 2 | Paragon D&E | $84,637.00 |
|  | Virtek Vision International ULC | $83,875.04 |
| 49 | 3M Company | $81,616.04 |
| 47 | General Dynamics Ordnance and Tactical Systems | $72,628.44 |
| 73 | Apex Engineering International, LLC | $60,342.21 |
| 40 | Industrial Mechanical Contractors, Inc. | $57,265.03 |
| 12 | Yoshi Hashimoto | $56,983.99 |
| 53 | IMITEC, INC. | $50,211.00 |
|  | Bodycote Surface Technologies | $48,198.50 |
|  | Bowden Manufacturing Corporation | $47,774.59 |
|  | Cytec - Winona | $43,823.17 |
|  | Henkel Corporation | $42,700.00 |
| 45 | Computer Xpress | $42,436.49 |
| 106 | Boeing Distribution Services Inc. | $42,314.20 |
|  | Aviall | $41,937.94 |
|  | Saint-Gobain Performance Plastics Corporation | $40,126.46 |
|  | Spincraft - WI | $34,999.97 |
| 6 | CPP - Syracuse, Inc. | $33,153.07 |
|  | GIS Benefits | $32,091.02 |
| 51 | Plex Systems, Inc | $30,198.71 |
|  | Numet Machining Techniques | $28,035.00 |
| 56 | C.H. Robinson Company, Inc | $26,852.58 |
|  | GE Engine Services Distribution | $26,497.89 |
|  | Park Aerospace Corp. | $26,429.89 |
| 84 | OTC Industrial Technologies | $24,711.99 |
| 10 | Tens Machine Company, Inc. | $24,395.00 |

|    | Andrews Laser Works Corporation | $23,405.03 |
|----|----------------------------------|------------|
|    | Adept Fasteners, Inc. | $22,709.23 |
| 1  | Starn Tool & Manufacturing Co | $19,708.36 |
| 7  | Pako, Inc. | $17,046.55 |
| 89 | Cincinnati Testing Laboratories, Inc. | $16,884.79 |
|    | FedEx | $16,784.11 |
|    | GeoCorp, Inc. | $16,157.49 |
| 80 | Adaptive Corporation | $15,969.49 |
|    | Environmental Enterprises Inc. | $15,858.84 |
|    | SBR Administrative Services, LLC | $15,739.16 |
|    | Ben McNary | $7,971.39 |
|    | Diversified Industrial Products | $7,790.80 |
|    | TS Machining | $6,930.88 |
| 91 | Eagle Registrations Inc | $5,577.18 |
|    | Bob Brink | $4,737.27 |
|    | Euro-Composites Corp. | $3,658.20 |
|    | Team Industrial Services, Inc. | $3,547.25 |
| 63 | Texas Almet, Inc. | $1,942.26 |
|    | Scott Crislip | $1,619.28 |
| 50 | Wells Fargo Equipment Services | $1,460.80 |
|    | Limble Solutions, Inc. | $607.22 |
|    | TigHitco LatinoAmerica | $195.15 |
|    | Krayden Inc. | $151.44 |
|    | PPG Aerospace Inc. | $104.62 |
| 48 | WEX Bank | $34.95 |
|    | John Irwin | $21.35 |
|    | **Total Assumed Trade Payables** | **$3,842,800.54** |

**Schedule 2.5(a)**
**Assumed Contracts**

| POC # | Trade AP Counterparty | Seller Estimated Cure Costs |
|---|---|---|
| | Paradigm Precision | $689,993.65 |
| 94 | Matheson Tri-Gas, Inc. | $88,538.12 |
| | Frisa Aerospace | $30,155.00 |
| | | |
| | Anthem Blue Cross | $51,341.43 |
| | EQT Exeter | $98,820.00 |
| | Mark Enterprises, LLC | $6,769.79 |
| | Prudential Realty Company | $59,504.00 |
| 44 | Toyota Industries Commercial Finance, Inc | $6,812.60 |
| | Applied Composites | $0.00 |
| | GE Avio | $0.00 |
| 99 | Yulista Integrated Solutions, LLC | $0.00 |
| | Northrop Grumman | $0.00 |
| | **Total Assumed Contract Cures** | **$1,056,300.62** |

**EXHIBIT A**

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

[*Attached*]

*Execution Version*

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into as of [●], 202[_], by and among CTL-Aerospace, Inc., a Ohio corporation (the "Assignor") and DK CTL Aerospace Opco LLC , a Delaware limited liability company (the "Assignee") (each of the Assignor and the Assignee, a "Party" and collectively, the "Parties").

WHEREAS, this Agreement is made and entered into in connection with the closing of the transactions contemplated by that certain Asset Purchase Agreement, dated as of December 22, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Purchase Agreement"), by and among the Assignor and the Assignee;

WHEREAS, pursuant to the Purchase Agreement, the Assignor has agreed to assign the Assumed Contracts to the Assignee, and the Assignee has agreed to assume certain obligations of the Assignor thereunder;

WHEREAS, the execution and delivery of this Agreement is required by Sections 4.2(a) and 4.3(a) of the Purchase Agreement; and

WHEREAS, this Agreement, as duly executed by the Assignor and the Assignee, is being delivered as of the date hereof by each Party to each other Party hereto effective as of the Closing Date.

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Assignee and the Assignor do hereby agree as follows:

1.    Definitions.  Capitalized terms used but not defined herein shall have the respective meanings given to such terms in the Purchase Agreement.

2.    Assignment and Assumption.  Subject to the terms and conditions of the Purchase Agreement, the Assignor does hereby sell, transfer, assign, convey and deliver to the Assignee, and the Assignee does hereby take assignment of, all of the Assignor's direct or indirect right, title, and interest in, to and under any and all Assumed Contracts to which such Assignor is party and required to be assigned pursuant to Section 2.5(a)(iv) of the Purchase Agreement, subject to Section 2.5(c) of the Purchase Agreement.  Subject to the terms and conditions of the Purchase Agreement, the Assignee hereby unconditionally and irrevocably assumes, and hereby agrees to discharge and perform when due, all of the Assumed Liabilities arising under, required to be performed under or related to the Assumed Contracts (in each case, solely to the extent expressly provided for in Section 2.3 of the Purchase Agreement and subject in all respects to the terms of the Purchase Agreement).

3.    Excluded Assets.  Notwithstanding anything to the contrary in this Agreement or in the Purchase Agreement, the Assignor shall not sell, transfer, assign, convey or deliver to the Assignee, and the Assignee shall not take assignment of, any contract or any other form of agreement included in the Excluded Assets or any obligation thereunder.

4.      <u>Excluded Liabilities</u>.  Notwithstanding anything to the contrary in this Agreement or in the Purchase Agreement, the Assignee shall not assume or otherwise be liable in respect of any of the Excluded Liabilities.

5.      <u>Further Assurances</u>.  During the Cooperation Period, at Assignee's cost, from time to time hereafter, and without further consideration therefor, the Assignor and its successors and permitted assigns covenants and agrees that the Assignor and its successors and permitted assigns shall execute and deliver such further instruments and certificates as shall be necessary or desirable to vest, perfect or confirm ownership (of record or otherwise) in the Assignee, the Assignor's right, title or interest in, to or under any or all of the Assumed Contracts, as set forth in the Purchase Agreement and effectuate the purposes and intent of this Agreement or for aiding, assisting, collecting and reducing to possession any of the Assumed Contracts and exercising rights with respect thereto. Each of the Parties, if after the Closing Date, during the Cooperation Period, at Assignee's cost, shall take, or cause to be taken, all actions, do or cause to be done all things as may be reasonably requested by the other Parties in order to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in the Assignee or otherwise to carry out this Agreement, and shall execute and deliver all deeds, bills of sale, instruments of conveyance, powers of attorney, assignments, assumptions and assurances, and as may be required to consummate the transactions contemplated by this Agreement.

6.      <u>Terms of the Purchase Agreement</u>.  This Agreement is executed and delivered pursuant to the Purchase Agreement.  In the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of the Purchase Agreement, the terms and conditions of the Purchase Agreement shall govern, supersede and prevail.  Notwithstanding anything to the contrary in this Agreement, nothing herein is intended to, nor shall it, extend, amplify or otherwise alter any representation, warranty, covenant or obligation contained in the Purchase Agreement.

7.      <u>Incorporation by Reference</u>.  <u>Article 12</u> of the Purchase Agreement are hereby incorporated by reference, *mutatis mutandis*.

8.      <u>No Reliance</u>.  Each Party represents and warrants that in entering into this Agreement it is relying on its own judgment, belief and knowledge and, as applicable, on that of any attorney it has retained to represent it in this matter.  In entering into this Agreement, no Party is relying on any representation or statement made by any other Party or any person representing such other Party.

9.      <u>Construction</u>.  This Agreement has been drafted through a cooperative effort of both Parties, and neither Party shall be considered the drafter of this Agreement so as to give rise to any presumption of convention regarding construction of this document.  All terms of this Agreement were negotiated in good faith and at arm's-length, and this Agreement was prepared and executed without fraud, duress, undue influence, or coercion of any kind exerted by any of the Parties upon the other.  The execution and delivery of this Agreement is the free and voluntary act of the Parties.

10.     <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original of this Agreement and all of which, when taken together, shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by telecopier, facsimile or email attachment that contains a portable document format (.pdf) file of an executed signature shall be effective as delivery of a manually executed counterpart of this Agreement.

*[The remainder of this page is intentionally left blank.]*

2

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed as of the date first set forth above.

ASSIGNEE:

DK CTL AEROSPACE OPCO LLC

By: _____
Name:
Title:

ASSIGNOR:

CTL-AEROSPACE, INC.

By: _____
Name:
Title:

*[Signature Page to Assignment and Assumption Agreement]*